## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LTAP US, LLLP,[1] | Case No. 10-_____ (___) |
| Debtor. | |

## DECLARATION OF DIETMAR HOFMARCHER
## IN SUPPORT OF FIRST DAY MOTIONS

I, Dietmar Hofmarcher, declare as follows:

1.     I am the manager (the "Manager") of LT Partner, LLC, which is the general partner (the "General Partner") of LTAP US, LLLP (the "Debtor" or the "Company"). The Debtor is a debtor in possession in the above-captioned chapter 11 case. I am duly authorized to submit this Declaration on behalf of the Debtor.

2.     I have served as the Manager of the General Partner of the Debtor since July 21, 2009. With the assistance of the other individuals assigned to the Debtor's operations, I am involved on a day-to-day basis with all aspects of the Debtor's reorganizational affairs, including business operations, strategic planning, financial reporting, and other management activities. , including the Debtor's efforts to address its current financial difficulties.

3.     As a consequence of my position, I have reviewed and worked extensively with the books and records of the Debtor, including its business plans, financial statements and projections, business analyses and reports, contracts and other legal documents, notes, correspondence, and other business records. I have instructed Alphabridge to negotiate with lenders and other potential investors regarding the restructuring of the Company's debt or the

---

[1] The Debtor's Tax I.D. No. is xx-xxx4021. The address for LTAP US, LLLP is Five Concourse Parkway, Suite 3100, Atlanta, Georgia 30328.

potential sale of assets and have been kept regularly apprised of the progress of these negotiations.

4.     Based upon all of the foregoing, I have developed a familiarity with the Debtor's books and records and the Debtor's business and financial history, and its current business and financial situation.

5.     I submit this Declaration in support of the "first day" motions and applications (collectively, the "First Day Motions") filed with the United States Bankruptcy Court for the District of Delaware (the "Court") in the Debtor's Chapter 11 case. I am familiar with the contents of each of the First Day Motions (including the exhibits thereto) and I believe each of the First Day Motions is (a) necessary to enable the Debtor to enter and operate in Chapter 11 with minimum disruption and diminution of assets or value and (b) is in the best interests of the Debtor's estate, creditors and stakeholders.

6.     Part I of this Declaration provides the Debtor's background, capital structure and a summary of the events leading to the bankruptcy case and Part II provides the relevant facts supporting the Debtor's First Day Motions.

## Part I

## BACKGROUND

7.     On the date hereof (the "Petition Date"), LTAP US, LLLP (the "Debtor" or the "Company") filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101, *et seq.* (as amended or modified, the "Bankruptcy Code") in the United States District Court for the District of Delaware (the "Court").

8.     The Debtor is operating its businesses and managing its property as a debtor in possession pursuant to Bankruptcy Code sections 1107 and 1108. No trustee, examiner or committee has been appointed.

**The Debtor's Business and Corporate Structure**

9.     The Company, headquartered at 5 Concourse Parkway, Suite 3100, Atlanta, Georgia, is a Delaware limited liability limited partnership that invests in, manages, and arranges for the servicing of life insurance policies. The Company, through its predecessors and affiliates, has been operating since 2003. The Company is managed by its general partner, LT Partner, LLC. ("LT Partner"), and has eight (8) limited partners: Life Trust Two GmbH & Co. KG, Life Trust Sechs GmbH & Co. KG, Life Trust Premium Acht GmbH & Co. KG, Life Trust Premium Zehn GmbH & Co. KG, Life Trust Elf GmbH & Co. KG, Life Trust Sieben GmbH & Co KG, Life Trust Premium Zwolf GmbH & Co KG, and Life Trust Vierzehn GmbH & Co KG that, together with LT Partner, hold all of the Company's 180,612 limited partnership units. LT Partner is wholly owned by Berlin Atlantic Holding GmbH & Co KG (BHO) ("Berlin Atlantic Holding") and uses Alphabridge Capital GmbH ("Alphabridge") for certain fund management advising services. Berlin Atlantic Capital US ("BACH") and SLG Life Settlements LLC ("SLG") also provide support to the Company's operations.[2]

10.     The Debtor was formed and exists to own and acquire previously issued life insurance polices (individually, a "Policy," or collectively, the "Policies") in the life settlement market. The life settlement market provides policyholders who desire to sell their Policies with an alternative to surrendering their policies to the issuing insurance company or letting the Policy lapse. Typically, in a life insurance settlement policy transaction, a life insurance contract is

---

[2] Neither the Company nor LT Partner has any direct employees. Both operate using the services of SLG and BACH on a shared basis, in exchange for origination, servicing and management fees.

purchased by an investor at a discount to the face value, but at a higher price than the surrender value of the policy (*i.e.*, the price at which the life insurance company that issued the policy would pay to the policy owner upon termination).

11. The Company uses an active management approach and continually monitors the market for purchase and sale opportunities. The Company derives profits from Policy maturities (*i.e.*, realizing a death benefit) or sales of individual Policies or Policy portfolios, either directly or through structured products. Due to current market conditions, the Company has been unsuccessful in selling Policies or portfolios of Policies at prices sufficient to yield a trading profit. In addition, due to constraints on liquidity imposed by its secured lender, the Company recently has been unable to purchase additional Policies.

12. In the course of operations, the Company purchases the Policies from Policy owners at prices expected to yield a profit upon the payment of death benefits to the Company. The Policies, which are the primary assets of the Company, insure individuals over sixty (60) years of age. The Debtor currently holds four hundred and ten (410) policies on three hundred and thirteen (313) lives, with the aggregate death benefits of approximately $1.36 billion. The Policies were issued by fifty-three (53) different insurance carriers, approximately 70% of which are rated AA or better. The Company has no other significant operations or assets.

13. The Debtor, through SLG, must maintain the Policies by paying premiums (the "Premiums") as and when they come due, which typically on a monthly, quarterly or annual basis. Due to liquidity restraints, the Company currently pays the Premiums on a monthly basis. As such, the Debtor must fund Premiums when they come due (subject to applicable grace periods); the failure to pay Premiums as and when due results in the issuance of a warning, and ultimately, the lapse of the Policy and the irrevocable loss of the investment and asset.

Accordingly, although the Policies themselves are valuable assets, without continued and required maintenance such assets will evaporate. Specifically, absent payment of the Premiums, the Debtor estimates that all of the Policies will lapse by March/April 2011.

14.     The Debtor's unaudited balance sheet and profit and loss statements reflect the following:

| Balance Sheet as of September 30, 2010 | | |
|---|---|---:|
| **Assets** | | |
| Current Assets | | **$7,189,756.35** |
| | Bank Account | $7,111,001.96 |
| | Accounts Receivable Affiliated Company | $78,754.39 |
| | Prepared Expenses | $0.00 |
| Fixed Assets | | **$351,591,674.13** |
| | Financial Assets Policies | $371,429,363.81 |
| | Financial Assets SWAP | ($19,838,689.68) |
| | Outstanding Capital | $1,000.00 |
| **Total Assets** | | **$358,781,430.48** |

| Liabilities and Stockholders Equity | | | | |
|---|---|---|---|---:|
| Liabilities | | | | **$231,007,391.40** |
| | Accrued Expenses | | | $395,290.59 |
| | Accounts Payable Trade | | | $4,614,997.42 |
| | Accounts Payable Intercompany | | | $997,103.39 |
| | Other Liabilities | | | $225,000,000.00 |
| Stockholders Equity | | | | **$127,774,039.08** |
| | Capital | | | **$177,945,617.75** |
| | Loss Carried Forward | | | ($18,928,742.09) |
| | Retained Earnings | | | ($31,242,836.58) |
| **Total Liabilities and Stockholder Equity** | | | | **$358,781,430.48** |

{860.001-W0012033.}

| PROFIT AND LOSS STATEMENT AS OF SEPTEMBER 30, 2010 | |
|---|---|
| Revenues/Gains on Assets | $11,382,416.95 |
| Asset Retirement | ($4,219,094.35) |
| Loss on Assets Expense | $0.00 |
| Asset Servicing | $567,155.67 |
| Payroll + Outside Help | $2,165,123.17 |
| Liability Fee | $0.00 |
| Office Expense | $55,052.29 |
| Escrow and Trustee Fee | $8,434.00 |
| Consulting Fee | $724,354.23 |
| Legal and Tax Expenses | $250.00 |
| Tax Advice and Auditing | $26,800.00 |
| Expenses from SWAP (not realized) | $23,064,056.24 |
| Bank Fees | $67.75 |
| FX Differences (Loss (+)/Profit (-)) | ($37,850.11) |
| Expenses Other Periods | $15,239.70 |
| Depreciation | $254,991.00 |
| Interest Income (+)/Expenses 9-) | ($11,562,485.24) |
| **Profit (Loss) After Tax** | **($31,242,836.58)** |

## SLG Servicing Agreement

15.     Pursuant to the Wells Fargo Agreement (defined below), SLG[3] was appointed as the servicer of the Policies. SLG acquires and services the Policies at the direction of the Company and LT Partner, and all final decisions on acquisition, sale and maintenance of the policies are made by LT Partner. SLG also provides management, administrative and operational services to the Debtor, maintaining corporate records, including the name, address, and phone numbers of the insureds under the policy and assisting in the preparation of financial statements. SLG's services also include, but are not limited to: the daily management of communications with third parties, including the insureds and the insurance companies regarding the maintenance and servicing of the Policies; banking and related services regarding the amounts due and received under the Policies, such as the payment of outstanding premiums;

---

[3] SLG is wholly-owned by BACH, which is wholly-owned by Berlin Atlantic Holding.

providing information to the Agent (defined below) as required under the Wells Fargo Facility; and analysis and advice regarding additional acquisitions of Policies.

**The Company's Debt Structure**

16.    **Secured Debt.**  The Debtor is a borrower under that certain Loan and Security Agreement, dated as of June 30, 2008 (as amended, supplemented or otherwise modified from time to time, the "Wells Fargo Agreement"),[4] among the Debtor, as borrower, SLG, as servicer ("Servicer"), LT Partner, as collateral manager ("Collateral Manager"), Wells Fargo Bank, N.A. and other lenders identified in the Wells Fargo Agreement (the "Prepetition Lenders"), Wells Fargo Securities, LLC, as administrative agent (the "Agent"), Wells Fargo Bank, N.A, as the securities intermediary and the verification agent ("Securities Intermediary"),  Wells Fargo Bank, N.A., as hedge counterparty (the "Hedge Counterparty") and Berlin Atlantic Capital US, LLC and BAC Asset management Gmbh, as performance guarantors (the "Performance Guarantors").

17.    The Wells Fargo Agreement provides for a secured variable loan pursuant to which the Debtor issued to the Prepetition Lenders a variable funding note ("VFN") in the principal amount of up to $224,000,000 as set forth in Section 2.1(a) of the Wells Fargo Agreement.  The Agent has alleged that the total amount of outstanding obligations under the Wells Fargo Agreement is approximately $222.5 million, exclusive of accrued and accruing interest, fees, costs and expenses.

---

[4] All capitalized terms not herein defined shall have the same meaning as ascribed to them in the Wells Fargo Agreement.  The Debtor and its professionals are in the process of reviewing the relevant loan documents and nothing herein shall constitute an admission or agreement with respect to any aspect of the financing transaction, the amount, validity, or priority of any debt asserted by the Prepetition Lenders, or the Prepetition Lenders' asserted interests in or relative rights with respect to the Collateral.

18.     Under the Wells Fargo Agreement, the Agent, on behalf of the Prepetition Lenders, asserts a valid, perfected, security interest in and lien on the Debtor's Collateral, which includes the Policies, all Accounts, all right, title and interest of the Borrower (but not the obligations) under the Transaction Documents, the Hedge Collateral, the Pledged Interests, the Newco Transfer Documents, and other related assets.[5]    Pursuant to the terms of the Wells Fargo Agreement, the Securities Account Control and Custody Agreement (the "Account Control Agreement") and other related documents, the Securities Intermediary holds the Policies as custodian.

19.     The history of the Wells Fargo Agreement is set forth in further detail below.

20.     **Unsecured Debt.**  As of the Petition Date, the Company has approximately $7.6 million in unsecured debt consisting primarily of accrued expenses and trade payables.

21.     **Equity.**  As set forth above, the Debtor's general partner and eight limited partners hold all of the limited partnership units in the Debtor.

**The History of the Wells Fargo Agreement**

22.     The Wells Fargo Agreement originally was entered into with Wachovia Capital Markets, LLC ("Wachovia"), as the administrative agent for the Prepetition Lenders (the "Original Loan").  The Original Loan amount was $500 million and was executed with the parties' intention that the loan be used to ramp up the Debtor's sizeable and diverse life settlement portfolio over a three (3) year period.  The purpose of the Original Loan was to create

---

[5] The Debtor and its professionals are still reviewing the loan documents and have not yet determined the validity and extent of Wells Fargo's liens.  Nothing herein shall constitute an agreement as to the validity and extent of the Wells Fargo liens and security interests in the Collateral or the relative rights in and to the Collateral.

{860.001-W0012033.}

a well underwritten life settlement portfolio that would be suited to facilitate structured product and capital transactions. It was not intended to be a long-term loan.[6]

23. At the creation of the Original Loan, Wachovia deemed certain life settlement policies that were originated under several premium finance loan programs to as ineligible assets with no borrowing base or collateral value to the Company (the "Ineligible Assets"), but required them to be pledged as collateral to secure the loan on the belief that after additional due diligence, they would become eligible assets. The Company also believed that after additional due diligence, all of the Ineligible Assets would be converted to eligible assets. The underlying rational of converting Ineligible Assets to eligible assets (with full collateral value) was to expedite the ramp up period of the portfolio, and make efficient use of the facility. However, neither Wachovia nor the Agent recognized the Ineligible Assets as having collateral value to support the complete use of the facility, notwithstanding that no insurer has ever indicated that the Policies constituting the Ineligible Assets are anything other than *bona fide* insurance policies. Although the Company has worked tirelessly and repeatedly to convince the Agent to treat the Ineligible Assets as having collateral value, the Agent has staunchly refused to do so, to the detriment of the Debtor.

24. The June 2009 Renewal. On June 2, 2009, prior to the first anniversary date and first renewal of the facility, the Company made a presentation to the Agent regarding existing development and opportunities. Although the Agent's reaction appeared to be positive, when it approved the initial renewal of the facility it *reduced* the amount of the facility to $225 million and *increased* the interest rate from 275 bps to 475 bps and *increased* the commitment fee from

---

[6] In addition, Wells Fargo Bank, N.A. was the securities intermediary and verification agent under the Original Loan, recognizing the parties' intent that the Policies be held by a neutral third-party custodian. Due to Wells Fargo's acquisition of Wachovia, Wells Fargo now serves as both agent for the Prepetition Lenders and custodian of the Collateral.

25 bps to 75 bps. Although the size of the loan was cut in half, the Agent did not decrease its initial structure fee of 1.25%. The renewal extended the facility to the end of June 2010.

25. <u>The Failed Note Offering.</u> The June 2009 reduction of the facility amount and increased interest and fees severely curtailed the Company's ability to purchase additional Policies and expand its portfolio. Accordingly, the Company again requested that the Agent include some value of the Ineligible Assets for purposes of collateral coverage, providing the Agent with detailed documentation in support of this request. Again, the Agent refused. At this point, with the reduction of the loan amount, increased costs and the failure to recognize the Ineligible Assets as having collateral value, it became clear that the Agent was not willing to assist in achieving the intended goal of the facility - to purchase Policies and create a well underwritten life settlement portfolio suited to facilitate structured product and capital market transactions, to the determinant of itself and the Company.

26. Following the 2009 renewal, the Agent suggested that it would prefer to refinance the facility off-balance and long-term. After detailed and extensive discussions, including the retention by the Company of Ernst & Young to conduct a market stress test, the parties began a note structuring process, with the full support of the Company and the back up of all of its resources in related entities. In March 2010, Wells Fargo unexpectedly retracted its support of the note placement alleging that its sale unit was unsuccessful in generating interest.

27. The Company's efforts to market the note, however, showed a positive market response in both the United Sates and Europe. The Company offered to market an initial round and collaborate with the Agent as a structuring agent or book runner. Although this proposal was rejected by the Agent, the Company nonetheless continued its ongoing equity raising efforts and sought out financing alternatives. These efforts included, and continue to include, pursuing

{860.001-W0012033.}

the following capital sources: (i) new institutional equity; (ii) liquidity for ineligible assets by North Channel Bank ("NCB"), (iii) alternative debt by third-party lenders, (iv) additional liquidity line for Ineligible Assets by the Agent; (v) additional liquidity line for eligible assets by the Agent, and (vi) Policy sales to third-party market participants. The Company retained the predecessor to Alphabridge to assist in its restructuring and refinancing options.

28. <u>The 2010 Renewal</u>. Prior to the termination date, the Company, backed by Berlin Atlantic Holdings, offered unlimited support and resources to fully explore the terms of a renewal or extension of the facility. The Company provided the Agent with regular updates as to the Company's equity and debt raising activities and responsible parties repeatedly offered to travel to the United States to discuss with the Agent and Prepetition Lenders in person the future of the Company. Unfortunately, all such offers were declined by the Agent.

29. With Alphabridge's assistance, the Company continued to explore alternatives for maximizing the value of the Ineligible Assets. It advised the Agent that it had entered into a term sheet with NCB regarding a three year revolving facility to cover premiums and expenses for the Ineligible Assets. It also advised that it may have a new institutional equity investor who might be will to invest if the Ineligible Assets could be used as an equity base. The Company also proposed terms for a further amendment. Although the Company proposed several alternatives that it believed would maximize the value of its assets, all alternatives and options were rejected by the Agent.

30. Ultimately, the Company was able to negotiate a further extension in connection with a transaction with NCB (the "NCB Transaction"). Generally, pursuant to the NCB Transaction, the Company transferred certain Ineligible Assets and certain eligible assets (the "NCB Collateral") to newly formed wholly-owned subsidiaries Atlantic Capital Funding 2, LLC,

Atlantic Capital Funding 3, LLC, Atlantic Capital Funding 4, LLC and Atlantic Capital Funding 5, LLC (collectively, the "Pledgors"). To finance the acquisition and maintenance of the NCB Collateral, Life Trust Sechs GmbH & Co KG, Life Trust Sieben GmbH & Co KG, Life Trust Elf GmbH & Co KG and life Trust Two GmbH & Co KG (collectively, the "NCB Borrowers") entered into a loan agreement (collectively, the "NCB Loan Agreements") with NCB. The NCB Borrowers loaned the proceeds of the NCB Loan Agreements to the Pledgors (collectively, the "Subsidiary Loan Agreements") to effectuate the acquisition of the NCB Collateral. In connection with the NCB Transaction, the parties entered into several agreements, including an Intercreditor and Security Agreement (the "Intercreditor Agreement"), dated November 12, 2010, wherein the Agent agreed to subordinate its liens in the NCB Collateral, subject to certain rights and restrictions.

31.    In addition, on or about November 12, 2010, the Debtor, the Servicer, the Collateral Manager, the Agent, the Hedge Counterparty, the Securities Intermediary and Performance Guarantors entered into the Omnibus Amendment to the Wells Fargo Agreement. Pursuant to the Omnibus Amendment, the Wells Fargo Agreement was modified in several material respects, including the inclusion of the Intercreditor Agreement and a performance guaranty with the Performance Guarantors. The Debtor, the Servicer, the Collateral manager and the Performance Guarantors also were required to release the Prepetition Lenders, the Agent, the Hedge Counterparty, the Securities Intermediary and all of their related and future related entities and employees, agents and officers and directors for any and all claims they may have related to any of the transaction documents or anything related to the parties' relationship prior to the Omnibus Amendment.

{860.001-W0012033.}

32.     The Omnibus Amendment contained several milestones, including, but not limited to the closing of the NCB Transaction. Specifically, the December NewCo Sale[7] (the 2nd tranche of the NCB Transaction) had to occur no later than December 17, 2010.

33.     As originally contemplated, the NCB Transaction provided for NCB and the Company to agree on a specific list of Policies that comprised both eligible and Ineligible Assets, which would be used as the basis for the 2nd tranche of the transaction. Due diligence resulted in NCB's determination not to finance certain Policies at all and to finance some at a reduced price only. NCB was willing to close on the sale of approximately twenty-five (25) originally listed Policies for $3.2 million. NCB also indicated its willingness to purchase additional Policies constituting eligible assets in order to obtain the original purchase price of $18.9 million. The Agent rejected this proposal and advised that it would not accept any sales that were not equal to the full purchase price of the Collateral. The Company requested that that it be permitted to close the 2nd tranche of NCB Transaction for $3.2 million and requested a further thirty (30) day extension in order to pursue alternatives. The Agent denied this request.

34.     On December 16, 2010, the Agent and Wells Fargo Bank, N.A., as a Prepetition Lender and a Hedge Counterparty ("Wells Fargo") issued a letter to the Debtor (the "December 16th Letter") stating that pursuant to Section 2.6(a) of the Wells Fargo Agreement, the Debtor would be required to pay all outstanding Advances and other obligations by December 17, 2010 and failure to do so would be a Termination Event under the Wells Fargo Agreement and the

---

[7] The "December NewCo Sale" is defined as "After the Omnibus Amendment Effective Date and on or prior to December 17, 2010, the sales of Eligible Assets approved by the Administrative Agent and Ineligible Assets by the Borrower to NewCos provided that (i) the Borrower shall have received (A) an aggregate cash purchase price of at least $18,900,000 in immediately available funds, which cash purchase price shall have been applied to reduce the Advances Outstanding, and (B) an aggregate deferred purchase price, evidenced by Deferred Purchase Notes issued in connection with such sales, of at least $15,634,222.45 and (ii) in addition to the amounts specified in (i), the Borrower shall have been reimbursed in cash for all Premiums paid in respect of such Eligible Assets and Ineligible Assets after September 30, 2010, and the proceeds of such reimbursement shall have been applied to the Advances outstanding.

Wells Hedging Agreement. Wells Fargo further advised that the Advances Outstanding would start accruing interest at the Default Rate on December 17th. Although Wells Fargo did not demand the turnover of any Collateral under the Wells Fargo Agreement or take any other action regarding the Collateral at that time, Wells Fargo did, however, agree to make certain additional Advances under the Wells Fargo Agreement to satisfy certain outstanding premiums of certain Policies.

35.     Because the December NewCo Sale did not occur prior to December 17, 2010, Wells Fargo Agreement terminated on December 17, 2010.

**Outstanding Balance to Prepetition Lender and the Estimated Value of the Collateral**

36.     The Agent, on behalf of the Prepetition Lenders have asserted that they are owed, as of the Petition Date, $222.5 million, secured by substantially all of the Debtor's assets.

37.     Pursuant to the Wells Fargo Agreement, Towers Watson Risk Consulting, Inc. ("Towers Watson") provides a monthly report on the value of the Collateral. According to the Life Settlement Collateral Value Calculation (the "Valuation Report") dated December 13, 2010, as of November 30, 2010, the "portfolio value" of the Policies is $311,473,957, well in excess of the outstanding obligations under the Wells Fargo Agreement.

**Events Leading to Filing for Chapter 11 Protection**

38.     The Debtor entered into the Wells Fargo Agreement in 2008 to allow the Company to continue to buy Policies, pay Premiums and ongoing expenses, and expand its portfolio. The Company expected that the loan would be paid off from a securitization of the Policies as the Company expanded, and as a consequence, the Wells Fargo Agreement was not intended to be a long term self-liquidating facility. In addition, the Company has seen less

frequent Policy maturities than were originally projected and its portfolio has failed to yield forecasted returns.

39.     The Company has been working actively to implement a strategy for maximizing value and preserving the Company as a going concern.  Since 2009, the Company has reached out to hundreds of investors to explore efforts to restructure or sell its assets.  As set forth above, it became clear to the Company in 2009, that its purpose and goals for entering into the Wells Fargo Agreement would not be achieved because the Agent would not accept any of the Company's proposals regarding alternatives necessary to grow its platform for the benefit of all parties.

40.     In addition to its marketing and refinancing efforts, the Company has continued to explore strategic alternatives, including seeking out new sources of debt or equity capital or the sale of substantially all of the Company's assets.  Specifically, the Company has canvassed the marketplace in an effort to locate potential financial or strategic partners.  To date, the Company has received no firm commitments regarding a financing or a sale but has received several positive inquiries regarding potential transactions, which the Company hopes will be brought to fruition in the near term.  The Company is also continuing to explore a transaction with NCB.  In addition, the Company has received a letter of intent to buy out the Prepetition Lenders at less than par (a transaction that has been repeatedly rejected by the Prepetition Lenders).

41.     The Debtor believes that there is significant value in the Policies and has filed for Chapter 11 in order to preserve such value for its stakeholders.

{860.001-W0012033.}

## PART II

## FIRST DAY MOTIONS AND APPLICATIONS

I.  **Motion of Debtor and Debtor in Possession for an Order (A) Authorizing Debtor to Maintain Existing Cash Management System, Bank Accounts and Business Forms; (B) Granting an Interim Waiver of the Requirements Contained in Bankruptcy Code Section 345(b); and (C) Providing for Other Related Relief**

42.     The Debtor currently manages its finances through the maintenance of a centralized cash management system (the "Cash Management System"). Specifically, the Debtor maintains five (5) accounts at Wells Fargo Bank, N.A. ("Wells Fargo"), which include the collection account, custody account, premium account, fund account, and borrower account (collectively, the "Bank Accounts"). The Bank Accounts are maintained in accordance with an account control and custodian agreement (the "Account Control and Custodian Agreement"), the execution of which was a requirement under the Wells Fargo Agreement. The Bank Accounts are essential to the Debtor's ongoing business operations and the interruption of the Cash Management System would be detrimental to the Debtor's estate.

43.     I believe that the Bank Accounts and related Cash Management System mechanisms are well-suited to the Debtor's business needs and operations. To require the Debtor to close the Bank Accounts and reestablish new accounts would not result in greater administrative controls and would require considerable time and expense to the Debtor's estate. Moreover, permitting the Debtor to continue using its existing Bank Accounts is essential to a smooth and orderly transition of the Debtor into chapter 11 and to avoid disruption of its business and operations, including the devaluation of assets that could result if checks written to pay Premiums but not negotiated or cashed prior to the Petition Date were to bounce.

44.     Likewise, the commencement of this case will already place a strain on the Debtor's relationships with its creditors, partners, and lenders, all of which are vital to the

Debtor's continued operations and successful reorganization. Requiring the Debtor to open all new Bank Accounts and to dishonor and reissue checks and drafts would not only cause delay, confusion and disruption in the Debtor's operations, it would also jeopardize the Debtor's relationships with these vital parties and place the Debtor's assets at risk.

45.    Consequently, I believe that maintenance of the existing Bank Accounts and Cash Management System is in the best interests of all creditors, other parties in interest, and the Debtor's estate.

46.    The Debtor also requests authorization to continue to use all letterhead, purchase order forms, invoice forms and any other business forms, including checks, as existing immediately prior to the Petition Date, without reference to the Debtor's status as debtor in possession, subject to Local Rule 2015-2(a) with particular respect to the Debtor's checks.[8] Parties doing business with the Debtor undoubtedly will be aware of the Debtor's status as a chapter 11 debtor in possession. Changing correspondence and business forms would be unnecessary, expensive, burdensome, and disruptive to the Debtor's business operations. For these reasons, the Debtor requests that it be authorized to continue using existing business forms without being required to place the label "Debtor in Possession" on each form.

47.    The cost to the Debtor and its estate in obtaining new checks and other business forms would be significant and the Debtor has already taken other measures to ensure that the policies underlying the U.S. Trustee Guidelines are protected by generally alerting parties in interest to the Debtor's chapter 11 filing. Accordingly, I believe that the requested relief is necessary to preserve the Debtor's estate.

---

[8] Once the Debtor has exhausted its current supply of checks and business forms, it will reorder new checks and business forms with the appropriate "Debtor in Possession" designation.

48.     Additionally, the Debtor requests a limited waiver of the requirements of Bankruptcy Code Section 345(b) on an interim basis and permit the Debtor to maintain its deposits in the Bank Accounts in accordance with existing deposit practices until such time as it obtains this Court's approval to deviate from the guidelines imposed under Bankruptcy Code Section 345(b) on a permanent basis. I believe the Debtor's existing deposit practices are significantly less burdensome and more appropriately tailored to its business needs than the practices otherwise required under the Bankruptcy Code and by the U.S. Trustee Guidelines. At times, the individual balances in the Bank Accounts may exceed the current limits of governmental insurance; provided, however, that such excess amounts are typically utilized and withdrawn from the relevant Bank Account to pay outstanding obligations on the date of deposit. Therefore, these accounts may be subject to the bonding or collateralization requirements of Bankruptcy Code Section 345(b) and the U.S. Trustee's Guidelines unless those requirements are waived.

49.     I believe it would be in the best interests of the estates' creditors to continue following the existing deposit practices, notwithstanding the requirements of Bankruptcy Code Section 345(b) and the U.S. Trustee Guidelines. I further submit that the Debtor's deposit practices are commercially reasonable, appropriate and consistent with the intent of Bankruptcy Code Section 345.

50.     For these reasons, I believe that authorizing the Debtor to maintain the existing Cash Management System, Bank Accounts, and Business Forms; and granting an interim waiver of the requirements contained in Bankruptcy Code Section 345(b) is in the best interest of the Debtor, their estates and creditors.

## II.     Motion For an Order Authorizing the Debtor's Use of Cash Collateral

51.     The Court should authorize the Debtor's immediate access to and use of Cash Collateral, as set forth in the budget attached to the motion, in order to maintain the Debtor's enterprise value, permit the Debtor to continue to operate its business, and protect and preserve the value of the Collateral by paying Premiums on the Policies as they come due over. As explained in the motion, the Debtor does not have sufficient available sources of cash to carry on the operation of its businesses without the use of the Cash Collateral. The Debtor's continued payment of Premiums on the Policies as they come due is essential to the Debtor's enterprise value, the value of the Collateral, and to ensure the Debtor's continued viability and prospects for reorganization. Absent access to Cash Collateral as set forth in the Budget, the value of the Debtor's primary assets – the Policies – would evaporate as the Polices lapse. Accordingly, the use of Cash Collateral is required to avert serious and irreparable harm to the Debtor and its estate. I believe the preservation, maintenance and enhancement of the going concern value of the Debtor and preservation of the Policies is of the utmost significance and importance to a successful reorganization of the Debtor under chapter 11. AS such, I believe this motion should be granted.

## III.     Motion To Establish Procedures For Interim Compensation and Reimbursement of Expenses for Professionals

52.     Simultaneously with the filing of this Declaration, the Debtor filed an application to retain Landis Rath & Cobb LLP as their counsel.

53.     The Debtor anticipates that, as these cases progress, it may need to retain other professionals in connection with their reorganization efforts. In addition, a statutory committee of unsecured creditors (the "Committee") may be appointed in these cases. If appointed, the

Committee will likely retain counsel, and possibly other professionals, to assist it in fulfilling its obligations in these cases.

54.     The proposed compensation procedures outlined in the motion should enable professionals to be paid partial amounts owed to them while ensuring appropriate oversight, and otherwise not unduly burdening the Court, the United States Trustee and the respective Professionals. Accordingly, I submit that approving the compensation procedures is in the best interests of the Debtor's estates, creditors and other parties-in-interest.

## IV.     Application to Approve the Employment of Landis Rath and Cobb, LLP as Bankruptcy Counsel To the Debtor

55.     The Debtor seeks to employ and retain Landis Rath & Cobb LLP ("LRC") as their counsel in these cases. By the Application, the Debtor requests the Court to approve the employment and retention of LRC, *nunc pro tunc* to the Petition Date, pursuant to Bankruptcy Code Section 327(a) under a general retainer as their counsel to perform the legal services that will be necessary during the Debtor's chapter 11 case.

56.     LRC is familiar with the Debtor's business affairs and capital structure, and will be able to immediately assist the Debtor in its efforts in this case. Accordingly, LRC has the necessary background to deal effectively with many of the potential legal issues and problems that may arise in the context of this case. Thus, in order to maximize the value of the Debtor's estate and because of LRC's recognized expertise in bankruptcy law, the Debtor desires that LRC represent them in this case.

57.     I believe the Debtor's employment of LRC under a general retainer is appropriate and necessary to enable the Debtor to execute faithfully its duties as debtor and debtor in possession and to implement a successful reorganization.

58. For these reasons, I believe the employment and retention of LRC is necessary and in the best interests of the Debtor, its estate and creditors.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 21 day of December, 2010 at Atlanta , GA

Dietmar Hoffnagcher
Manager of LT Partner, LLC, the General
Partner of LTAP US, LLLP