## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| LTAP US, LLLP,[1] | Case No. 10-14125 (KG) |
| Debtor. | Hearing Date: January 6, 2011 at 3:00 p.m. (EST)<br>Objection Deadline: January 5, 2011 at 5:00 p.m. (EST) |

## MOTION OF WELLS FARGO SECURITIES, LLC AND
## WELLS FARGO BANK, N.A. FOR RELIEF FROM THE AUTOMATIC STAY

Wells Fargo Securities, LLC (the "Agent") and Wells Fargo Bank, N.A. (in its individual capacity, the "Lender" and, collectively with the Agent, "Wells Fargo"), by and through their undersigned attorneys, respectfully move the Court for entry of an order granting relief from the automatic stay pursuant to Sections 362(d)(1) and 362(d)(2) of the Bankruptcy Code in this Chapter 11 case of LTAP US, LLLP, the above-captioned debtor and debtor-in-possession (the "Debtor"). In support of this motion, Wells Fargo states as follows: [2]

### I.    PRELIMINARY STATEMENT

1.    The Debtor owes Wells Fargo at least $222,346,070.11 in principal plus accrued and unpaid interest thereon of at least $1,711,604.37 on account of loan advances, plus an estimated $7,400,000 in additional amounts owing under terminated interest rate swap agreements,[3] plus attorneys' fees and expenses (totaling at least $200,000) and other out-of-

---

[1]    The Debtor's Tax I.D. No. is xx-xxx4021. The address for LTAP US, LLLP is Five Concourse Parkway, Suite 3100, Atlanta, Georgia 30328.

[2]    Wells Fargo will file the affidavits required by Local Bankruptcy Rule 4001-1(c)(i) no later than December 29, 2010.

[3]    The amounts owed under the terminated interest rate swap agreements are not yet finalized and thus subject to change.

pocket expenses. That indebtedness is secured by senior and perfected liens and security interests in substantially all of the Debtor's assets consisting primarily of its ownership of 410 life insurance policies that insure the lives of 313 individuals under which the Debtor is the beneficiary (collectively, the "Policies").[4]

2.      By their very nature, the Policies (and thus, Wells Fargo's collateral) essentially will evaporate and thus, will be rendered valueless if premiums (the "Premiums") are not timely paid. In its Cash Collateral Motion,[5] the Debtor itself acknowledges both that approximately $6 million of Premiums are due on January 9, 2011 and that the Debtor, which asserts that it only has $160,000 in cash,[6] does not have the cash, whether consisting of Wells Fargo's collateral or otherwise, to pay such Premiums.[7] And this is not just a January 9, 2011 problem. Other Premiums will be due in each of the ensuing months, and the Debtor does not have, and cannot point to, any liquidity available or that will be available to it to pay those Premiums when due and thus, preserve the existence and value of the Policies. In fact, should relief from the automatic stay not be immediately granted to Wells Fargo, all the Policies may lapse by March or April, 2011. Accordingly, the value of Wells Fargo's interest in its collateral is subject to the

---

[4]     Capitalized terms used herein but not defined shall have the meaning given such term in the Loan and Security Agreement (as defined below).

[5]     The Motion for an Order Authorizing the Debtor's use of Cash Collateral (Dkt. No. 5) is herein referred to as the "Cash Collateral Motion".

[6]     Although the Debtor contends it has "cash on hand of approximately $160,000," (Cash Collateral Motion, ¶ 37), Wells Fargo's review of the Debtor's accounts held at Wells Fargo reveal that the Debtor has approximately $8,222.50 in cash in those accounts and Wells Fargo is not aware of any other cash accounts maintained by the Debtor.

[7]     The Debtor contends that it may realize a death benefit or obtain debtor in possession financing *before* it is required to pay the Premiums. Cash Collateral Motion at ¶ 51. However, the Debtor has not provided any reason to believe that the Debtor could actually obtain funding from either source on such a compressed timeline, let alone funding that would be acceptable to Wells Fargo and otherwise comply with Bankruptcy Code requirements. Certain Policies will lapse before the end of January. Even if a policy matured today, it would take at least 30 days to collect the death benefit. Furthermore, parties that invest in, or fund against, life settlement portfolios typically conduct due diligence over three months before funding.

imminent risk of destruction, let alone erosion, and "cause" exists under Section 362(d)(1) to grant Wells Fargo immediate relief from the automatic stay so that it can proceed to protect its interests in the collateral.

3.      Alternatively, "cause" exists under Section 362(d)(1) because the Debtor has no other ability to provide "adequate protection" of Wells Fargo's interest in the Policies.  The Debtor's assertion that there is a substantial "equity cushion" in the Policies is wrong.  Although the Policies may pay out up to $1.36 billion in aggregate benefits over time, this amount can only be realized by paying the Premiums accruing on such Policies, which could exceed several hundred millions of dollars in the aggregate and, at a minimum, requires tens of millions of dollars to be paid in regular installments over many years.  As Wells Fargo will show at the hearing on this Motion, the present fair market value of the Policies, even if the Debtor had the liquidity to pay the Premiums on time (which the Debtor does not have), is significantly less than the amount of Wells Fargo's indebtedness.

4.      The Debtor (perhaps unintentionally, but nonetheless unmistakably) itself effectively concedes as much when, in the Cash Collateral Motion, it references a recent third party offer to purchase the Wells Fargo indebtedness at "less than par."  Id.  In fact, the offer was for a nearly one-third discount off of Wells Fargo's indebtedness.  This offer and other indicia of market conditions underscore that Wells Fargo is significantly undersecured.[8]

5.      To the extent that the Debtor states that the valuation model referenced in the loan documents is intended to produce (and does produce) a fair market valuation for the Policies, the

---

[8]    The state of the present market is also indicated by the Debtor's attempted financing of "Ineligible Assets" (i.e. Policies that under the Wells Fargo loan agreement are subject to Wells Fargo's lien but not assigned value in the Wells Fargo funding formula) that was intended to generate $18.9 million in financing this month from a third party lender but resulted in the lender's offer to fund only $3.2 million after the lender, based on its due diligence, refused to finance 58 of the 83 Policies and reduced its proposed price for the remainder.  See Cash Collateral Motion at ¶ 34; see also id. at ¶ 5 ("Due to current market conditions, the Company has been unsuccessful in selling Policies or Portfolios of Policies at prices sufficient to yield a trading profit.").

Debtor presents a fundamentally inaccurate picture.  In the loan documents, the Debtor expressly acknowledges that the model and the "Outstanding Asset Value" figure it produced were "intended to be used *solely* in the administration of the Loan Agreement prior to the Facility Termination Date *and for no other purpose*."  <u>See</u> Annex C to the Loan and Security Agreement attached as <u>Exhibit A</u> hereto, at C-43 (emphasis added).[9]  Specifically, the Debtor's valuation model applies a discount rate to the valuation of the Policies that simply is not representative of the return that is being sought in the current life settlement market.  When this input is corrected, and even assuming the Debtor's valuation model otherwise represents a reliable indicator of fair market value, the Policies have a present fair market value of significantly less than the Wells Fargo indebtedness they secure, let alone the $311 million value claimed by the Debtor.

6.      Alternatively, Wells Fargo is entitled to immediate relief from the automatic stay under Section 362(d)(2) of the Bankruptcy Code because the Debtor has no equity in the collateral and the collateral is not necessary for an effective reorganization of the Debtor since there is "no reasonable possibility of the successful reorganization within a reasonable period of time."  <u>United States Assoc. of Texas v. Timbers of Inwood Forest Assoc., Ltd.</u>, 484 U.S. 365 (1988).  As noted, and as Wells Fargo will show at the hearing on this Motion, the Debtor clearly has no equity in the Policies.  Without any equity in the Policies, the Debtor has the burden to prove that there is a reasonable possibility of a successful reorganization within a reasonable period of time.  The Debtor cannot meet this burden.  The Debtor does not conduct any business other than its passive ownership of an existing portfolio of Policies; it has no capacity to acquire new Policies; it does not have any employees; its day-to-day business activities are managed and

---

[9]      Similarly, the Debtor presents another fundamentally inaccurate picture when it states that the Towers Watson report places the fair market value of the Policies at $311 million.  Such report, on its face, expressly disclaims its use as a statement of the fair market by stating that it "in no way represents a value on a Policy as determined by Towers Watson."  <u>See</u> Section 1 to Valuation Report, "Scope of Services" at p.1.

performed by a related-party servicer; and, other than Wells Fargo, it has no non-insider creditors of any consequence. Thus, even putting aside the insurmountable plan feasibility issues caused by the Debtor's present financial condition, which alone would render any plan of reorganization proposed by the Debtor non-confirmable under Section 1129(a)(9) of the Bankruptcy Code, the likelihood that any plan of reorganization could be confirmed over Wells Fargo's objection is remote at best and, given the extent to which Wells Fargo is undersecured and the absence of other, significant non-insider creditors, effectively non-existent.

7.     Thus, and although the Debtor inaccurately and inappropriately attempts to blame Wells Fargo for the position in which it presently finds itself, it is apparent that this case was not filed in pursuit of any legitimate or even possible restructuring of the Debtor's obligations, but rather was filed in bad faith. While the Debtor's bad faith motivations for filing this case should result in dismissal of this case, such bad faith, in and of itself, is yet another independent "cause" to lift the stay pursuant to Section 362(d)(1) of the Bankruptcy Code.

8.     For the reasons summarized above and set forth in greater detail below, and as supported by the well-established authority discussed below, Wells Fargo is entitled to immediate relief from the automatic stay.

## II.     PROCEDURAL AND JURISDICTIONAL BACKGROUND

9.     On December 22, 2010 (the "Petition Date"), the Debtor filed a voluntary petition seeking relief under Chapter 11 of the Bankruptcy Code in this Court. The Debtor is in possession of its assets as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code. No official committee of unsecured creditors has been appointed in this case.

10.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and Local Rule 4001-1. This is a core proceeding pursuant to 28 U.S.C. §§

157(b)(2)(A) and (G). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested in the Motion are Section 362(d) of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 4001 and 9014.

### III.    FACTUAL BACKGROUND

### A.    Description of the Debtor

11.    The Debtor is a Delaware limited liability limited partnership with a relatively simple capital structure. The Debtor has eight limited partners that are each investment funds organized under German law. The general partner is LT Partner, LLC, a Delaware limited liability company (the "General Partner"). The sole member of the General Partner is Berlin Atlantic Capital Holding GmbH & Co. KG ("BAC Holding"). The General Partner acts as Collateral Manager for the Debtor. SLG Life Settlements, LLC ("SLG") is a wholly-owned subsidiary of BAC Holding and acts as the servicer for the Policies. The Debtor does not engage in any business not related to the ownership of the Policies. In sum, the Debtor is a special purpose, "bankruptcy remote" investment vehicle whose business and assets are solely limited to ownership of the Policies and other related collateral. See Cash Collateral Motion, ¶ 4, FN2; Declaration of Dietmar Hofmarcher in Support of First Day Motions (Dkt. No. 3) (the "Declaration"), ¶ 10, FN2.

12.    The Debtor's ownership of the Policies includes the right to receive all payments accruing thereunder, including receipt of a Policy's cash surrender value and collection of any accruing benefits at maturity. The Policies were acquired by the Debtor under the terms of purchase agreements entered into between the Debtor and either SLG or certain third parties (each, an "Initial Purchaser") or were contributed by one of its limited partners, which, in turn,

had initially acquired the Policies from individuals.[10]  Moreover, although the Debtor states that it was formed, in part, to acquire life insurance policies in the secondary market pursuant, and attempts to allege that Wells Fargo limited this ability, the Debtor has failed to raise the capital necessary to acquire a material number of life insurance policies other than those initially contributed by its limited partners.[11]

13.    As noted above, the Debtor contracted with its affiliate, SLG, to be the servicer of the Policies and with its General Partner (who, according to the Debtor, also has no employees) to be the collateral manager for the Policies.  It is SLG, as servicer, ***not*** the Debtor, that handles all aspects regarding the day-to-day management of the Policies, including, among other things: (a) the daily management of communications with third parties, including the insureds and the insurance companies regarding the maintenance and servicing of the Policies; (b) banking and related services regarding the amounts due and received under the Policies, such as the payment of outstanding Premiums; (c) providing information to the Agent as required under the Loan and Security Agreement; and (d) other related matters regarding the Policies.  <u>See</u> Cash Collateral Motion, ¶ 9; Declaration, ¶ 15.

---

[10]    In particular, in exchange for receiving an upfront payment of cash per the terms of a life settlement agreement (collectively referred to hereinafter as the "<u>Life Settlement Agreements</u>"), an insured individual sold to an Initial Purchaser all of that person's rights under his or her life insurance policy, including, most importantly, the right to receive the benefits payable upon such person's death.

[11]    The Wells Fargo loan facility was never intended to fund the entire purchase price of any policy or all of the premium payments thereon.  The Debtor was required to fund a portion of these amounts from equity.  The 2008 world financial crisis and changes to German tax law, among other things, contributed to the virtual collapse of the Debtor's ability to raise equity within months after the Wells Fargo loan facility closed.  The equity the Debtor had at the time of such closing was exhausted as the Debtor continued to maintain Ineligible Assets entirely with proceeds of equity even after it was abundantly clear that these Policies were not financeable, whether by Wells Fargo or any other lender.  Accordingly, the size and duration of the Wells Fargo facility could not be and are not the cause of the Debtor's financial problems.

## B.     **Facts Regarding Wells Fargo's Secured Claim**

14.     As of the Petition Date, the total indebtedness due and owing by the Debtor with respect to its obligations under (a) that certain Loan and Security Agreement dated as of June 30, 2008 (as amended, restated, supplemented or otherwise modified from time to time, including, *inter alia*, pursuant to that certain Omnibus Amendment, dated as of November 12, 2010, the "Loan and Security Agreement")[12] and (b) that certain ISDA Master Agreement and Schedule dated as of June 30, 2008 (including confirmations issued from time to time thereunder, collectively, the "Hedging Agreement") was at least $231,657,674.48  consisting of: (i) $222,346,070.11 in outstanding principal; (ii) $1,711,604.37 of accrued but unpaid interest; (iii) an estimated $7,400,000 in Hedge Breakage Costs[13]; and (iv) more than $200,000 in attorneys' fees and expenses and other actual out-of-pocket expenses (collectively, together with any other amounts that now or hereafter become owing to Wells Fargo under the terms of the loan documents and applicable law, the "Indebtedness").[14]

15.     In order to secure Debtor's performance under the Loan and Security Agreement and the Hedging Agreement, including, but not limited to, repayment of the Indebtedness, together with interest accruing thereon and all fees, costs and expenses incurred by Wells Fargo

---

[12]     Pursuant to the Loan and Security Agreement, the Lender made certain advances and provided other financial accommodations to the Debtor in the aggregate principal amount of $222,346,070.11 (the "Advances"), which Advances are evidenced by, among other things, that certain Variable Funding Note dated as of November 12, 2010 (as amended, restated, supplemented or otherwise modified from time to time, the "Funding Note").

[13]     Pursuant to the terms of such Hedging Agreement, the parties entered into interest rate swap transactions (the "Swaps"), and, as of December 28, 2010, and by virtue of the termination event consisting of the commencement of this Chapter 11 Case (and pursuant to applicable Bankruptcy Code authority), the Hedge Counterparty exercised its rights to terminate (and, in fact, has terminated) the Swaps, thereby resulting in an estimated termination payments in the amount of $7,400,000 becoming due and owing by the Debtor to the Hedge Counterparty (the "Hedge Breakage Costs").  As of the time of the filing of this motion, the Hedge Breakage Costs were not yet finalized and thus remain subject to change.

[14]     True and correct copies of the Loan and Security Agreement, the Omnibus Amendment, the Funding Note and the Hedging Agreement are attached hereto as Exhibits A, B, C, and D, respectively.  Also attached hereto as Exhibit G is a copy of the Second Amended and Restated Fee Letter, dated November 12, 2010.

with respect thereto, the Debtor granted the Agent a lien upon and security interest in and to all of its assets (as more particularly defined in the Loan and Security Agreement, the "Collateral"), including, without limitation: (a) the Policies; (b) all amounts payable to Policy beneficiaries and other collections on the Policies; (c) the Life Settlement Agreements pursuant to which the Policies were acquired; (d) the Swaps; (e) all of the Debtor's accounts and investments therein (including, but not limited to, the Reserve Fund); and (f) all proceeds of the foregoing. See Loan and Security Agreement, Section 8.1.[15] Wells Fargo has taken all appropriate steps to perfect and has perfected its security interests and liens in, on, and to the Collateral.

**C.      The Debtor's Efforts to Obtain Alternative Financing Underscore that Wells Fargo is Undersecured**

16.      In connection with its restructuring efforts, the Debtor pursued a facility (the "NCB Facility") with North Channel Bank GmbH & Co. KG ("NCB") to create liquidity for the Debtor by funding the purchase of certain Policies (consisting primarily of "Ineligible Assets"[16]) by four wholly owned subsidiaries of the Debtor. The NCB Facility, however, failed to raise the additional capital the Debtors expected when NCB, following extensive due diligence, determined that it would not finance the purchase of a number of the Policies and would only finance others at a reduced purchase price.

---

[15]   See also both the Account Control and Custodian Agreement dated June 30, 2008 (the "Account Control Agreement"), a true and correct copy of which is attached hereto as Exhibit E, and the UCC-1 Financing Statements attached hereto as group Exhibit F.

[16]   "Ineligible Assets" are those Policies that do not meet the criteria for "Eligible Assets" under the Loan and Security Agreement. Most of the Ineligible Assets include previously premium-financed Policies and thus were subject to Wells Fargo approval to be eligible for financing. Because these Policies had been previously premium-financed, they bear an increased level of risk as collateral and are potentially subject to increased challenges by the issuing insurance companies. As a result, the market for such premium-financed Policies generally has been smaller and they are generally valued based on a different and much higher discount rate than non-premium-financed Policies. The Premiums and other expenses in respect of Ineligible Assets were required to be funded from the Borrower's own funds, typically through funds contributed by the Debtor's limited partners. However, Wells Fargo, on a number of occasions (and though it was not obligated to do so under the Loan and Security Agreement), provided emergency funds to the Debtor to pay Premiums on Ineligible Assets in order to avoid their lapse and termination.

17.     On December 8, 2010, the Debtor proposed in an email that Wells Fargo sell its obligations to a third party (the "New Lender") for approximately $160 million.  The New Lender was then to consider restructuring the obligations.  This proposal would have required Wells Fargo to write-off nearly one-third of the outstanding amount of the Indebtedness.  Inherent, of course, in such offer is a valuation of the Policies at an amount significantly less than the Indebtedness they secure.

**D.     The Collateral is Subject to Imminent Erosion (if not Complete Destruction) of Its Value**

18.     Actuarial modeling demonstrates the precarious condition of the Collateral and the great risk that it will significantly diminish in value if left in the Debtor's hands.  Specifically, it is projected that it will take many years before sufficient net benefits are realized from the maturation of Policies to pay off the Indebtedness in full—assuming all Premium obligations and other payment obligations are kept current during that time by the Debtor.

19.     Under the terms of the Loan and Security Agreement, the Debtor was required to keep funds in a reserve account sufficient to pay at least three months worth of accruing Premium obligations on the Policies. (the "Reserve Funds").  However, those Reserve Funds were entirely exhausted prior to the Petition Date and Wells Fargo was required to repeatedly advance funds to the Debtor, including more than $1.5 million on the eve of the Debtor's bankruptcy filing, simply to protect its own Collateral by ensuring the Debtor was able meet its immediate Premium obligations. See Cash Collateral Motion at ¶ 28.  The Debtor, having fully depleted its Reserve Fund *before* filing, is going to be unable to fund the nearly $6 million of Premium payment obligations that must be paid by January 9, 2011 (i.e., in less than 2 weeks). See Cash Collateral Motion, ¶ 7 ("although the Policies themselves are valuable assets, without continued and required maintenance such assets will evaporate.  Specifically, ***absent the***

*payment of Premiums, the Debtor estimates that all of the Policies will lapse by March/April 2011*.") (emphasis added).  Simply put, if such Premium obligations are not funded per the terms of the Policies, the Policies will terminate, thereby obliterating whatever market value they might otherwise have and rendering Wells Fargo's collateral valueless.  <u>See</u> Cash Collateral Motion, ¶ 52 ("As stated, if the Debtor does not have immediate access to cash, the Premiums will not be paid and the Policies will lapse.").  Thus, because of the Policies' very nature, no amount of equity cushion (even if one existed, which it does not) can protect Wells Fargo's interests in the Policies from their total loss if the Debtor lacks the minimal liquidity of funds necessary to pay the required Premiums and maintain their viability.

20.     The Debtor acknowledges the inherent uncertainty of knowing exactly when a maturity will occur, how many days will elapse before the proceeds on the pertinent Policy actually will be received (typically 30 to 60 days after maturity) and the amount of proceeds that will be received (as benefits vary from Policy to Policy).  However, notably absent from any papers the Debtor has filed to date in this case is any discussion of the Debtor's "Plan B" if maturities do not occur and proceeds are not collected as projected.  Instead, the Debtor wishfully hopes that it "may realize a death benefit or succeed in obtaining debtor in possession financing before it is required to pay Premiums."  <u>See</u> Cash Collateral Motion, ¶ 51.  However, even more disconcerting for the preservation of Wells Fargo's Collateral is the fact that the Debtor's proposed Budget does not project even one single maturity through March 27, 2011 and instead shows that, as early as January 2, 2011, the Debtor's estate will have no real cash on hand and that the Debtor will entirely fail to pay the over $13 million in Premiums due through the end of March 2011.  <u>See</u> Exhibit A to Cash Collateral Motion.  In fact, even the Debtor admits that "absent payment of the Premiums, the Debtor estimates that all of the Policies will

lapse by March/April 2011." <u>See</u> Cash Collateral Motion at ¶ 7.  As such, it is simply undisputed that the Debtor's present liquidity crisis will result in its inability to meet its Premium obligations on January 9, 2011 (and beyond) which will undoubtedly cause Policies to lapse thereby "destroying the value of the Collateral." <u>Id.</u> at ¶ 51.

21.     If the automatic stay is not immediately terminated, then, in order to avoid the termination of the Policies, Wells Fargo will be confronted with a Hobson's choice of either advancing more of its money to the Debtor to fund the payment of Premiums and servicing fees or accepting the potential disposition of Policies on a piecemeal basis at fire-sale prices (assuming any buyer could be found absent a significant due diligence period).  In fact, the Debtor itself even acknowledges that, absent a miraculous change in circumstances, Wells Fargo must continue to fund advances in order to provide the Debtor sufficient cash resources with which to protect Wells Fargo's Collateral from wholesale evaporation.  <u>See</u> Cash Collateral Motion at ¶ 37 ("[w]ithout an alternative source of funding or additional advancements by [Wells Fargo], the Debtor will quickly run out of cash").  Under these circumstances, it is clear that the Debtor, with no unencumbered assets and no cash (even if it were allowed to use Wells Fargo's currently *de minimis* cash collateral) is unable to protect Wells Fargo from an imminent erosion of the value of the Policies and that Wells Fargo's interest in the Policies is not adequately protected.

22.     At this point, there are no other sources of available cash to keep Premiums current other than by selling Policies at highly distressed, fire-sale levels or relying on the occurrence of statistically unlikely numbers of Policies maturing and benefits therefore being paid (which, the Debtor entirely fails to recognize can take up to thirty days after the maturity of the Policy).  Accordingly, faced with the only remaining option available to it (i.e., the choice to

either protect its unreasonably jeopardized Collateral by advancing its own funds or watching idly by as the Debtor allows the Collateral to evaporate before its eyes), Wells Fargo is entitled to immediate relief from the automatic stay under Section 362(d)(1) of the Bankruptcy Code.

**E.      The Debtor Lacks Any Equity in the Collateral**

23.      The Debtor does not have any equity in the Collateral that secures payment of the Indebtedness due to Wells Fargo.  Even assuming that a discounted cash flow methodology is appropriate for determining the present fair market value of the Policies, and as Wells Fargo will show at the hearing on this Motion, the present fair market value for the Collateral under any reasonable and market-based application of that methodology is significantly less than the amount of the Indebtedness.[17]  Significantly, as the Debtor admits in its own papers, the one written offer the Debtor presented to Wells Fargo to "refinance" Wells Fargo's Indebtedness in its entirety contemplated the purchase of the Indebtedness owed to Wells Fargo at less than par (significantly less assuming the proposal in question is the recent offer to purchase the Indebtedness for $160 million—a discount of nearly one-third off the principal amount of the Indebtedness), providing further evidence that Wells Fargo is substantially undersecured.[18]  See Cash Collateral Motion, ¶ 34.

24.      Furthermore, to the extent the Debtor's valuation of the Policies is based on the assumption that those Policies that constitute "Ineligible Assets" should be valued at or near the

---

[17]      The valuation posited by the Debtor uses a "discounted cash flow" methodology.  However, in purporting to discount the estimated future net cash flow to a present value based on the expected discount rate (or, as it is also known, the internal rate of return ("IRR")) an investor likely would require in order to invest in the Policies, the Debtor clearly is not using an IRR that would be required by investors today.  Instead, it is assuming that investors today would settle for an IRR that does not take into account the effects of the recent credit crisis and that yields a return that would be simply unacceptable to post-crisis investors by a wide margin.

[18]      As the Debtor itself points out, this $160 million below-par bid was one of the only offers the Debtor was able to negotiate even after the Debtor "canvassed the marketplace" and "reached out to hundreds of investors to explore efforts to restructure or sell its assets."  See Declaration, ¶ 39, 40.

same level as those Policies that constitute "Eligible Assets," the Debtor's own filings again demonstrate the fallacy of the Debtor's assumptions. As an initial matter, the very nature of the Ineligible Assets demonstrates why they should not be given the same value as the Eligible Assets. As noted in the Debtor's own filings, this fact was born out in connection with the Debtor's attempt to refinance the Ineligible Assets with NCB. Specifically, after conducting its due diligence, NCB refused to fund 58 of the 83 Policies it had conditionally agreed to finance. See Cash Collateral Motion, ¶ 27.

25. As the foregoing plainly demonstrates, the fair market value of the Policies (including spending ample time and effort marketing the Policies and providing prospective buyers with adequate means to perform due diligence) is significantly less than the Indebtedness. Accordingly, there is no equity in the Collateral and Wells Fargo's claim on the Indebtedness, therefore, is substantially undersecured.

## IV. REQUEST FOR RELIEF FROM THE AUTOMATIC STAY

26. The Bankruptcy Code provides that the automatic stay shall be lifted for "cause," including a Debtor's bad faith in filing its petition for relief and/or a lack of adequate protection of the moving creditor's interest in the debtor's property. See 11 U.S.C. § 362(d)(1). Alternatively, Section 362(d)(2) provides that a court must grant relief from the stay with respect to property if: (A) the debtor does not have any equity in such property; and (B) such property is not necessary to an effective reorganization. See 11 U.S.C. § 362(d)(2). This relief is mandatory; upon satisfaction of the elements under either (d)(1) or (d)(2), the court is required to grant relief from the stay. See John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs., 987 F.2d 154, 157 (3d Cir. 1993) ("Section 362(d)(1) *requires* a bankruptcy court to grant relief if the creditor would not otherwise have 'adequate protection' of an interest in the property in

question.") (emphasis added); <u>In re Indian Palms Assocs., Ltd.</u>, 61 F.3d 197, 208 (3d Cir. 1995) ("Furthermore, we note that ***the language of section 362(d)(2) is mandatory***, when both factors necessary for relief under section 362(d)(2) are met 'the court ***shall*** grant relief.'") (emphasis added). Here, there are ample and compelling grounds for granting Wells Fargo stay relief.

**A.**     <u>Cause Exists to Lift the Stay Pursuant to Section 362(d)(1)</u>

27.      Section 362(d)(1) of the Bankruptcy Code provides that a secured party is entitled to relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property." <u>See</u> 11 U.S.C. § 362(d)(1). Most frequently, cause is shown by a debtor's failure to afford adequate protection of a secured creditor's interest in its security. In this case, cause clearly exists to modify the automatic stay, not only because Wells Fargo is inadequately protected given the Debtor's precarious liquidity crisis, but because this case was instituted by the Debtor in bad faith.

28.      Cause exists to modify the automatic stay pursuant to Section 362(d)(1) because the Debtor simply cannot provide Wells Fargo with any meaningful adequate protection. As noted above, the Debtor's Reserve Fund was fully depleted before the Petition Date and the Debtor itself concedes that, if Premiums on the Policies are not paid, "the failure to pay Premiums as and when due results in the issuance of a warning, and ultimately, the lapse of the Policy and the irrevocable loss of the investment and asset." Cash Collateral Motion, ¶ 7. However, the Debtor admits that, because of the uncertainty as to when policy benefits will mature and then be received, the "Debtor has seen less frequent Policy maturities than were originally projected and its portfolio has failed to yield forecasted returns." <u>Id.</u> at ¶ 32. And, of course, as a single-purpose entity, all of whose assets are encumbered in favor of its secured creditor, the Debtor has no other unencumbered assets from which to provide or otherwise

facilitate such liquidity. Thus, without a significant equity contribution (for which the Debtor has made no offer and demonstrated no prospect of securing), the Debtor's only hope of preserving the value of the Polices depends almost entirely on whether significant numbers of Policies mature and their corresponding benefits quickly become available to it (a virtual impossibility with respect to those Premiums that must be funded by January 9, 2011).

29. As a result, the value of Wells Fargo's collateral is subject to imminent erosion, and, accordingly, the continued imposition of the stay cannot be justified. See Matter of Union Deposit Center Equities Ltd. P'ship, 639 F.2d 1045, 1049 (3d Cir. 1981) (lifting the automatic stay because "[a] first mortgagee-creditor, especially one whose debt comprises the overwhelming bulk of the debtor's aggregate liabilities, should not be kept in cold storage indefinitely while its security erodes, in the faint hope that some miracle may happen"); In re Balco Equities Ltd., 312 B.R. 734, 751 (Bankr. S.D.N.Y. 2004) (granting stay relief and noting that the debtors' inability to pay for the constant maintenance needed to sustain the collateral, to include providing funding for the services necessary to operate the collateral was a "hallmark" of a lack of adequate protection and rendered it likely that the secured creditor would be required to make advances in order to preserve its collateral); In re Kruger Properties, LLC, No. 09-10336, 2009 WL 1490569, at *7 (Bankr. N.D. Okla. May 27, 2009) (sharing the secured creditor's concern that the debtor was unable or unwilling to take appropriate measures to protect and preserve the creditor's collateral where the creditor was required to pay delinquent taxes to avoid foreclosure); In re Pawtuxet Valley Prescription & Surgical Ctr., Inc., No. 07-11767, 2008 WL 1990887, at *5 (Bankr. D.R.I. Mar. 10, 2008) (recognizing adequate protection lacking where the debtor's continued operations would result in $400,000 in collateral being depleted and not replaced based only on the vague hope of the debtor becoming profitable). Stay relief is

particularly warranted where, as here, the Debtor is a limited purpose entity with no other source from which to provide adequate protection.  See In re Union-Go Dairy Leasing, LLC, No. 10-01703, 2010 WL 1848485, at *3 (Bankr. S.D. Ind. May 6, 2010) (lifting the stay where the Debtor was merely a "pass through" entity with no employees who merely passed lease payments to a parent and, therefore, (1) could not make periodic payments because it had insufficient income for operations, (2) could only grant a worthless administrative expense because it lacked sufficient cash to operate postpetition, and (3) had no unencumbered property to grant a replacement lien on).

**B.**     **The Debtor Has No Equity in the Property and the Property Is Not Necessary For An Effective Reorganization**

30.     Wells Fargo is further entitled to stay relief here under Section 362(d)(2) of the Bankruptcy Code since (A) the Debtor lacks equity in the Collateral and (B) the Collateral is not necessary for an effective reorganization. 11 U.S.C. § 362(d)(2).

**1.     The Debtor lacks equity in the Collateral**

31.     As indicated above, and as will be shown at the hearing on this Motion, the present market value for the Policies is significantly less than Wells Fargo's claim, which was at least $231.6 million as of the Petition Date.  Accordingly, the Debtor has no equity in the Collateral.  E.g., Timbers, supra, 484 U.S. at 375 (Section 362(d)(2) provides that the court shall grant relief "if ... (A) the debtor does not have an equity in such property [*i.e.,* the creditor is undersecured]" and "[o]nce the movant under § 362(d)(2) establishes that he is an undersecured creditor, it is the burden of the *debtor* to establish that the collateral at issue is "necessary to an effective reorganization.") (emphasis in original).

**2. The Collateral is not necessary for an effective reorganization**

32.     Under Section 362(d)(2), the property is necessary for an effective reorganization only if there is a "reasonable possibility of a successful reorganization within a reasonable period of time." Id.  Moreover, pursuant to 11 U.S.C. § 362(g), once it is established that a debtor has no equity in its property (as is clearly the situation here), the debtor bears the burden of proving that the property is necessary to an effective reorganization. Id. (emphasizing that Section 362(d)(2) was intended in part to avoid "inordinate and extortionate delay" faced by undersecured creditors who are not compensated during the pending bankruptcy case and to protect the undersecured creditor from the debtor's incentive to delay in the hope of a change in fortune).[19]  A combination of a lack of equity in the collateral and the inability of the debtor to show any likelihood of effective reorganization *requires* a court to grant an undersecured creditor relief from the automatic stay.  In the Matter of MCM, Inc., 95 B.R. 307, 310 (Bankr. D. Del. 1988) (emphasis added).

33.     Here, the Collateral is not necessary to an effective reorganization because  the Debtor has no reasonable prospects of being able to confirm a plan of reorganization over the objection of Wells Fargo.  As demonstrated above, the Debtor does not have a reasonably certain cash flow stream to fund even the minimum level of expenditures necessary to ensure that the Policies remain in effect. See In re Loco Realty Corp., No. 09-11785, 2009 WL 2883050, at *7 (Bankr. S.D.N.Y. 2009) (finding that the uncertainty of a Debtor's cash flow, combined with its questionable ability to make required debt servicing payments, "makes any prospect of a

---

[19]     Further, "[i]t is insufficient for the debtor to show merely that the reorganization is impossible without the property.  That much is obvious to all concerned.  The debtor must also show that reorganization is feasible within a reasonable period of time." In re Century Inv. Fund VII Ltd. Partnership, 96 B.R. 884, 888 (Bankr. E.D. Wis. 1989); see also In re 8th St. Village Ltd. Partnership, 88 B.R. 853, 856 (Bankr. N.D. Ill. 1988) (finding that, although the loss of the property in question will make reorganization of the debtor "absolutely impossible . . . this is not enough to prevent the lifting of the stay").

successful plan speculative at best").  There is only the remotest of possibilities, premised upon a statistically improbable number of Policies maturing quickly, that the Debtor can offer any prospect of being able to fund its post-confirmation obligations.  See In re The Southerton Corp., 46 B.R. 391, 400 (M.D. Pa. 1982) (noting that the debtor's inability to obtain refinancing bears on the question of prospects for a successful reorganization).  Accordingly, the Debtor will not be able to satisfy its burden under Section 1129(a) to show that any such plan would be feasible. See In re New Era, 125 B.R. 725, 730 (S.D.N.Y. 1991) (affirming relief from stay under Section 362(d)(2) where no reorganization was in prospect; all the court had before it were "pipe dreams" of an insider unsupported by any expert testimony and stating that "unrealistic hypotheticals such as these are the precise reason why the statute requires that property be necessary to an effective reorganization").

34.     In addition, the Debtor does not conduct any business other than the ownership of the Policies; it does not have any employees; its day-to-day business activities are managed and performed by a related-party servicer; and other than Wells Fargo, it does not have any non-insider creditors of any consequence.  Thus, even putting aside the plan feasibility issues caused by the Debtor's present financial condition, the likelihood that any plan of reorganization could be confirmed over Wells Fargo's objection is remote, given the extent to which Wells Fargo is undersecured and the absence of any other significant non-insider creditors.[20] E.g., Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.), 16 F.3d 552, 567-68 (3d Cir. 1994) ("for this reason alone, an effective reorganization of [the debtor] is not realistically possible" and, holding that, as a result, "the Debtor cannot meet its burden to prove

---

[20]     The plan confirmation objections discussed in the text are illustrative only and are not intended to be a complete listing of the potential impediments to confirmation under Section 1129 of the Bankruptcy Code likely to be faced by any plan proposed by the Debtor.

that the property is necessary to an effective reorganization in prospect"); In re Nw. Timberline Enters., Inc., 348 B.R. 412, 436 (Bankr. N.D. Tex. 2006) (lifting automatic stay where secured creditor's deficiency claim would "dominate the voting results of the unsecured creditors" because "the court sees no way that the Debtor . . . could ever have a legitimate impaired accepting class of creditors to go cram down, so long as [the secured creditor] . . . is opposing its plan."); In re Baxter & Baxter, Inc., 172 B.R. 198, 202 (Bankr. S.D.N.Y. 1994) (lifting automatic stay where undersecured creditor's deficiency claim accounted for 97 percent of eligible unsecured claims necessary to approve plan, and as "no plan can be proposed that can be confirmed over [the secured creditor's] opposition, it follows that the automatic stay should be lifted.")

35.     Because the Debtor has no equity in the Collateral and has no reasonable prospect of confirming a plan within a reasonable period of time over Wells Fargo's objection, Wells Fargo respectfully submits that it is entitled to relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(2). E.g., Timbers, supra, 484 U.S. at 476.

36.     Finally, the Debtor clearly has filed this case in bad faith under the standards enunciated by In re Primestone Investment Partners, L.P., 272 B.R. 554 (D. Del. 2002), which constitutes yet another independent "cause" for the granting of relief under Section 362(d)(1).

## V.     WAIVER OF STAY OF ORDER

37.     Wells Fargo submits that, especially in light of the impending lapse of certain of the Policies on January 9, 2011, waiver of the ten-day period under Rule 4001(a)(3) is appropriate in this case and requests that, upon the granting of stay relief, Rule 4001(a)(3) be waived.

## VI.     CONCLUSION

WHEREFORE, Wells Fargo respectfully requests that the Court enter an order lifting the automatic stay to allow Wells Fargo to exercise whatever rights it may have under the Loan and Security Agreement and related loan documents with respect to the Collateral (including any existing Cash Collateral), including, but not limited to, its right to foreclose upon its security interest in the Policies, waiving the stay of such Order under Bankruptcy Rule 4001(a)(3), and grant such other or further relief as may be necessary under the circumstances.

Dated: December 28, 2010   Respectfully submitted,

           WELLS FARGO SECURITIES, LLC, as Agent and
           WELLS FARGO BANK, N.A., as Lender


           */s/Richard W. Riley*
           Richard W. Riley (DE 4052)
           Duane Morris LLP
           222 Delaware Avenue, Suite 1600
           Wilmington, DE 19801-1659

           - and -

           Thomas S. Kiriakos, Esq. (admission *pro hac vice* pending)
           Matthew V. Wargin, Esq. (admission *pro hac vice* pending)
           Joshua M. Grenard, Esq. (admission *pro hac vice* pending)
           Mayer Brown LLP
           71 South Wacker Drive
           Chicago, Illinois 60606-4637
           Telephone: (312) 782-0600
           Facsimile: (312) 701-7711
           *Co-Counsel to Wells Fargo Securities, LLC*
           *and Wells Fargo Bank, N.A.*