# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>LTAP US, LLLP,[1]<br><br>Debtor. | Chapter 11<br><br>Case No. 10-14125 (KG)<br><br>Hearing Date: February 10, 2011 at 10:30 a.m.<br>Objection Deadline: February 3, 2010 at 4:00 p.m.<br>Ref. No. 36 |

## OBJECTION TO THE MOTION OF WELLS FARGO SECURITIES, LLC AND WELLS FARGO BANK, N.A. FOR RELIEF FROM THE AUTOMATIC STAY

The above-captioned debtor and debtor in possession (the "Debtor"), by and through its proposed undersigned counsel, hereby files this Objection to the Motion of Wells Fargo Securities, LLC (the "Agent") and Wells Fargo Bank, N.A. (in its individual capacity, the "Prepetition Lender" and together with the Agent as "Wells Fargo") for Relief from the Automatic Stay (the "Stay Motion"). In support thereof, the Debtor respectfully states the following:

### PRELIMINARY STATEMENT

1. The Debtor filed this case in order to maximize the value for all of its creditors (not just Wells Fargo) and its stakeholders. Six days after the Debtor commenced this case, Wells Fargo filed its Stay Motion. The Debtor and Wells Fargo have gone through an extensive discovery process in a short period of time in order to prepare for the hearing on the Stay Motion and Cash Collateral Motion (defined below). Even with this time consuming and expedited process, the Debtor has worked tirelessly both prior to and following the filing to develop its exit strategy. To that end, the Debtor is in the final stages of debtor in possession financing, which will be presented to the Court soon. In addition, the Debtor has spoken with

---

[1] The Debtor's Tax I.D. No. is xx-xxx4021. The address for LTAP US, LLLP is Five Concourse Parkway, Suite 3100, Atlanta, Georgia 30328.

hundreds of parties who have indicated an interest in participating in the Debtor's reorganization efforts. These efforts, of course, cannot begin in earnest until the cloud of the Stay Motion is denied.

2. The Stay Motion should be denied. The Debtor will provide credible evidence at trial that Wells Fargo has a sufficient equity cushion that is sufficient to provide adequate protection. Moreover, upon the approval of the debtor in possession financing, Wells Fargo will be further protected. The evidence at trial will further show that Wells Fargo's equity cushion will only increase over time with the payment of the Policy Premiums. This is because the value of life settlement portfolios increases upon the payment of premiums and the realization of Policy (defined below) maturities.

## BACKGROUND

### A. Procedural Background

3. On December 22, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended or modified, the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court").

4. The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

5. No examiner or committee has been appointed.

### B. Background Regarding the Debtor's Operations

6. The Debtor was formed and exists to own and acquire previously issued life insurance policies (individually, a "Policy," or collectively, the "Policies") in the life

settlement market.[2] As of the Petition Date, the Debtor held four hundred and nine (409) policies on three hundred and thirteen (313) lives, with the aggregate death benefits of approximately $1.36 billion. The Policies were issued by fifty-three (53) different insurance carriers. The Company has no other significant operations or assets. Thus, the Policies, in addition to some accounts receivable, are the Debtor's primary assets.

7. On June 30, 2008, in order to expand its policy portfolio and to optimize its business, the Debtor first borrowed funds under that certain Loan and Security Agreement (as amended, supplemented or otherwise modified from time to time, the "Wells Fargo Agreement").[3] Under the Wells Fargo Agreement, the Agent, on behalf of the Prepetition Lenders, asserts a valid, perfected, security interest in and lien on the Debtor's Collateral, which includes, among other things, the Policies. According to Wells Fargo's Stay Motion, Wells Fargo is owed approximately "$222,346,070.11 in principal plus accrued and unpaid interest thereon of at least $1,711,604.37 on account of loan advances, plus an estimated $7,400,000 in additional amounts owing under terminated interest rate swap agreements" and attorneys' fees and expenses, for a total claim of approximately $231.5 million. See Stay Motion at ¶1; see also Affidavit of Justin M. Dardani In Support of Motion For Relief Form the Automatic Stay [D.I. 42] at ¶2. Solely for purposes of the Stay Motion, the Debtor is not contesting the priority, validity or Wells Fargo's calculation of the amount of its claim; however, the Debtor reserves all rights for claims or setoffs against Wells Fargo, including in its capacity as Securities Intermediary of the Policies, with respect to valuation.

---

[2] For further information on the Debtor's history and business, the Debtor refers to the *Declaration of Deitmar Hofmacher in Support of First Day Motions* [D.I. 3] (the "Hofmacher Declaration"), which is incorporated herein by reference.
[3] All capitalized terms not herein defined shall have the same meaning as ascribed to them in the Wells Fargo Agreement.

8. Pursuant to the terms of the Wells Fargo Agreement, the Securities Account Control and Custody Agreement and other related documents, the Securities Intermediary holds the Policies as custodian. As such, while the Policies are the Debtor's assets, under the Wells Fargo Agreement and related documents, Wells Fargo, as the Securities Intermediary, is the record owner of the Policies.[4]

9. In order to preserve the value of the Policies, the Debtor must maintain the Policies by paying premiums (the "Premiums") as and when they come due, which typically occurs on a monthly, quarterly or annual basis. Generally, if the Premiums are not paid when due, the Policies will go into applicable grace periods. Most of the Policies provide a grace period of approximately sixty-one (61) days between the Premium due date and when the Policy will lapse in the event of non-payment (the "Grace Period"). Currently, there are one hundred and sixty-seven (167) Policies known to be in grace (the "Grace Policies"). During the Grace Period, the Policies remain in full force and effect.

C. **Post-Petition Efforts to Preserve the Value of the Policies**

    a. **The Cash Collateral Motion**

10. On the Petition Date, the Debtor filed its Motion for an Order Authorizing the Use of Cash Collateral [D.I. 5] (the "Cash Collateral Motion"). Through the Cash Collateral Motion, the Debtor seeks authority to use the Cash Collateral (as defined in the Cash Collateral Motion) on both an interim and a final basis in accordance with the proscribed budget to pay the Premiums and maintain the value of the Policies. Should the Cash Collateral Motion be granted and the Debtor receives payment on a policy maturation, the Debtor will have sufficient liquidity

---

[4] In addition, Wells Fargo Bank, N.A. was the securities intermediary and verification agent under the Original Loan (as defined in the Hofmacher Declaration), recognizing the parties' intent that the Policies be held by a neutral third-party custodian. Due to Wells Fargo's acquisition of Wachovia, Wells Fargo now serves as both agent for the Prepetition Lenders and custodian of the Collateral.

{860.001-W0012790.} 4

to continue to fund the Premiums and preserve the assets while pursuing a successful reorganization.

11. The Cash Collateral Motion is currently scheduled to be heard in conjunction with the Stay Motion on February 10, 2011.

### b. The 108(b) Motion

12. On December 28, 2010, the Debtor filed its Motion for Entry of an Order Enforcing Bankruptcy Code Section 108(b) [D.I. 18] (the "108(b) Motion"). Pursuant to the 108(b) Motion, the Debtor sought the entry of an order enforcing Bankruptcy Code section 108(b) and confirming that none of the Grace Policies would lapse prior to February 21, 2011 due to nonpayment. On January 6, 2011, the Court entered the Order Enforcing Bankruptcy Code Section 108(b) [D.I. 65] (the "108(b) Order"). The 108(b) Order currently covers 109 Policies, of which the Debtor is aware.

### D. Wells Fargo's Stay Motion and Limited Stay Relief

13. On December 28, 2010, Wells Fargo filed the Stay Motion and sought expedited relief. By order dated December 29, 2010, the Court granted expedited consideration of the Stay Motion and scheduled it for the January 6, 2011 [D.I. 46]. The Stay Motion was rescheduled for February 10, 2011 [D.I. 79].

14. Through the Stay Motion, Wells Fargo seeks relief from the automatic stay to allow it to exercise rights under the Wells Fargo Agreement with respect to the Policies, including any existing Cash Collateral and foreclose upon its interest in the Policies.

15. It is important to note that under the Wells Fargo Agreement, the Policies are treated as "securities" under Article 8 of the Uniform Commercial Code. Thus, if granted relief from the automatic stay, Wells Fargo will likely be able to obtain immediate possession of

the Policies, particularly given its position as both the Prepetition Lender and the Securities Intermediary.

E. **The LTAP Expert Reports and Value of the Policies**

16. On January 7, 2011, the Debtor retained Anna Hart, the Principal of ARHart Consulting, LLC and Richard L. Bergstrom, the Principal of Bergstrom Consulting, LLC to perform an independent underwriting and mortality review and analysis of a selected sample of the Policies. Additionally, on January 7, 2011, the Debtor retained R. Larry Warnock, the President and CEO of Value Life Corporation, (together with Ms. Hart and Mr. Bergstrom as the "LTAP Experts") to perform an independent valuation of the Policies utilizing conclusions reached by Ms. Hart and Mr. Bergstrom in their review.

17. On January 26, 2011, the LTAP Experts produced: (i) the Actuarial Review and Independent Calculation of the Valuation of 439 Life Insurance Assets Included in the LTAP US, LLLP Life Settlement Portfolio As of December 31, 2010 On Behalf of LTAP US, LLLP prepared by Larry Warnock (the "Valuation Report") and (ii) the Mortality and Underwriting Review and Independent Analysis of the Mortality and Underwriting Methodology Of a Sample of 135 Life Insurance Policies Included in the LTAP US, LLLP Life Settlement Portfolio As of December 31, 2010 On Behalf of LTAP US, LLLP, prepared by Anna Hart and Richard Bergstrom (the "Mortality and Methodology Report" and together with the Valuation Report as the "Expert Reports"). The Expert Reports establish that Wells Fargo is adequately protected.

## ARGUMENT

18. Wells Fargo is not entitled to relief from the automatic stay because it currently enjoys a significant equity cushion, which will only increase upon the payment of Premiums. As such, the Debtor is entitled to the statutory protections encompassed by the automatic stay and an actual breathing spell in order to develop a plan of reorganization.

19. A primary vehicle for enforcement of the bankruptcy court's jurisdiction is the automatic stay under Bankruptcy Code section 362. In particular, section 362(a)(1) provides, in pertinent part, as follows:

> (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title . . . operates as a stay, applicable to all entities, of—
>
> (1) the commencement or continuation, including the issuance of employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.

11 U.S.C. § 362(a)(1).

20. The automatic stay is one of the fundamental protections afforded to debtors under the Bankruptcy Code. See Midatlantic Nat'l Bank v. N.J. Dep't of Envt'l Protection, 474 U.S. 494, 503 (1986). The automatic stay provisions operate primarily to "stop all creditor collection efforts, stop all harassment of a debtor seeking relief, and to maintain the status quo between the debtor and his creditors, thereby affording the parties and the court an opportunity to appropriately resolve competing economic interests in an orderly and effective way." Taylor v. Slick, 178 F.3d 698, 702 (3d Cir. 1999) (citation omitted); see also H&H Beverage Distribs. v. Pa. Dep't of Revenue, 850 F.2d 165, 166 (3d Cir. 1988). Moreover, the automatic stay is intended to "allow the bankruptcy court to centralize all disputes concerning

property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas." SEC v. Brennan, 230 F.3d 65, 70 (2d Cir. 2000) (citation omitted).

21. Furthermore, courts in this circuit have repeatedly held that the fundamental purpose of the automatic stay is to give the debtor a "breathing spell" to begin the process of reorganization. See In the Matter of Cont'l Airlines, Inc., et al., 134 B.R. 536, 542 (Bankr. D. Del. 1991) (stating that "[t]he automatic stay exists to give the debtor a breathing spell, gather its thoughts, and begin the process of liquidation or reorganization."); see also In re Schaefer Salt Recovery, Inc., 542 F.3d 90, 100 (3d Cir. 2008) (internal quotations and citations omitted) (explaining that "[t]he purpose of the automatic stay is to afford the debtor a 'breathing spell' by halting the collection process," which "enables the debtor to attempt a repayment or reorganization plan with an aim toward satisfying an existing debt" and "also benefits creditors by preventing certain creditors from acting unilaterally to obtain payment from the debtor to the detriment of other creditors").

22. Wells Fargo requests relief from the automatic stay pursuant to sections 362(d)(1) and (d)(2) of the Bankruptcy Code, which provide, in relevant part:

> (d) On request of party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section . . .
>
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;
>
> (2) with respect to a stay of an act against property under subsection (a) of this section, if –
>
> > (A) the debtor does not have an equity in such property; and
> > (B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d)(1) and (d)(2).

23. Under Bankruptcy Code section 362(d)(1), whether "cause" exists to lift the automatic stay is a decision within the sound discretion of the bankruptcy court, and one that is made on a case-by-case basis. See e.g., In re SCO Group, Inc., 395 B.R. 852, 856 (Bankr. D. Del. 2007); In re Brown, 311 B.R. 409, 412 (E.D. Pa. 2004). Because section 362(d)(1) does not define "cause," courts are left to determine what constitutes cause based on the totality of the circumstances. See Baldino v. Wilson (In re Wilson), 116 F.3d 87, 90 (3d Cir. 1997); Joyner Auto World v. George (In re George), 315 B.R. 624, 628 (Bankr. S.D. Ga. 2004).

24. Additionally, Bankruptcy Code section 362(d)(2) requires a showing that the debtor lacks equity in the property and that such property is unnecessary to the debtor's reorganization. See, e.g., Nazareth Nat. Bank v. Trina-Dee, Inc., 731 F.2d 170, 171 (3d Cir. 1984). Pursuant to 11 U.S.C. § 362(g), the party requesting relief from the stay bears the burden of proof on the issue of the debtor's equity in the property and the party opposing bears the burden on all other aspects.

### A. Cause Does Not Exist Under Bankruptcy Code Section 362(d)(1) to Lift the Automatic Stay

25. There is no cause to lift the automatic stay.[5] Wells Fargo enjoys an equity cushion, which will only increase, not decrease over time, with the payment of Premiums and the realization of maturities; and, as such, is adequately protected as required under the Bankruptcy Code. Bankruptcy courts have routinely held that where a creditor is oversecured, the equity cushion alone satisfies the adequate protection requirement of Bankruptcy Code section 362(d)(1). In re Cont'l Airlines, 146 B.R. at 539 (holding specifically that where "the creditor is

---

[5] Wells Fargo alleges that the Debtor's "bad faith" is an independent "cause" to lift the stay. Of course, the opposite is true. The Debtor filed this case to maximize value for its creditors and stakeholders. Not surprisingly, this baseless argument is abandoned in the actual argument section as there are no facts or law to support such a position.

oversecured many courts hold that the equity cushion alone satisfies the adequate protection requirement of section 362(d)(1)"); see also In reShaw Indus., Inc., 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003) (stating that "[t]he existence of an equity cushion alone can constitute adequate protection").

26. Moreover, courts consistently reject the argument that an oversecured creditor is entitled to adequate protection of an equity cushion. See e.g., In re Westchase I Assoc., LP, 126 B.R. 692, 694 (W.D. N.C. 1991) (explaining that "the "value" of a creditor's interest in property that merit[s] protection [is] the "value of the collateral" and "[t]hus, if the value of the *property* itself is not declining . . ., the creditor would not be entitled to protection of the accruing interest value of the claim") (citing United States Assoc. of Texas v. Timbers of Inwood Forest, 484 U.S. 365, 372-73 (1988)) (emphasis in original); In re Lane, 108 B.R. 6, 8 (Bankr. D. Mass. 1989) ("[T]here is no lack of adequate protection when the equity cushion above that amount is eroding through either a decline in collateral value or increase in the claim due to the accrual of interest and expenses."); In re Richards, 2004 Bankr. LEXIS 388 *9-10 (Bankr. N.D. Iowa April 2, 2004) ("A decline in the amount of an equity cushion is not equivalent to the denial of adequate protection").

27. Furthermore, Wells Fargo's principal collateral, the Policies, will appreciate in value over time with the timely payment of Premiums and the realization of maturities. Thus, unlike cases where collateral would depreciate over time, the life settlement market is unique and the value actually increases over time. Bankruptcy Courts have routinely held that movants seeking adequate protection are required to show a decline in the value of their collateral. In re Cont'l Airlines, 146 at 539; see also In re Forest Ridge II, Ltd., 116 Bankr. 937, 950 (Bankr. W.D.N.C. 1990). Wells Fargo cannot meet this burden. The Debtor will show at

trial that even Wells Fargo's expert agrees that as long as the Policies are in full force, their values increase due to the decline of the life expectancies of the insureds.

**B. The Debtor Has Equity in the Property and the Property Is Necessary For an Effective Reorganization**

### 1. The Debtor Has Equity In the Collateral

28. As will be shown at trial, the Policies current value is in excess of Wells Fargo's alleged claim. Bankruptcy Code section 362(d)(2)(A) requires the movant to demonstrate that there is *no* equity in the collateral. 11 U.S.C. 362(g)(1). The evidence at trial will show not only that the Debtor has equity in the Policies, but also that the Policies value and the Debtor's equity therein increases overtime. Thus, Wells Fargo has failed to meet and cannot meet its burden to demonstrate that the Debtor lacks equity in the Policies.

### 2. The Collateral Is Necessary for an Effective Reorganization

29. Even assuming Wells Fargo could demonstrate that the Debtor has no equity in the Policies, the Policies are critical for an effective reorganization, as they are the primary asset of the Debtor and the corner stone upon which the Debtor's business is built. The United States Supreme Court articulated the standard for determining whether property is necessary to an effective reorganization in United States Assoc. of Texas v. Timbers of Inwood Forest, 484 U.S. 365 (1988). There the Supreme Court explained that there "must be a *reasonable possibility* of a successful reorganization within a *reasonable time*." Timbers, 484 U.S. at 375-76 (emphasis added). However, "a bankruptcy court should be reluctant to deprive a debtor of the benefits of Chapter 11 relief before it has an adequate opportunity to utilize its rehabilitative features," unless such efforts would be futile. In re American Sweetners, Inc., 1999 Bankr. LEXIS 1457, *13 (Bankr. E.D. Pa. 1993).

30. Wells Fargo's arguments in this regard are based on the unsupported conclusion that the Debtor cannot confirm a plan, because Wells Fargo has the right to object. This, of course, is not the holding in Timbers. The Debtor has been actively working on its strategy for reorganizaing its business. It will come as no surprise to the Court, that although the Debtor's discussions with potential investors and parties necessary to develop an exist strategy have been positive, such parties are in essence waiting until the Stay Motion is denied to continue the finalization of these discussions. The Debtor recognizes that some additional steps are required before it will be able to propose a confirmable plan, but that does not mean such a plan cannot or will not be developed. Accordingly, the Debtor will demonstrate at trial, not that it has a *"reasonable possibility"* of successful reorganization within a reasonable time, but that it likely will emerge soon with stable, robust, and thriving operations.[6]

*[Remainder of Page Intentionally Left Blank.]*

---

[6] Wells Fargo's argument regarding feasibility and their right to object are wholly misplaced.

## CONCLUSION

31. Quite simply, with debtor in possession financing, any fear that Wells Fargo's Collateral is at risk is completely allayed. There is no concern that Policies will lapse because the Debtor has the ability to pay timely the Premiums; and in turn, the value of the Debtor's business and the value of the Policies only will increase. The Bankruptcy Code's and this Court's protections in bankruptcy have stabilized LTAP and has provided a pathway for a successful reorganization. Thus, the Debtor respectfully requests that the Court further steady the environment by denying the Stay Motion and specifically prohibiting Wells Fargo from foreclosing on the Policies – enabling LTAP to submit timely a plan for a successful and profitable emergence, for all parties involved.

Dated: February 3, 2011
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

/s/ Adam G. Landis

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
James S. Green, Jr. (No. 4406)
Kimberly A. Brown (No. 5138)
919 Market Street, Suite 1800
Wilmington, DE 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
      mumford@lrclaw.com
      green@lrclaw.com
      brown@lrclaw.com

*Counsel to Debtor and Debtor in Possession*