## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LTAP US, LLLP,[1] | Case No. 10-14125 (KG) |
| Debtor. | Hearing Date: February 10, 2011 at 10:30 a.m. (proposed)<br>Objection Deadline: At Hearing (proposed) |

### EMERGENCY MOTION OF THE DEBTOR, FOR ENTRY OF EMERGENCY AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 364(e) AND 507 AND BANKRUPTCY RULES 2002, 4001, AND 9014: (I) AUTHORIZING DEBTOR (A) TO OBTAIN POST-PETITION SECURED FINANCING, (B) TO UTILIZE CASH COLLATERAL, AND (C) PAY WORK FEE AND BREAKUP FEE; (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED PARTIES; AND (III) SCHEDULING A FINAL HEARING

LTAP US, LLLP, a Delaware limited liability limited partnership, the debtor and debtor in possession in the above-captioned case (the "Debtor"), respectfully represents:

### SUMMARY OF RELIEF REQUESTED

1.     By this motion (the "Motion"), the Debtor requests entry of emergency (the "Emergency Order") and final orders, pursuant to sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(d)(1), 364(e) and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "Bankruptcy Code"), rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and local rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (a)(i) authorizing the Debtor to use the "Cash Collateral" (as such term is defined in Bankruptcy Code section 363(a)) of the Prepetition Lenders (defined below), and (ii) granting and authorizing the adequate protection proposed herein for the benefit of the

---

[1] The Debtor's Tax I.D. No. is xx-xxx4021.  The address for LTAP US, LLLP is Five Concourse Parkway, Suite 3100, Atlanta, Georgia 30328.

Prepetition Lenders; (b) authorizing the Debtor to enter into a debtor in possession financing facility (the "DIP Facility") with the DIP Lenders (defined below) and to obtain first priority secured postpetition financing on a priming basis in the aggregate principal amount of $21,150,000.00 on an emergency basis and $40,000,000.00 in the aggregate on a final basis; (c) authorizing and approving a related Work Fee and Breakup Fee (each as defined below); (d) scheduling a final hearing on the Motion (the "Final Hearing") to consider entry of a final order approving the Motion (the "Final Order"); and (e) granting related relief. The terms of the DIP Facility are substantially set forth in the commitment letter (the "Commitment Letter") and term sheet (the "Term Sheet") attached hereto as Exhibit A and the proposed form of Emergency Order attached hereto as Exhibit B.

## BACKGROUND

### A. General Background

2. On December 22, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Court"). The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee, examiner or committee has been appointed in the Debtor's chapter 11 case.

3. The Debtor was formed and exists to own and acquire previously issued life insurance policies (individually, a "Policy," or collectively, the "Policies") in the life settlement market. As of the Petition Date, the Debtor held four hundred and ten (410) policies on three hundred and thirteen (313) lives, with the aggregate death benefits of approximately

$1.36 billion. The Policies were issued by fifty-three (53) different insurance carriers (collectively, the "Insurance Carriers"). The Debtor has no other significant operations or assets.

4. In order to maintain the value of the Policies, the Debtor must timely pay premiums (the "Premiums"). Failure to timely pay the Premiums will ultimately result in the lapse of the Policies and complete devaluation of the Debtor's assets.

5. The factual background relating to the Debtor's commencement of its chapter 11 case and further information regarding the Debtor's history and business is set forth in detail in the *Declaration of Dietmar Hofmarcher in Support of First Day Motions* (the "Hofmarcher Declaration") filed on the Petition Date and incorporated herein by reference.[2]

## B. The Company's Debt Structure

6. **Secured Debt.** The Debtor is a borrower under that certain Loan and Security Agreement, dated as of June 30, 2008 (as amended, supplemented or otherwise modified from time to time, the "Wells Fargo Agreement"),[3] among the Debtor, as borrower, SLG, as servicer ("Servicer"), LT Partner, as collateral manager ("Collateral Manager"), Wells Fargo Bank, N.A. and other lenders identified in the Wells Fargo Agreement (the "Prepetition Lenders"), Wells Fargo Securities, LLC, as administrative agent (the "Agent"), Wells Fargo Bank, N.A, as the securities intermediary and the verification agent ("Securities Intermediary"), Wells Fargo Bank, N.A., as hedge counterparty (the "Hedge Counterparty") and Berlin Atlantic Capital US, LLC and BAC Asset Management Gmbh, as performance guarantors (the "Performance Guarantors").

---

[2] The Debtor further incorporates herein by reference all of the prior proceedings in this chapter 11 case as well as any proceedings related to the Cash Collateral Motion and Stay Relief Motion (both as defined herein).

[3] All capitalized terms in this section not herein defined shall have the same meaning as ascribed to them in the Wells Fargo Agreement. The Debtor and its professionals are in the process of reviewing the relevant prepetition loan documents and nothing herein shall constitute an admission or agreement with respect to any aspect of the financing transaction, the amount, validity, or priority of any debt asserted by the Prepetition Lenders, or the Prepetition Lenders' asserted interests in or relative rights with respect to the Collateral.

7.     The Wells Fargo Agreement provides for a secured variable loan pursuant to which the Debtor issued to the Prepetition Lenders a variable funding note ("VFN") in the principal amount of up to $224,000,000 as set forth in Section 2.1(a) of the Wells Fargo Agreement. The Agent has alleged that the total amount of outstanding obligations under the Wells Fargo Agreement is approximately $222.5 million, exclusive of accrued and accruing interest, fees, costs and expenses.

8.     Under the Wells Fargo Agreement, the Agent, on behalf of the Prepetition Lenders, asserts a valid, perfected, security interest in and lien on the Debtor's Prepetition Collateral (as defined in the Term Sheet), which includes the Policies, all Accounts, all rights, title and interest of the Borrower (but not the obligations) under the Transaction Documents, the Hedge Collateral, the Pledged Interests, the Newco Transfer Documents, and other related assets. Pursuant to the terms of the Wells Fargo Agreement, the Securities Account Control and Custody Agreement (the "Account Control Agreement") and other related documents, the Securities Intermediary holds the Policies as custodian.

9.     The Agent, on behalf of the Prepetition Lenders, has asserted that the Prepetition Lenders are owed, as of the Petition Date, $222.5 million, secured by substantially all of the Debtor's assets.

10.     Pursuant to the Wells Fargo Agreement, Towers Watson Risk Consulting, Inc. ("Towers Watson") provides a monthly report on the value of the Prepetition Collateral. According to the Life Settlement Collateral Value Calculation (the "Valuation Report") dated December 13, 2010, as of November 30, 2010, the "portfolio value" of the Policies is $311,473,957, well in excess of the outstanding obligations under the Wells Fargo Agreement.

### C. The Cash Collateral and Stay Relief Motions

11.     On the Petition Date, the Debtor filed its Motion for an Order Authorizing the Use of Cash Collateral [D.I. 5] (the "Cash Collateral Motion"). Through the Cash Collateral Motion, the Debtor seeks authority to use the Cash Collateral (as defined in the Cash Collateral Motion) on both an interim and a final basis in accordance with the proscribed budget to pay the Premiums and maintain the value of the Policies. Should the Cash Collateral Motion be granted and the Debtor receives payment on a policy maturation, the Debtor will have sufficient liquidity to continue to fund the Premiums and preserve the assets while pursuing a successful reorganization. The Cash Collateral Motion is currently scheduled to be heard at the hearing on February 10, 2011.

12.     On December 28, 2010, Wells Fargo filed the Motion of Wells Fargo Securities, LLC and Wells Fargo Bank, N.A. for Relief from the Automatic Stay [D.I. 36] (the "Stay Motion") and sought expedited relief. By order dated December 29, 2010, the Court granted expedited consideration of the Stay Motion and scheduled it for a hearing on January 6, 2011 [D.I. 46]. The Stay Motion was rescheduled for February 10, 2011 [D.I. 79].

13.     Through the Stay Motion, Wells Fargo seeks relief from the automatic stay to allow it to exercise rights under the Wells Fargo Agreement with respect to the Policies, including any existing Cash Collateral and foreclose upon its interest in the Policies.

14.     On February 3, 2011, the Debtor filed the Objection to the Motion of Wells Fargo Securities, LLC and Wells Fargo Bank, N.A. for Relief from the Automatic Stay [D.I. 96] (the "Objection").

15.     Through the Objection, the Debtor requested that the Court deny the Stay Motion because not only will the Debtor provide credible evidence at trial that Wells Fargo has a

sufficient equity cushion to provide adequate protection, but also that upon the approval of the debtor in possession financing, Wells Fargo will be further protected. The Stay Motion and the Objection are currently scheduled to be heard on February 10, 2011.

## JURISDICTION

16. This Court has jurisdiction over this case, the Debtor, its estate and this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

17. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

18. The statutory bases for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363, 364, and 507, Bankruptcy Rule 4001 and Local Rule 4001-2.

## RELIEF REQUESTED

19. By this Motion, the Debtor requests that the Court (a) authorize (i) the Debtor's non-consensual usage of the Prepetition Lenders' Cash Collateral, and (ii) the Debtor's provision of adequate protection to the Prepetition Lenders for the usage of their Cash Collateral and the incurrence of the DIP Obligations; (b) approve the Debtor's entry into the DIP Facility (defined below) and to borrow up to $21,150,000.00, on an emergency basis, and up to $40,000,000.00 in the aggregate, on a final basis; (c) approve the related Work Fee and Breakup Fee; (d) schedule the Final Hearing on the Motion; (e) grant a waiver of any stay of the effectiveness of the order approving this Motion; and (f) grant such other and related relief as is deemed necessary. The Debtor submits that obtaining the relief requested herein is in the best interest of the Debtor, its estate and stakeholders and presents the best opportunity for the Debtor to maximize value from its assets and its estates through this case for the benefit of all parties in interest.

### A. Usage of the Prepetition Lenders' Cash Collateral and Priming the Prepetition Lenders' Liens

20.     In connection with its entry into the DIP Facility, the Debtor is requesting that the Court authorize (i) the non-consensual usage of the Prepetition Lenders' Cash Collateral, and (ii) the priming of the Prepetition Lenders' Liens (defined below) in favor of the DIP Liens. The Debtor has proposed an Adequate Protection Package (defined below) that the Debtor believes more than adequately protects the interests of the Prepetition Lenders in the Prepetition Collateral during this case. Additionally, the Debtor believes that the Prepetition Lenders have a significant equity cushion, even after accounting for the priming of the Prepetition Lenders' Liens as proposed herein.

21.     Absent obtaining post-petition financing, the Debtor will be unable to pay the Premiums and the Policies will eventually lapse to the detriment of all stakeholders. The financing proposed under the DIP Facility provides the Debtor with both the liquidity infusion and the financing timeline necessary for the Debtor to preserve the value of the Policies while enabling the Debtor to avoid a forced liquidation of its assets at distressed values.

### B. The Prepetition Lenders' Adequate Protection

22.     The Debtor is requesting the (i) non-consensual usage of the Cash Collateral of the Prepetition Lenders, and (ii) priming of the liens on the Debtor's assets granted to the Prepetition Lenders in connection with the Wells Fargo Agreement (the "Prepetition Lenders' Liens"). In order to provide the Prepetition Lenders with adequate protection, pursuant to Bankruptcy Code section 361, the Debtor proposes the following (the "Adequate Protection Package"):

> a.     *Adequate Protection Liens.* Pursuant to Bankruptcy Code section 361, as adequate protection of the interests of the Prepetition Lenders in the Prepetition Collateral against any diminution in value of such interests in

the Prepetition Collateral on account of (i) depreciation, physical deterioration, use, sale, loss, or decline in market value, (ii) the granting of liens to the DIP Agent and the DIP Lenders (the "Postpetition Liens") , (iii) the Debtor's use of Cash Collateral , and (iv) the imposition of the automatic stay, the Debtor will grant to the Prepetition Agent on behalf of the Prepetition Lenders, continuing valid, binding, enforceable and perfected postpetition security interests in and liens on the Prepetition Collateral (the "Replacement Liens"). The Replacement Liens shall be junior in priority only to (i) liens and claims granted to the DIP Agent and the DIP Lenders under the DIP Facility; and (ii) the Carve-Out. The Replacement Liens shall be senior to all other security interests in, liens on, or claims against any of the Prepetition Collateral.

b.  *Adequate Protection Claim.*   As further adequate protection of the interests of the Prepetition Lenders in the Prepetition Collateral against any diminution in value of such interests in the Prepetition Collateral on account of (i) depreciation, physical deterioration, use, sale, loss, or decline in market value, (ii) the granting of the Postpetition Liens, (iii) the Debtor's use of Cash Collateral, and (iv) the imposition of the automatic stay, the Prepetition Agent on behalf of the Prepetition Lenders will be granted as and to the extent provided by Bankruptcy Code section 507(b) an allowed superpriority administrative expense claim in this Case and any successor case (the "Adequate Protection Priority Claim"). Except as set forth in the Emergency Order, the Adequate Protection Priority Claim shall have priority over all administrative expense claims and unsecured claims against the Debtor or its estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114; provided, however, that the Adequate Protection Priority Claim shall be junior in priority to the Superpriority Claim of the DIP Lenders and the Carve-Out.

c.  *Adequate Protection Payments.*  As additional adequate protection for the Prepetition Lenders, the Prepetition Lenders shall receive (i) immediate repayment of the principal amount of the Prepetition Lenders' Liens in the amount of $10 million; and (ii) Net Death Benefits and proceeds of any individual policy sales that exceed the greater of (a) $30,000,000 and (b) all amounts outstanding under the DIP Facility (including accrued and unpaid interest thereon and the payment of the make-whole referred to in the Term Sheet), which shall be remitted to Wells Fargo and applied to the principal amount due under the Wells Fargo Agreement upon the indefeasible payment in full in cash of all outstanding DIP Obligations (including such make-whole obligations).

As more fully set forth below, the Debtor also believes that the Prepetition Lenders are adequately protected by an equity cushion because the Debtor believes that the value of the Prepetition Collateral far exceeds the aggregate amount of the Prepetition Secured Debt and the total amount of postpetition financing the Debtor is requesting under the DIP Facility.

## C. The DIP Facility

23.     The Debtor is requesting the authorization to enter into the DIP Facility, and to prime the Prepetition Lenders' Liens on a non-consensual basis. The pertinent terms of the DIP Facility are:[4]

    *a.*    *Borrower*. LTAP US, LLP.

    *b.*    *DIP Lenders*. Monarch Holdings (Onshore) LLC and any other lenders selected by the DIP Agent and consented to by the Debtor (such consent not to be unreasonably withheld, delayed or conditioned).

    *c.*    *DIP Agent*. Monarch Alternative Capital LP.

    *d.*    *Maximum Availability*. $40 million.

    *e.*    *Purpose and Availability*. Proceeds of the DIP Loans under the DIP Facility will be used for the following purposes: (a) to the extent and on the dates set forth in the schedule attached to the Term Sheet as Appendix A and to the extent set forth in the budget also contained in such Appendix A (which schedule, as the same may hereafter be amended, modified or supplemented in accordance with the terms of the DIP Facility, shall at all times be in form and substance satisfactory to the DIP Agent, and is hereinafter referred to as the "Approved Budget") and to the extent set forth in the Approved Budget and in accordance with the terms of the DIP Facility and the Orders (as defined below), (i) for the payment of working capital and other general corporate needs of the Debtor in the ordinary course of business, (ii) for the payment of Chapter 11 costs and expenses of the Debtor and the DIP Agent and the DIP Lenders, including allowed professional fees subject to the terms and

---

[4] The description of the DIP Facility set forth herein is fully qualified by the Term Sheet and the Emergency Order, and parties in interest are advised to review both of these documents in their entirety. Unless otherwise defined herein, all capitalized terms used in this description of the DIP Facility shall have the meanings ascribed to them in the DIP Facility Documents.

conditions set forth in the Term Sheet, and (iii) all necessary insurance policy premiums and servicing fees payable by the Debtor during the Availability Period as provided in the Approved Budget attached to the Term Sheet as Appendix A; and (b) payment, upon the Initial Closing Date, of a portion of the principal amount owed under the Wells Fargo Agreement in the amount of $10 million as a form of adequate protection, in each case subject to the DIP Term Sheet and the Orders.

The DIP Loans under the DIP Facility may be incurred at any time during the Availability Period, subject to the satisfaction or waiver of all conditions thereto set forth in the Term Sheet, and to the extent set forth in the Approved Budget, as follows: (a) an initial draw on the Initial Closing Date consisting of (i) $10 million to be used as a principal payment to reduce the outstanding loans under the Wells Fargo Agreement and as a form of adequate protection, and (ii) up to an additional $11.15 million to be used to pay the DIP Agent for fees, costs and expenses payable on the Initial Closing Date, as well as to be used to pay premiums and other costs, all as provided for in the Approved Budget estimated to be incurred or payable by the Debtor during the month of February 2011 (all such draws referred to in clause (a) being hereinafter referred to as the "First Advance"), and (b) a minimum of $4.5 million per month following the First Advance, *provided* that commencing with the fourth advance, draws may be in a minimum amount of $1 million or more; *provided further* that (i) the amount of any DIP Loan made or made available on any draw date shall be not greater than the amount set forth in the Approved Budget (as defined below) with respect to such draw date and (ii) no advances other than the First Advance (and an additional advance of up to $4.6 million in the event the Final Order is not entered prior to March 6, 2011) will be made available to the Debtor unless and until definitive loan, security, guarantee and related documentation satisfactory to the DIP Agent has been duly executed and delivered by the Debtors, the DIP Agent and the DIP Lenders and duly approved by the Bankruptcy Court (such date herein being referred to as the "Second Closing Date"). All Loan fundings under the DIP Facility (except for the First Advance) will take place on the 3rd business day of any month and must be requested, in writing, by the Debtor no later than the 25th day of the prior month.

*f.*    *Closing Date.* February 15, 2011.

*g.*    *Term.* The earliest of (a) September 30th 2011, (b) the effective date of a Chapter 11 plan of reorganization of the Debtor that provides for the indefeasible payment in full in cash of all DIP Obligations (defined below) or that is otherwise acceptable to the DIP Agent, (c) sale of all or substantially all of Debtor's assets, (d) 30 calendar days after the entry of the Emergency Order, unless the Final Order shall have been entered and

shall have become effective prior thereto and the Second Closing Date shall have occurred, or (e) the acceleration and/or termination of the DIP Facility upon the occurrence of an Event of Default (defined below). All DIP Obligations shall be due and payable in full and in cash on the Termination Date and the Availability Period shall terminate on the Termination Date provided, that the Initial Note shall be due and payable on the date that is 30 days after the Initial Closing Date, unless definitive loan, security, guarantee and related documentation satisfactory to the DIP Agent has been duly executed and delivered by the Debtor, the DIP Agent and the DIP Lenders and duly approved by the Bankruptcy Court.

h.   *Priority and Security*. Any and all obligations of the Borrower under the DIP Facility to the DIP Agent and the DIP Lenders, including, without limitation, all principal and accrued interest, costs, fees (including the Work Fee and Break-Up Fee), expenses, premiums and the make-whole referred to above (collectively, the "DIP Obligations"), will be:

*(1)*   Claims entitled to the benefits of section 364(c)(1) of the Bankruptcy Code, having super-priority over any and all administrative expenses of the kind specified in Bankruptcy Code §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other Bankruptcy Code provision, subject only to the Carve-Out (defined below);

*(2)*   Secured, pursuant to section 364(c)(2) of the Bankruptcy Code, by a first priority lien on and security interest in all of the Borrower's assets and property (i) not otherwise encumbered by a security interest or lien prior to Petition Date or (ii) acquired after the Petition Date; and

*(3)*   Secured, pursuant to section 364(d)(1) of the Bankruptcy Code, by a first priority, priming, senior lien on and security interest in all of the Borrower's assets and property that is subject to a perfected lien or security interest on the Petition Date (or subject to a lien or security interest in existence on the Petition Date that is perfected subsequent thereto to the extent permitted by § 546(b)), including, without limitation, all of the Borrower's assets and property securing the obligations under the Wells Fargo Agreement

The property referred to in the preceding clauses (2) and (3) is collectively referred to as the "DIP Collateral" and shall include, without limitation, all assets (whether tangible, intangible, real, personal or mixed) of the Borrower, whether now owned or hereafter acquired and wherever located, including, without limitation, all insurance policies (and all rights, interests and entitlements thereto and thereunder (including any return of premiums)), accounts, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, causes of action (including avoidance actions and

proceeds thereof) patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof.

i.  *Carve-Out.* The liens and super-priority claims granted by the Bankruptcy Court with respect to the DIP Facility shall be subject to the claims and the payment of the following expenses (the "Carve-Out"): (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under Section 1930(a) of title 28 of the United States Code; and (b) to the extent provided for in the Approved Budget, the unpaid and outstanding fees and expenses actually incurred on or after the Petition Date, by attorneys, accountants and other professionals retained by the Debtor or any official statutory committee appointed under Sections 327, 363 or 1102(a) of the Bankruptcy Code (collectively, the "Professionals"), which have been or subsequently are allowed by a final order of the Bankruptcy Court pursuant to Sections 326, 328, 330 or 331 of the Bankruptcy Code (collectively, the "Allowed Professional Fees"); provided that the Carve-Out shall only be applicable to such fees and expenses specified in the foregoing clauses (a) and (b) to the extent they are accrued prior to an event of default under the DIP Facility. In addition, the additional sum of $50,000 shall be available to fund Allowed Professional Fees after the date of any such event of default.

j.  *Interest Rate: Default Rate.* Interest rate: 14% per annum; Default interest rate: 16% per annum.

k.  *Make Whole Fee.* If the DIP Facility is repaid or terminated prior to September 30th 2011, the Debtor agrees to pay to the DIP Lenders an amount equal to the difference between (a) an amount equal to the DIP Commitment multiplied by 14.00% (plus, if as a result of a termination arising from an Event of Default through September 30th, 2011, an additional 2.00% for the period from and after the occurrence of such Event of Default) and (b) the amount of interest and commitment fee actually paid by the Debtor up to the repayment date or the Termination Date, as applicable.

l.  *Commitment Fee on undrawn portion.* 1.50% per annum, payable monthly in arrears on each monthly anniversary of the date of the First Advance, calculated from and including the date of the Commitment Letter.

m.  *Facility Fee.* 2.00% of the maximum amount available under the DIP Facility, earned and payable upon entry of the Emergency DIP Order.

n.  *Administrative Agent Fees.* $25,000 per annum, payable in full initially on the Initial Closing Date.

*o.* *Event of Default.* As set forth in Appendix E to the DIP Term Sheet.

*p.* *Expenses.* The Debtor shall pay promptly upon request, and in each case within three (3) business days of receipt of a detailed invoice from the DIP Agent or DIP Lenders, all reasonable, out-of-pocket fees, costs and expenses of the DIP Agent and DIP Lenders (including all reasonable fees, expenses and disbursements of outside counsel, including local counsel, and other professional advisors hired by the DIP Agent and DIP Lenders, including the servicing advisor) in connection with the preparation, and the funding of all Loans under the DIP Facility, including, without limitation, all due diligence, syndication (including printing, distribution and bank meeting), transportation, computer, duplication, messenger, audit, insurance, appraisal, valuation and consultant costs and expenses, and all search, filing and recording fees, incurred or sustained by the DIP Agent and DIP Lenders in connection with the DIP Facility, or the transaction contemplated thereby, the administration of the DIP Facility and any amendment or waiver of any provision of the DIP Facility. If the Debtor objects to any such fees or expenses, it shall provide written notice of such objection to the DIP Agent within three (3) business days, provided that the Debtor shall be required to pay any and all amounts regardless of such objection pending resolution of the objection.

*q.* *Work Fee / Breakup Fee.* Debtor acknowledges and agrees that the DIP Agent and the DIP Lenders would not proceed with (a) the negotiation and documentation of the DIP Facility, and (b) the funding of any amount under the DIP Facility, in the absence of Debtor's agreement to seek and obtain Bankruptcy Court approval, in the Emergency Order, of a work fee in the amount of $100,000 (the "Work Fee") and a breakup fee in the amount of 5% of the total DIP Commitment (the "Breakup Fee"). Subject to the entry of the Emergency Order, the Work Fee shall be payable upon funding of the First Advance and shall be non-refundable. Subject to the entry of the Emergency Order, the Breakup Fee shall be payable during the period from the date of the Commitment Letter until the Second Closing Date (a) upon the entry of an order approving any other financing or (b) if the Debtor refinances, repays or prepays the Initial Note (other than through definitive documentation of the DIP Facility), and in all cases in the event that the Debtor does not consummate the DIP Facility for any reason, including to pursue an alternative financing arrangement with Wells Fargo or any other party. The Work Fee and Breakup Fee shall be afforded the same lien and claim priorities as all other DIP Obligations.

24.     In accordance with Local Rule 4001-2(a)(i), the Debtor highlights for the

Court the following provisions included in the DIP Facility:

a.  Local Rule 4001-2(a)(i)(B) requires disclosure of, among other things, the waiver of claims against a secured creditor without first providing parties in interest 75 days, and the creditors committee 60 days from its formation, to investigate the claims being waived. The Emergency Order waives claims related to (i) any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation and entry into the DIP Facility Documents, and (ii) any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability and nonavoidability of the Postpetition Liens and Superpriority Claims, which may be held or asserted against the DIP Agent, the DIP Lenders and affiliated parties. (Emergency Order, at ¶15) The Debtor believes that this provision of the Local Rules in intended to address prepetition claims against existing lenders for events occurring prior to the commencement of a debtor's bankruptcy case and is not applicable to waivers granted with respect to entering into a new money debtor in possession facility. Accordingly, the Debtor submits that Local Rule 4001-2(a)(i)(B) is not applicable to the waiver but the Debtor is nonetheless highlighting it for purposes of full disclosure.

b.  Local Rule 4001-2(a)(i)(C) requires disclosure of any provision which seeks to waive, without notice, whatever rights the estate may have under Bankruptcy Code section 506(c). The Emergency Order provides that, effective upon entry of the Emergency Order, no party may seek to surcharge the DIP Collateral, including charges under section 506(c). (Emergency Order, at ¶ 13.) The Debtor believes that the Local Rules seeks to address waivers of 506(c) rights as to prepetition secured claims and does not apply to the contest of postpetition borrowings from a new money lender.

c.  Local Rule 4001-2(a)(i)(D) requires the disclosure of provisions that immediately grant to prepetition secured creditors liens on the debtor's claims and causes of action arising under Bankruptcy Code sections 544, 545, 547, 548 and 549 (collectively, "Avoidance Actions"). The Emergency Order grants the DIP Lenders liens in Avoidance Actions. (Emergency Order, at ¶ 10.) For the reasons set forth below, given the Debtor's lack of liquidity and alternative financing options, and because the DIP Lenders are new money lenders, the Debtor believe that liens on Avoidance Actions in the Emergency Order are appropriate under the circumstances.

d. Local Rule 4001-2(a)(i)(G) requires disclosure of any provision which seeks to prime any secured lien without the consent of that lienor. The DIP Facility provides for the priming of the Prepetition Lenders' Liens and the Debtor does not believe that the Prepetition Lenders consent to such priming. (Emergency Order, at ¶ 6, 10.) Nonetheless, the priming of the Prepetition Lenders' Liens is a necessary condition to entering into the DIP Facility, and the Debtor believes that the DIP Facility presents the Debtor's best available financing proposal. Moreover, as demonstrated below, the Prepetition Lenders are more than adequately protected for the priming of their liens. Accordingly, the Debtor believes that the proposed priming provisions are appropriate.

e. The Emergency Order further provides for the payment of the Work Fee and Breakup Fee. Emergency Order, at ¶ 5. The Debtor has acknowledged and agreed that the DIP Agent and the DIP Lenders would not proceed with (a) the negotiation and documentation of the DIP Facility, and (b) the funding of any amount under the DIP Facility, in the absence of Debtor's agreement to seek and obtain Bankruptcy Court approval of such amounts in the Emergency Order. Emergency Order, at ¶ N.

## APPLICABLE AUTHORITY

### A. Use of Cash Collateral

25. Bankruptcy Code section 363 governs a debtor's use of estate property.[5]

In relevant part, Bankruptcy Code section 363(c)(1) provides that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).

26. Bankruptcy Code section 363(c)(2), however, provides an exception with respect to "cash collateral" to the general grant of authority to use property of the estate in the

---

[5] Pursuant to Bankruptcy Code section 1107, a debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Bankruptcy Code section 363. *See*, 11 U.S.C. § 1107(a).

ordinary course as set forth in Bankruptcy Code section 363. Specifically, a trustee or debtor in possession may not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

27.     The Debtor submits that, under the circumstances here, its request to use Cash Collateral should be approved. Absent access to the usage of Cash Collateral, the Debtor's access to liquidity would be severely limited, and the Debtor's ability to preserve the value of the Policies during this case would be significantly impaired. While the DIP Lenders have expressly consented to the use of any Cash Collateral they advance (satisfying the requirements of Bankruptcy Code section 363(c)(2)(A)), the Prepetition Lenders have not consented to the use of their Cash Collateral on the terms proposed herein. However, the Debtor is nonetheless compelled to request approval for the usage of the Prepetition Lenders' Cash Collateral in order to have access to sufficient funds to operate. As demonstrated herein, the Prepetition Lenders' interest in the Cash Collateral is adequately protected by a significant equity cushion and the proposed Adequate Protection Package; and, as such, the Court should authorize the usage of the Prepetition Lenders' Cash Collateral.

### i.  The Need to Use Cash Collateral

28.     The Debtor has proposed to use the Cash Collateral of the Prepetition Lenders, as well as the borrowings under the DIP Facility, pursuant to the Approved Budget (as defined in the Term Sheet), subject to permitted variances, in order to fund these cases. The Debtor presently does not have sufficient available sources of cash to pay the Premiums on a

timely basis without the use of the Cash Collateral and the proposed DIP Facility. The Debtor's continued timely payment of the Premiums is essential to the Debtor's enterprise value, the value of the Prepetition Collateral, and to ensure the Debtor's continued viability and prospects for reorganization. Absent access to Cash Collateral and the DIP Facility, as set forth in the Approved Budget, the value of the Debtor's primary assets – the Policies – will evaporate as the Polices lapse due to non-payment of the Premiums on a timely basis. Accordingly, in order to avoid immediate and irreparable harm to the Debtor's business and its estate, the Debtor has an immediate need for authority to use Cash Collateral.

### ii. Adequate Protection

29.    Bankruptcy Code section 363(c)(2) provides that a debtor may not use, sell or lease cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). To use cash collateral without the lienholder's consent and to use other property in which a creditor claims an interest, the debtor is required to provide the lienholder with adequate protection of its interest in the cash collateral and other property in which an interest is claimed. Further, Bankruptcy Code section 363(e) provides, in pertinent part, that "on request of an entity that has an interest in property . . . proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Examples of adequate protection are provided in Bankruptcy Code section 361 and include, but are not limited to: (a) lump sum or periodic cash payments to the extent that such use will result in a decrease in value of such entity's interest in the property; (b) provisions for an additional or replacement lien to the extent that the use of the property will

cause a decrease in the value of such entity's interest in the property; and (c) such other relief as will result in the realization by the entity of the indubitable equivalent of such entity's interest in the property. 11 U.S.C. § 361.

30. Additionally, courts have found a secured creditor adequately protected where either a sufficient equity cushion in the collateral exists to protect the secured creditor, or the level of the secured creditor's collateral is not decreasing over time. *In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D. N.H. 1993) (secured creditor was adequately protected and debtor was authorized to use cash collateral where level of collateral was not declining); *In re May*, 169 B.R. 462 (Bankr. S.D. Ga. 1994) (equity cushion in property may provide creditor with adequate protection of its interest, sufficient to permit the debtor to use cash collateral); *In re Southwest Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992 (same). Even in those instances where its equity cushion is fluctuating, a secured creditor is adequately protected so long as an adequate cushion remains over and above its secured claim. *Dynaco Corp.*, 163 B.R. at 394.

31. Nevertheless, adequate protection must be determined on a case-by-case basis, in light of the particular facts and circumstances presented, the focus being that which is required to protect a secured creditor from diminution in the value of its interest in the particular collateral during the use period. *See In re Ledgmere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990); *Delbridge v. Prod. Credit Assoc. & Fed. Land Bank*, 104 B.R. 824, 827 (E.D. Mich. 1989); *In re Kain*, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986).

32. Pursuant to Bankruptcy Code sections 361 and 363(e), the Debtor is prepared to adequately protect the Prepetition Lenders to the extent: (i) they are secured; and (ii) there is any diminution in the value of the Prepetition Collateral resulting from the Debtor's use

of the Cash Collateral. The Debtor submits that the equity cushion that the Prepetition Lenders currently enjoy, the continued payment of the Premiums and maintenance of the Policies, as well as the Adequate Protection Package, satisfy the requirements that the Debtor must provide the Prepetition Lenders with adequate protection for the use of their Cash Collateral.

33. Given the value of the Policies, the Debtor asserts that the Prepetition Lenders are oversecured. Even assuming the net value of the Policies falls at the low-end of the recent valuation spectrum, which the Debtor believes represents a significant undervaluation of the Policies, the Prepetition Lenders have a substantial equity cushion because the value of the Prepetition Collateral exceeds the amount of the Prepetition Secured Debt ($222.5 million) and the proposed DIP Facility. Accordingly, the Debtor submits that the Prepetition Lenders are more than adequately protected.

34. To the extent that further protection against diminution in the value of the Prepetition Collateral resulting from the Debtor's use of the Cash Collateral is required, the Debtor has proposed the Adequate Protection Package, consisting of: (a) Replacement Liens, junior in right only to the (i) liens granted to the DIP Lenders; and (ii) the Carve-Out; (b) a superpriority administrative expense claim pursuant to Bankruptcy Code section 507(b) for any diminution in the value of the Prepetition Collateral, junior in priority to the Superpriority Claim and the Carve-Out; (c) the immediate payment of $10 million; (d) the payment of Net Death Benefits and proceeds of any individual policy sales that exceed the greater of (a) $30,000,000.00, and (b) all amounts outstanding under the DIP Facility (including accrued and unpaid interest thereon and the payment of the make-whole referred to above), which shall be remitted to Wells Fargo and applied to the principal amount due under the Wells Fargo Agreement upon the indefeasible payment in full in cash of all outstanding DIP Obligations

(including such make-whole) and (e) the provision of the same documentation and reports provided to the DIP Agent and DIP Lenders under the Term Sheet, the Emergency Order and Final Order. The Debtor believes that the foregoing Adequate Protection Package provides the Prepetition Lenders with sufficient adequate protection of their interest in the Prepetition Collateral and also compensates the Prepetition Lenders for the Debtor's continued usage of the Cash Collateral during this case.

35.     Accordingly, the Debtor respectfully submits that the use of Cash Collateral on the terms set forth herein and in the attached proposed Term Sheet and Emergency Order provides the Prepetition Lenders with adequate protection and is in the best interest of the Debtor, its estate, its stakeholders and all parties in interest and, therefore, should be authorized by this Court.

36.     Further, the Debtor is not seeking approval for the use of any cash collateral of NCB nor will the DIP Lenders be granted priming liens on the NCB Collateral. The DIP Facility will not modify NCB's asserted first-priority lien in the Debtor's equity interest in the ACF Subsidiaries. As a result, NCB is not entitled to any additional adequate protection of the NCB Collateral.

**B.  The DIP Facility Should Be Approved**

37.     Section 364(c) requires a finding, made after notice and a hearing, that the debtors in possession cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense."[6] *See In re Garland Corp.*, 6 B.R. 456, 461 (1st

---

[6] Section 364(c) of the Bankruptcy Code provides that:

> If the trustee [or debtors-in-possession] is unable to obtain unsecured credit allowable under § 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt —

Cir. BAP 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit was unobtainable); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor seeking unsecured credit under section 364(c) of the Bankruptcy Code must prove that it cannot obtain unsecured credit pursuant to section 364(b)); *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it made reasonable efforts to seek other sources of financing under sections 364(a) and (b)).

38.     In addition, section 364(d)(1), which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the Court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –
>
> (A)     the trustee is unable to obtain credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

39.     As set forth herein and as the evidence will demonstrate, the Debtor could not have obtained postpetition financing on the terms and of the type and magnitude required in this case on an unsecured basis; or, indeed, without offering terms largely similar to those of the DIP Facility.

40.     A debtor need only demonstrate "by a good faith effort that credit was not available" without the protections afforded to potential lenders by sections 364(c) or 364(d) of the Bankruptcy Code. *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986). Thus, "[t]he

---

(1)  with priority over any and all administrative expenses of the kind specified in § 503(b) or 507(b) of this title;
(2)  secured by a lien on property of the estate that is not otherwise subject to a lien; or
(3)  secured by a junior lien on property of the estate that is subject to a lien.

statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Ames*, 115 B.R. at 40 (holding that debtor made reasonable effort to secure financing when it selected the least onerous financing option from the remaining two lenders). Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

      41.    Both pre and postpetition, the Debtor endeavored to identify potential sources of financing and explored various financing alternatives. Based on discussions with potential lenders, the Debtor has determined that adequate postpetition financing on an unsecured basis or on a junior priority basis to the Prepetition Lenders is not available. Without postpetition financing, the Debtor will be unable to pay the Premiums, which would eventually cause the Policies to lapse. Further, the terms of the DIP Facility are fair, reasonable, and adequate given the Debtor's circumstances.

### C.  Approval of Priming Liens and Adequate Protection Under Section 364(d)

      42.    If a debtor is unable to obtain adequate credit under the provisions of Bankruptcy Code section 364(c), the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien." 11 U.S.C. § 364(d). Bankruptcy Code section 364(d)(1), which governs the incurrence of postpetition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

      (a) The trustee is unable to obtain such credit otherwise; and

> (b) There is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d).

43.    The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis. *See In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996). "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." *Id.* (quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)). The Debtor has concluded that adequate and acceptable alternative financing on a non-priming basis and on terms more favorable than those being provided by the DIP Lenders under the DIP Facility is currently unobtainable.  As set forth above, the Debtor believes that the Prepetition Lenders enjoy an equity cushion with respect to the Prepetition Collateral.  In fact, the Debtor believes that the value of the Prepetition Collateral exceeds the amount of the Prepetition Secured Debt and the proposed DIP Facility.  The Debtor believes that the equity cushion enjoyed by the Prepetition Lenders by itself provides adequate protection to the Prepetition Lenders. Nonetheless, the Debtor has proposed the Adequate Protection Package to protect the Prepetition Lenders' interest in the Prepetition Collateral, to the extent that there is any diminution in the Prepetition Lenders' interests therein.  Because the Debtor has demonstrated that (i) the same or superior financing is otherwise unavailable, and (ii) the Prepetition Lenders will be adequately protected, Bankruptcy Code section 364(d) has been met and the Court should authorize the priming of the Prepetition Lenders' Liens by the DIP Liens in connection with the DIP Facility.

### D. No Adequate Alternative to the DIP Facility Is Currently Available

44.     A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by Bankruptcy Code sections 364(c) and (d). *See In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

45.     Substantially all of the Debtor's assets are subject to the Prepetition Lenders' Liens. Because of the amount of the Prepetition Lenders' secured claims, obtaining the financing needed by the Debtor as unsecured debt or debt that would be secured by liens junior to the liens of the Prepetition Lenders was not a realistic option, especially given the current state of the capital markets. Both prior to and after the Petition Date, the Debtor diligently pursued potential sources of financing. Based on discussions with potential lenders, the Debtor has determined that adequate postpetition financing on an unsecured basis or on a junior priority basis to the Prepetition Lenders is not available and no other lenders offered terms that were more favorable than the terms set forth in the DIP Facility. Finally, the DIP Agent and the DIP Lenders were not prepared to provide the DIP Facility unless they were granted the priming liens as security for the DIP Loans.

46.     Accordingly, the Debtor has satisfied the requirement of Bankruptcy Code sections 364(c) and (d) that alternative credit on more favorable terms was unavailable to the Debtor.

### E. The Terms of the DIP Facility Are Fair, Reasonable and Appropriate

47.     The terms and conditions of the DIP Facility are fair and reasonable and were negotiated by the parties in good faith and at arms' length. In the reasonable exercise of the Debtor's business judgment, the DIP Facility is the best financing option available under the present circumstances. The purpose of the DIP Facility is to enable the Debtor to timely pay the

Premiums as they come due during this case. Further, the DIP Facility does not directly or indirectly deprive the Debtor's estate or other parties-in-interest of possible rights and powers by restricting the services for which professionals may be paid in this case. See Ames, 115 B.R. at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "absent such protection, the collective rights and expectation of all parties-in-interest are sorely prejudiced").

48.     Generally, the proposed DIP Facility subjects the security interests and administrative expense claims of the DIP Lenders and Prepetition Lenders to the Carve-Out, as set forth in the Term Sheet. The Carve-Out is for the benefit of fees payable under 28 U.S.C. § 1930 and all professionals retained in this case pursuant to an order of the Bankruptcy Court. The Carve-Out protects the fees and expenses up to $50,000.00 that remain unpaid or may thereafter be incurred at the time of an Event of Default. Payments made on account of professional fees before an Event of Default shall not reduce the Professional Fee Cap, but payments made thereafter shall reduce the Professional Fee Cap dollar-for-dollar. In *Ames Dept. Stores*, the Bankruptcy court found such "carve-outs" for professional fees not only reasonable but necessary to ensure that official committees and debtors' estates can retain assistance from counsel. *See Ames*, 115 B.R. at 40.

49.     Likewise, the various fees and charges required under the DIP Facility are reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and rights specified in Bankruptcy Code section 364. *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316 (9th Cir. BAP 1992) (approving financing facility pursuant to section 364 of the Bankruptcy Code that included a lender "enhancement fee").

50.     In particular, the Work Fee and Breakup Fee are reasonable and appropriate under the circumstances. The DIP Agent and the DIP Lenders will not proceed with (a) the negotiation and documentation of the DIP Facility, and (b) the funding of any amount under the DIP Facility (including under the Note), in the absence of the Debtor's agreement to seek and obtain in the Emergency Order Court approval of the Work Fee and Breakup Fee. Given the absence of viable alternative financing options, and the immediate need for continued liquidity for the Debtor to pay the Premiums and maintain the Policies, Court approval and payment of the Work Fee and Breakup Fee is reasonable and appropriate under the circumstances.

51.     The Debtor will further demonstrate the fairness and reasonableness of the terms of the DIP Facility at the Emergency and Final Hearings.

**F.  Application of the Business Judgment Standard**

52.     As described above, after appropriate investigation and analysis, the Debtor has concluded that the DIP Facility is the best alternative available under the circumstances. Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions, including the decision to borrow money, unless such decision fails the arbitrary and capricious standard. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that approval of interim loan, receivables facility and asset-based facility "reflect[ed] sound and prudent business judgment...[was] reasonable under the circumstances and in the best interest of [the debtor] and its creditors"); *cf. Group of Institutional Investors v. Chicago, Mil., St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943) (holding that decisions regarding assumption or rejection of leases are left to the business judgment of the debtor); *In re Simasko Prods. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court"). Indeed, "more exacting scrutiny [of the debtor's business

decisions] would slow the administration of the Debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

53. The Debtor has exercised sound business judgment in determining the appropriateness of a postpetition credit facility and has satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the DIP Facility. The DIP Facility contains terms that are fair, reasonable and in the best interests of the Debtor and its estate. Accordingly, the Debtor should be granted authority to enter into the DIP Facility and to obtain funds from the DIP Lenders on the secured and administrative "superpriority" basis described above, pursuant to Bankruptcy Code sections 364(c) and 364(d).

### G. Emergency Approval Should Be Granted

54. The Debtor requests that the Court conduct an expedited preliminary hearing on the Motion and authorize the Debtor, from and after the entry of the Emergency DIP Order until the Final Hearing, to obtain credit under the DIP Facility in the amount of not more than $21,150,000.00, which the Debtor shall use to, among other things, pay the Premiums as they come due and to pay interest, fees and expenses in accordance with the Emergency DIP Order and the DIP Facility. This will ensure that the Debtor preserves the value of the Polices and avoids immediate and irreparable harm and prejudice to its estate and all stakeholders pending the Final Hearing.

55. Absent this Court's approval of the emergency relief sought in this Motion, the Debtor faces a substantial risk of irreparable harm to the value of the Policies. Simply put, the relief sought herein will allow the Debtor to pay the Premiums on a timely basis and prevent the Policies from lapsing.

56. Fed. R. Bankr. P. 4001(c) permits a court to approve a debtor's request for financing during the 14-day period following the filing of a motion requesting authorization to obtain postpetition financing "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." In examining requests under this rule, courts apply the same business judgment standard as is applicable to other business decisions. See, e.g., Ames, 115 B.R. at 38. After the 14-day period, the rule does not limit the request to those amounts necessary to prevent the destruction of the debtor's business, and the debtor can borrow those amounts it views as prudent to the operation of its business. Id. at 36. The Debtor submits that, for the reasons set forth herein, the immediate obtaining of credit up to the amount of $21,150,000.00 and the use of Cash Collateral on an emergency basis as requested in this Motion is necessary to avert immediate and irreparable harm to the Debtor's business. During the Emergency Period, any and all borrowing under the DIP Facility will be pursuant to the Emergency Order and Note (as defined in the Emergency Order) and the Definitive Credit Documents (as defined in the Emergency Order) will be filed with the Court prior to a final hearing on the DIP Facility.

## REQUEST FOR FINAL HEARING

57. Pursuant to Fed. R. Bankr. P. 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date for the Final Hearing that is no later 30 days following the entry of the Emergency Order.

58. The Debtor requests that it be authorized to serve a copy of the signed Emergency DIP Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the Notice Parties (defined below). The Debtor requests that the Court consider such notice of the Final Hearing to be sufficient notice under Fed. R. Bankr. P. 4001.

## REQUEST FOR WAIVER OF STAY

59.     The Debtor further seeks a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Fed. R. Bankr. P. 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the DIP Facility is essential to enable the Debtor to pay the Premiums on a timely basis to preserve the Debtor's assets.  Accordingly, the Debtor submits that ample cause exists to justify a waiver of the fourteen-day stay imposed by Fed. R. Bankr. P. 6004(h), to the extent it applies.

## NOTICE

60.     No examiner or creditors' committee has been appointed in this chapter 11 case.  Notice of this Motion has been given to: (i) the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee");  (ii) counsel for the Agent for the Prepetition Agent and the Prepetition Lenders; (iii) counsel for the DIP Agent and DIP Lenders; (iv) the issuers of the Life Policies; (v) counsel to NCB; (vi) all other parties entitled to receive notice under Rule 4001 of the Bankruptcy Rules and the local rules of this Court.; and (v) any party requesting notice pursuant to Bankruptcy Rule 2002.  The Debtor submits that no other or further notice is necessary.  No prior request for the relief sought in this Motion has been made to this or any other court.

**WHEREFORE**, the Debtor respectfully requests that the Court (i) at the emergency hearing, enter the Emergency Order; (ii) at the Final Hearing, approve the balance of the Motion and enter the Final Order; and (iii) grant such other relief as the Court deems just and necessary.

Dated: February 8, 2011
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)
Kerri K. Mumford (No. 4186)
Kimberly A. Brown (No. 5138)
919 Market Street, Suite 1800
Wilmington, DE 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: landis@lrclaw.com
mumford@lrclaw.com
brown@lrclaw.com

*Counsel to Debtor and
Debtor in Possession*