# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| LTAP US, LLLP, | ) | Case No. 10-14125(KG) |
| | ) | |
| Debtor. | ) | **Re Dkt. Nos. 5, 36 & 107** |

## MEMORANDUM ORDER[1]

| | |
|---|---|
| LANDIS RATH & COBB LLP | DUANE MORRIS LLP |
| Adam G. Landis, Esquire | Richard W. Riley, Esquire |
| Kerri K. Mumford, Esquire | 222 Delaware Avenue, Suite 1600 |
| 919 Market Street, Ste. 1800 | Wilmington, DE 19801 |
| Wilmington, DE 19801 | |
| | |
| Counsel for Debtor | Counsel for Wells Fargo Securities LLC |
| and Debtor-in-Possession | and Wells Fargo Bank, N.A. |

---

[1] This Opinion constitutes the findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent any of the following findings of fact are determined to be conclusions of law, they are adopted, and shall be construed and deemed, conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted, and shall be construed and deemed, as findings of fact.

The Court has before it three pending motions, all of which are determinative of the Debtor's reorganization prospects. The principal parties are the Debtor, and Wells Fargo Securities, LLC and Wells Fargo Bank, N.A. ("Wells Fargo"). The motions are: (1) Motion for an Order Authorizing the Debtor's Use of Cash Collateral (the "Cash Collateral Motion") (D.I. 5), (2) Motion of Wells Fargo Securities, LLC and Wells Fargo Bank, N.A. for Relief from the Automatic Stay (the "Lift Stay Motion") (D.I. 36), and Emergency Motion of the Debtor for Post-Petition Secured Financing (the "DIP Motion") (D.I. 107), (collectively, the "Motions", and, as appropriate, the "Debtor's Motions" and the "Wells Fargo Motion"). The parties' requirement for an immediate decision on the Motions will necessitate a summary ruling.

## BACKGROUND

Briefly, the Debtor is a Delaware limited liability limited partnership with eight limited partners that are each investment funds organized under German law. It invests in, manages and arranges for the servicing of life insurance policies. It acquires previously issued life insurance policies from policyholders who want to sell their life insurance policies. The industry which deals with such ownership and acquisitions is know as the "Life Settlement Industry." Debtor makes its money from policy maturities (i.e., the deaths of the insureds). Debtor has been facing serious difficulties because it has been unable to sell policies or bundles of policies at a profit and does not have funds to purchase additional policies.

1

Debtor presently owns 409 policies on 313 lives. Joint Pretrial Stipulation (D.I. 111) ("JPS ____") ¶ 3. The aggregate death benefits at the maturities are approximately $1.36 billion. *Id.* Debtor has no other significant assets. The Debtor must maintain the policies by paying the premiums, which it pays on a monthly basis. The Debtor estimates that all of its policies will lapse by March or April, 2011, unless it has the cash to pay the premiums. Debtor presently has less than $9,000 in cash. JPS ¶ 7.

Wells Fargo is Debtor's secured lender under a Loan and Security Agreement, dated June 30, 2008, for the principal sum of $224 million (the "Wells Fargo Agreement"). For the Motions, the parties have agreed that Wells Fargo has valid liens on all of Debtor's assets, including the life insurance policies. JPS ¶ 20. The parties have stipulated that the outstanding amount due as of the petition date was $230,757,674.48. JPS ¶ 18. Debtor claims to have approximately $7.6 million in unsecured debt, much of which is due to insiders.

Debtor filed its chapter 11 case on December 22, 2010, after Wells Fargo declared the Wells Fargo Agreement had terminated. The Office of the United States Trustee has not appointed a creditors committee.

The Debtor has reached a critical moment. As of the hearing, premium payments of $9 million were due by February 22, 2011, or Debtor would lose policies with death benefits of approximately $297 million[2]. WFX26. Debtor has virtually no cash with which to make the payment or the premium payments which are coming due soon. Debtor does not presently have any financing, but is seeking such financing through the DIP Motion, whereby Debtor seeks authority to borrow $21,150,000 on an interim basis and a total of $40 million on a final basis from Monarch Alternative Capital LP ("Monarch"). Among other terms of the proposed DIP Loan, Monarch requires its loan to prime Wells Fargo's liens.

## DISCUSSION

As the Court will discuss below, whether Debtor is entitled to the relief it seeks in Debtor's Motions, to use cash collateral and to borrow funds from Monarch on a priming basis, depends on the value of its policies, as the value must exceed the balance of Debtor's obligations to Wells Fargo. Similarly, the Lift Stay Motion requires proof that Debtor does not have enough equity in its assets to protect Wells Fargo's liens, again requiring the Court to determine the value of Debtor's assets. Finally, the DIP Motion requires valuation since Monarch would prime Wells Fargo's first lien position by $40 million. The Debtor and Wells Fargo presented expert testimony on valuation which the Court will evaluate in reaching decision on the merits of the Motions. The legal tenets applicable to the Motions

---

[2] The parties have alleviated the dire emergency by agreeing that Wells Fargo will advance the payment. Other premiums will soon be due, however, so the resolution of the Motions remains urgent.

3

are indisputable.

### A. The Cash Collateral Motion

Debtor's effort to obtain authority to use cash collateral in the face of Wells Fargo's liens is governed by Section 363 of the Code. A debtor may not use cash collateral (defined in Section 363(a) as cash and cash equivalents) without consent or court approval. A debtor bears the burden of proving that the secured lender is adequately protected, meaning that there is sufficient value in the secured assets to protect the secured lender. Section 363(e). *See also United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs. Ltd.,* 484 U.S. 365 (1988).

The facts show that the value of Debtor's assets do not provide Wells Fargo with the required protection against the use of its cash collateral. Even the Court's *rachmunis* (Yiddish: genuine sympathy) must give way to the harsh reality of the evidence. In arriving at its decision the Court places great weight on the analysis by Wells Fargo's expert, Richard Hershman of FTI Consulting. Mr. Hershman conducted a very thorough review of sales and offering price information for 2007 through 2010 and an analysis of the life settlement industry. See WFX 27. Mr. Hershman concluded that the range of value of Debtor's assets is between $123.9 million and $200 million, with a base case value of $156.9 million. The base case carried a discount rate of 28.2%.

Mr. Hershman based his valuation on the conclusion that the "accurate indicator of fair market value in the life settlement market is the average price paid for policies as a

4

percentage of the policies' face value, based on actual market data. . . ." WFX 27 at 9. Mr. Hershman's analyses for his base case, and low value and high value cases, were thorough and supported by detailed market data.

The Debtor established that Mr. Hershman's analysis may be $70 to $80 million low because he did not properly account for brokerage fees and other expenses. While the adjustment would raise the base case value to $232 million, this still does not provide an equity cushion which would protect Wells Fargo. Moreover, the distressed condition of the life settlement industry remains, and particularly the absence of a market for the life policies. Other evidence of the distressed market for Debtor's insurance policies includes an offer in December 2010 to buy Wells Fargo's loan for $160 million which never went forward, an unsuccessful effort by Debtor in August 2010 to sell a portion of the policy holdings, and an effort directed at 27 lenders to refinance Wells Fargo's loan for which the Debtor received no offers. WFX 27 at 11.

Moreover, the Debtor has not met its own projections for maturities, thereby casting doubt over the future prospects for Debtor. Debtor projected 13.5 maturities in 2010, but there were only 5. Debtor's projection of future maturities is similarly unreliable. No, or fewer than, projected maturities means continuing losses. While it is true, of course, that all of the policies will eventually mature, Debtor's business model and economic success depends on maturities as projected.

Debtor's expert, R. Larry Warnock of Value Life Corporation, also performed a valuation of Debtor's portfolio of policies and arrived at a value of $269.2 million as of December 31, 2010, and a projected value of $312 Million as of September 30, 2011. DX 30. Mr. Warnock analyzed Debtor's future premiums, life expectancy of the insureds, administrative expenses, projected monthly cash flows and applied discount rates of 17% for premium finance policies and 15% for others to determine net present value. DX 30 at 10. Mr. Warnock also relied on Debtor's projections of maturities, which the Court finds are not reliable. Mr. Warnock does not account for Debtor's inablility to generate positive cash flow, inability to obtain additional financing, the lack of a market to buy the policies and the overall distressed nature of the life settlement industry. Mr. Warnock's work product was thorough, but was hampered by the parameters Debtor set. The Court finds Mr. Hershman's valuation to be more persuasive, and thus values Debtor's assets at $232 million – allowing the $70 million to $80 million correction in full.

The DIP Motion

The DIP Motion and the proposed DIP suffer from the same infirmity as the Cash Collateral Motion, namely, the Debtor has insufficient asset value to allow priming of Wells Fargo's loan. Debtor cannot meet its burden of proving that there is a sufficient equity cushion to allow such a substantial subordination of Wells Fargo's secured first lien on Debtor's assets. Priming is extraordinary relief requiring a strong showing that the loan to

be subordinated is adequately protected . *In re Swedeland Development Group, Inc*., 16 F.3d 552 (3d Cir. 1994). Bankruptcy judges are required to grant Section 364(d) financing only upon a tangible demonstration of adequate protection. *Id*. at 567. The Court must be cautious in assuring that Wells Fargo has received genuine adequate protection, and the facts simply do not provide the Court with confidence that the DIP financing protects Wells Fargo's security interest. For instance, the proposal to pay $10 million to reduce Wells Fargo's loan does not negate Wells Fargo's undersecured position. The additional $40 million priming the DIP Motion proposes only makes matters worse. Providing Wells Fargo with a replacement lien on assets against which it already has a lien is illusory. Debtor must provide Wells Fargo with additional collateral, and there is none.

## The Lift Stay Motion

Wells Fargo has moved for relief from the automatic stay pursuant to Sections 362(d)(1) and 362(d)(2), arguing that its collateral will become valueless if premiums are not paid on time, and Debtor does not have the cash to pay the premiums. Additionally, under Section 362(d)(2), and as the Court has already discussed, the Debtor has no equity in the collateral and the collateral is not necessary for a successful reorganization because Debtor is not in a position to reorganize. *In the Matter of MCM, Inc.*, 95 B.R. 307, 310 (Bankr. D. Del. 1988). Debtor does not conduct any form of business except to hold its portfolio of policies, it does not have employees, it has few non-insider unsecured creditors, and it is not able to purchase additional policies as an ongoing business. Most importantly, Debtor lacks

7

equity in the policies and Wells Fargo is entitled to relief from the stay in order to maintain the policies. Under the circumstances, and with substantial premium payments coming due, relief from the stay is mandatory. *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d, 154,157 (3d Cir. 1993). The continuing immediacy of the premium payment due dates has been eased by the parties' agreement for emergency funding. The Court will therefore not grant Wells Fargo's request for a waiver of the stay period under Rule 4001(a)(3).

## **CONCLUSION**

The Court's decision may be viewed by some as a harsh result, particularly at an early stage of the case. It is clear from the evidence, however, that a wait, watch and hope approach to the case would place Wells Fargo at increasing risk with little or no benefit to Debtor. It has to mean something to be a fully secured lender. The priming DIP financing would mean a deeper debt without a reasonable likelihood of success and would hurt Wells Fargo without helping Debtor. Accordingly, (1) the Cash Collateral Motion is denied, (2) the DIP Motion is denied and (3) the Lift Stay Motion is granted.

SO ORDERED this 18th day of February, 2011.

*[signature]*

KEVIN GROSS, U.S.B.J.