# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| LTAP US, LLLP,[1] | Case No. 10-14125 (KG) |
| Debtor. | Hearing Date: April 1, 2011 @ 10:00 a.m. (EDT)<br>Objection Deadline: March 30, 2011 @ 4:00 p.m. (EDT) |

## MOTION OF THE DEBTOR PURSUANT TO BANKRUPTCY CODE SECTIONS 105(A), 107(C), 363, 365, AND 1112 AND BANKRUPTCY RULES 9019(A), 2002, 6004, AND 6006 FOR AUTHORIZATION AND APPROVAL OF THE SETTLEMENT AMONG THE DEBTOR, THE BAC PARTIES, AND WELLS FARGO

LTAP US, LLLP ("LTAP" or the "Debtor"), as debtor and debtor in possession herein, by and through its undersigned counsel, hereby submits this Motion of the Debtor Pursuant to Bankruptcy Code Sections 105(a), 107(c), 363, 365, and 1112 and Bankruptcy Rules 9019(a), 2002, 6004, and 6006 for Authorization and Approval of the Settlement Among the Debtor, the BAC Parties (defined below), and Wells Fargo (defined below), including authorizing and approving (a) transfer of Sale Assets to a subsidiary of Wells Fargo free and clear of liens and interests (other than liens in favor of the Administrative Agent for the benefit of the Lender Parties and the claims of the Lender Parties) and (b) assumption and assignment of specified executory contracts and (c) providing for dismissal of the above-captioned chapter 11 case (the "Motion"). In support of this Motion, the Debtor respectfully states as follows:

## I. BACKGROUND

### A.    General Background

1.      On December 22, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy

---

[1]      The Debtor's Tax I.D. No. is xx-xxx4021.  The address for LTAP US, LLLP is Five Concourse Parkway, Suite 3100, Atlanta, Georgia 30328.

Court for the District of Delaware (the "Court"). The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to Bankruptcy Code sections 1107(a) and 1108. No trustee, examiner or committee has been appointed in the Debtor's chapter 11 case.

2.      The Debtor was formed and exists to own and acquire previously issued life insurance policies (individually, a "Policy," or collectively, the "Policies") in the life settlement market. As of the Petition Date, the Debtor held four hundred and ten (410) policies on three hundred and thirteen (313) lives, with the aggregate death benefits of approximately $1.36 billion. The Policies were issued by fifty-three (53) different insurance carriers (collectively, the "Insurance Carriers"). The Company has no other significant operations or assets. The Debtor engaged SLG Services LLC ("SLG") to be the servicer for the Policies (in such capacity, the "Existing Servicer").

**B.      The Company's Debt Structure**

3.      The Debtor is a borrower under that certain Loan and Security Agreement, dated as of June 30, 2008 (as amended, supplemented or otherwise modified from time to time, the "Wells Fargo Agreement"), among the Debtor, as borrower, SLG, as the Existing Servicer, LT Partner, as collateral manager ("Collateral Manager"), Wells Fargo Bank, N.A. ("Wells Fargo Bank") and other lenders identified in the Wells Fargo Agreement (the "Prepetition Lenders"), Wells Fargo Securities, LLC, as administrative agent (the "Agent" and together with Wells Fargo Bank as "Wells Fargo"), Wells Fargo Bank as the securities intermediary and the verification agent ("Securities Intermediary"), Wells Fargo Bank as hedge counterparty (the "Hedge Counterparty") and Berlin Atlantic Capital US, LLC and BAC Asset Management Gmbh, as performance guarantors (the "Performance Guarantors").

4.     The Wells Fargo Agreement provides for a secured variable loan pursuant to which the Debtor issued to the Prepetition Lenders a variable funding note ("VFN") in the principal amount of up to $224,000,000 as set forth in Section 2.1(a) of the Wells Fargo Agreement. As more particularly set forth in the Settlement Agreement (defined below) that is the subject of this Motion[2], the total amount of indebtedness due and owing to Wells Fargo as of the date hereof is approximately $252,295,472 consisting of: (a) $234,278,371 in outstanding principal; (b) $9,876,809 of accrued but unpaid interest; (c) $6,500,000 as a result of a termination of the Hedge Transactions under the Hedging Agreement; and (d) approximately $1,640,292 of professional fees and expenses and other actual out-of-pocket expenses.

5.     Under the Wells Fargo Agreement, the Debtor granted to Wells Fargo a valid, perfected, security interest in and lien on substantially all of the Debtor's assets.

6.     In connection with its prepetition restructuring efforts, the Debtor pursued a transaction with North Channel Bank GmbH & Co. KG ("NCB") to create liquidity for the Debtor by funding the purchase of certain Life Policies (the "NCB Collateral") by four wholly owned subsidiaries (the "ACF Subsidiaries") of the Debtor (the "NCB Transaction").

7.     In connection with the NCB transaction, the Debtor, certain related parties and Wells Fargo entered into the Omnibus Amendment to the Wells Fargo Agreement, dated November 12, 2010 (the "Omnibus Amendment"). Pursuant to the Omnibus Amendment, the Wells Fargo Agreement was modified to include, among other things, that certain Intercreditor and Security Agreement dated November 12, 2010 by and among NCB, Wells Fargo, the Debtor, the ACF Subsidiaries and certain other parties (the "Intercreditor Agreement"). Pursuant to the

---

[2]     Capitalized terms used herein but not defined are intended to have the same meaning as in the Settlement Agreement.

NCB Transaction, NCB asserts a first-priority lien in the Debtor's equity interest in the ACF Subsidiaries.

8.     As more particularly set forth in the Settlement Agreement and as discussed below, the Debtor is seeking authority to transfer and convey the Sale Assets to a subsidiary of Wells Fargo that is controlled by Wells Fargo. The Sale Assets do not include any of the Debtor's equity interests in the ACF Subsidiaries or the other Deferred Collateral. Accordingly, the transactions contemplated by the Settlement Agreement, including conveyance of the Sale Assets, and other relief requested herein are not intended to and do not in fact impair, disturb or otherwise impact upon any of NCB's rights, claims and interests under the Intercreditor Agreement, all of which are acknowledged by the Debtor to remain in full force and effect notwithstanding any of the relief requested herein.

C.     **Significant Filings in the Bankruptcy Case**

9.     On the Petition Date, the Debtor filed its Motion for an Order Authorizing the Use of Cash Collateral [D.I. 5] (the "Cash Collateral Motion"). Through the Cash Collateral Motion, the Debtor sought authority to use the Cash Collateral (as defined in the Cash Collateral Motion) on both an interim and a final basis in accordance with the proscribed budget to pay the Premiums and maintain the value of the Policies. On or about February 3, 2011, Wells Fargo filed its objection to the Cash Collateral Motion [D.I. 94].

10.     On December 28, 2010, the Debtor filed its Motion for Entry of an Order Enforcing Bankruptcy Code Section 108(b) [D.I. 18] (the "108(b) Motion"). Pursuant to the 108(b) Motion, the Debtor sought the entry of an order enforcing Bankruptcy Code section 108(b) and confirming that none of the Grace Policies would lapse prior to February 21, 2011

due to nonpayment. On January 6, 2011, the Court entered the Order Enforcing Bankruptcy Code Section 108(b) [D.I. 65] (the "108(b) Order").

11.     On December 28, 2010, Wells Fargo filed the Motion of Wells Fargo Securities, LLC and Wells Fargo Bank, N.A. for Relief from the Automatic Stay [D.I. 36] (the "Stay Relief Motion"). Through the Stay Relief Motion, Wells Fargo sought relief from the automatic stay to allow it to exercise rights under the Wells Fargo Agreement with respect to the Policies, including any existing Cash Collateral and to foreclose upon its interest in the Policies. On February 3, 2011, the Debtor filed an objection to the Stay Relief Motion [D.I. 96].

12.     On February 8, 2011, the Debtor filed its Emergency Motion for Entry of Emergency and Final Orders Authorizing Post-Petition Financing and Other Related Relief (D.I. 107) (the "DIP Motion"). Through the DIP Motion, the Debtor requested the authority to obtain, among other things, post-petition financing. On February 9, 2011, Wells Fargo filed its objection to the DIP Motion [D.I. 118].

13.     Following a two-day evidentiary hearing held on the Cash Collateral Motion, the Stay Relief Motion and the DIP Motion, on February 18, 2011, the Court issued its Memorandum Order [D.I. 136] (the "Memorandum Order"), granting the Stay Relief Motion and denying both the Cash Collateral Motion and the DIP Motion. Pursuant to Bankruptcy Rule 4001(a)(3), the effectiveness of the Memorandum Order was stayed for 14 days until March 4, 2011 (the "Stay Period").

14.     To facilitate the transfer of servicing from the Existing Servicer to 21st Services, LLC, which was the backup servicer (the "Backup Servicer") under the Wells Loan Agreement, Wells Fargo and the Debtor agreed to the entry of an order providing for such (the "Stipulated Servicing Order"). On February 25, 2011, the Court executed the Stipulated

Servicing Order [D.I. 142] and, among other things, the servicing of the Policies was immediately transferred from the Existing Servicer to the Backup Servicer. Further, after expiration of the Stay Period, the Collateral Manager was terminated by notice dated March 7, 2011.

## II. SETTLEMENT AGREEMENT

15.     After extensive negotiations, the Debtor, Wells Fargo and certain related parties have entered into a settlement (the "Settlement"), subject to this Court's approval, which is embodied in a Settlement and Sale Agreement (the "Settlement Agreement"), a copy of which is attached hereto as Exhibit 1. The following is a summary of the salient terms of the Settlement:[3]

- The Debtor will sell, convey, transfer and assign all of its right, title and interest in and to the Sale Assets to the Acquirer, for the benefit of the Lender Parties, and the Acquirer (for the benefit of the Lender Parties) shall purchase the Sale Assets from the Debtor, free and clear of all "claims" as defined in the Bankruptcy Code (other solely than claims of the Lender Parties under or in connection with the Transaction Documents) and Liens (other solely than the Lien of the Administrative Agent for the benefit of the Lender Parties in and to the Sale Assets), pursuant to Sections 363(b) and (f) and 365 of the Bankruptcy Code.

- Each BAC Party will provide releases and covenants not to sue the Bank Released Parties (as more particularly defined in the Settlement Agreement, the "Initial Releases").

- During the Exercise Period, the Debtor will have an option (as more particularly defined in the Settlement Agreement, the "Debtor Option") to purchase the Sale Assets from the Acquirer upon satisfaction of all of the conditions set forth in Section 5.1 of the Settlement Agreement on or prior to the Option Termination Date. The terms of the Settlement Agreement, inter alia, provide:

---

[3] The description of salient terms of the Settlement Agreement contained in this Motion is provided for ease of reference only and in no way is intended to modify, amend, alter or otherwise change in any way whatsoever the Settlement Agreement. The reader is urged to carefully review the Settlement Agreement for a complete and accurate description of its terms and conditions.

- "Exercise Period" means the period from the Effective Date to and including the Option Termination Date.

- "Required Payment Amount" means, at any time, the sum of the Lender Party Claims, the Lender Party Expenses and the Lender Party Yield, as reduced by Death Benefits in respect of the Policies actually received by the Acquirer prior to such time. Such sum shall be determined by Lender in its sole discretion and such determination will be conclusive absent demonstrable error.

- "Lender Party Claims" means the sum, determined as of any point in time and without duplication, of (i) the aggregate unpaid principal of all protective advances made during the Chapter 11 Case and all Advances, (ii) amounts payable under the Hedging Agreements, including Hedge Breakage Costs, (iii) costs and expenses incurred by the Lender Parties prior to March 15, 2011, including fees and expenses of attorneys, expert witnesses and consultants, required to be reimbursed under the Lender Documents, (iv) interest (including default interest at the Default Rate set forth in the Loan Agreement regardless of whether interest or default interest was permitted to be paid during the Chapter 11 Case) accrued on all of the foregoing and (v) all other amounts required to be paid by the Debtor, any Subject Party or any of the Debtor's Affiliates to the Lender Parties under or in connection with the Lender Documents, as such sum may be reduced by cash collateral in the Accounts on the Effective Date.

- "Lender Party Expenses" means mean all reasonable fees, costs and expenses of any nature in connection with the ownership, maintenance, servicing and administration of the Policies and the other Sale Assets or other Collateral incurred by the Lender Parties or paid out of the Accounts on or after March 15, 2011. Without limitation, such expenses include, as more particularly set forth and described in the Settlement Agreement, premiums, fees, expenses and indemnities paid to servicers, consultants, expert witnesses, valuation agents, life expectancy providers, securities intermediaries, custodians, accountants, attorneys, brokers, advisors, and others, taxes, hedging costs, capital charges, financing costs, and damages in any proceeding.

- "Lender Party Yield" shall mean yield on all Lender Party Claims and Lender Party Expenses, commencing as of the Petition Date and determined at (i) the rate specified in the Loan Agreement prior to the Effective Date and (ii) the rate of

14% per annum thereafter, in each case on the basis of actual days and a 360-day year and compounded quarterly, commencing March 31, 2011.

- At all times, including during the Exercise Period, the Acquirer shall be entitled in all respects to manage, service and otherwise exercise all of the rights of an absolute owner of the Sale Assets, including as to the application of Death Benefits and the resolution of disputes with insurance carriers or other third parties with respect to Sale Assets, solely from the perspective of its own economic self-interest and shall otherwise have complete discretion and control over every matter or condition related to the Sale Assets; provided that, (i) during the Exercise Period, the Lender shall cause the Acquirer to pay Premiums on the Policies to the extent required by Section 5.7, (ii) during the Exercise Period, the Lender shall not permit the Acquirer to sell or otherwise dispose of the Sale Assets, and (iii) the Lender Parties shall otherwise comply with Section 5 of the Settlement Agreement.

- Upon the permitted exercise of the Debtor Option and satisfaction of all the conditions precedent set forth in Section 5.1 of the Settlement Agreement, on the Option Exercise Date, the Lender will cause the Acquirer to sell, assign, and transfer to the Debtor all of the Sale Assets on an "as is, where is" basis, except that the Administrative Agent shall have released its liens and security interests thereon. The Required Payment Amount shall be applied to amounts owed to the Lender Parties under or in connection with the Lender Documents, including Lender Party Claims, Lender Party Expenses and Lender Party Yield, and will be deemed to satisfy in full the obligations of the BAC Parties under the Lender Documents other than obligations that, pursuant to the express terms of the Loan Agreement, the Intercreditor Agreement or any other applicable Lender Document, survive termination of the applicable Lender Documents.

- In connection with the Debtor's attempts to finance its exercise of the Debtor Option, upon reasonable notice during the Exercise Period, the Lender will make available to the Debtor, without cost, monthly reports delivered to the Lender or the Acquirer by 21st Services, including reports they receive from 21st Services as to Premium payments made or required to be made with such detail as may be contained in 21st Services reports as to amounts, timing, payee and related Policy. If the Debtor shall request additional information, and at the Debtor's pre-funded expense, the Lender will instruct 21st Services to

provide such information as can reasonably be provided without disruption of the ordinary course of operations of 21st Services, including updated Life Expectancies, medical information and policy illustrations; provided that (i) if any such information has been included in the Servicing Files transferred to 21st Services or has otherwise been obtained by the Lender or the Acquirer, subject to applicable confidentiality policies, 21st Services will provide such information to the Debtor without cost other than administrative charges that 21st Services ordinarily charges its customers to provide copies of similar materials, and (ii) if (at the Debtor's expense as provided above) the Debtor shall instruct 21st Services to acquire additional Life Expectancies, medical information, policy illustrations or other information, copies of such information also shall be provided to the Lender and the Acquirer at no cost, and shall be included in the Servicing Files.

- Upon reasonable request during the Exercise Period, but no more frequently than monthly, the Lender will report to the Debtor the amount of the Required Payment Amount, which report will show, with respect to the period between the date of the last Lender Report and the end of the most recent calendar month (or such other cut-off date as the Lender shall agree), (i) the aggregate amount of Death Benefits received by the Acquirer with respect to the Sale Assets during such period, (ii) the aggregate Lender Party Expenses, the aggregate Lender Party Yield and the sum of the Lender Party Expenses, Lender Party Yield and Lender Party Claims as of the end of such period, and (iii) the summary of Lender Party Expenses incurred during such period, showing (A) aggregate Premiums that have been paid, (B) aggregate Lender Party Yield, (C) aggregate servicing fees paid to 21st Services and (D) any other expenses in excess of $25,000 if the aggregate amount of Lender Party Expenses exceeds $500,000. Any objection by the Debtor to the sufficiency of information provided in any such notice must be communicated to the Lender in writing prior to the earlier of (i) the third Business Day prior to the Exercise Option Date and (ii) the tenth Business Day after delivery of such notice (after which time the Lender's determination shall be conclusive and any subsequent objection shall have no force or effect). Only the Debtor (and no other Person) shall be entitled to make such an objection.

• The Settlement, including the Sale, the releases and all related matters, must be approved by an order of the bankruptcy court satisfactory to Wells

Fargo, and after notice and opportunity for hearing satisfactory to Wells Fargo, no later than April 1, 2011.

- The Debtor's chapter 11 case must be dismissed by the Dismissal Deadline, which date will not be less than 30 days after the Sale. In connection therewith, the Court must enter an order enjoining the Debtor and the Subject Parties from commencing any subsequent bankruptcy proceedings involving the Debtor under any chapter of the Bankruptcy Code without the prior, express written consent of Wells Fargo for a period of at least twelve (12) months following the date of the dismissal of the Debtor's chapter 11 case.

- Pending consummation of the Sale and subject to the reservation of the Lender Parties' rights with respect to Termination Events and "Defaults" (as such term is defined in the Intercreditor Agreement) existing prior to the date hereof, then, as provided in Section 9.2 of the Settlement Agreement, the Debtor and the BAC Parties will perform all of their ongoing obligations under the Loan Agreement and other Transaction Documents solely with respect to the maintenance and protection of the Sale Assets, the transition of the servicing of the Sale Assets to 21st Services, the existence and ownership of the Debtor, and compliance with law; provided that (i) the Debtor and the BAC Parties will not be obligated to perform an obligation required to be performed by 21st Services after the transfer of servicing to 21st Services, and (ii) the Debtor will not be required to pay any Premiums specified to be paid by Wells Fargo under Section 5.7 of the Settlement Agreement. Provided that the Standstill Conditions are satisfied, the Lender Parties will, prior to the consummation of the Sale and during the Exercise Period, forebear from exercising its rights and remedies under the Transaction Documents with respect to (i) Termination Events and Defaults existing on the date of execution of the Settlement Agreement, and (ii) new Termination Events and Defaults arising solely from the Debtor's inability to pay Premiums on Policies in the Collateral.

- Subject to satisfaction of the Standstill Conditions, (i) prior to the consummation of the Sale, the Lender will make protective advances to fund premiums, and (ii) during the Exercise Period, Lender will cause the Acquirer to pay Premiums on the Policies, in each case in an amount determined by the Sale Assets Servicer to be at least equal to the minimum required to keep in force the Policies included in the Sale Assets.

- Subject to the terms of the Settlement Agreement, each of the parties thereto have agreed to pay all of their own costs, expenses and fees (including legal fees and disbursements) associated or in any way pertaining to the Debtor's chapter 11 case and the Settlement Documents, including the consummation of the transactions contemplated by the Sale and Settlement Agreement; although the parties further have agreed that

the expenses of the Lender Parties (including the expenses of the Debtor and/or SLG reimbursed by the Lender pursuant to Section 4.3 of the Settlement Agreement) are and will be included in the Required Payment Amount. With respect to the period prior to the Dismissal Deadline, the Lender will shall pay the reasonable legal fees and expenses of LRC and of German counsel to the BAC Parties ("German Counsel") relating to or incurred in connection with the negotiation, approval and implementation of the transactions contemplated by the Settlement Documentation in an aggregate amount of up to U.S. $50,000 for LRC and U.S. $15,000 for German Counsel, but not to exceed actual fees and expenses incurred (collectively, the "Fee/Expense Amounts"); provided that the Fee/Expense Amounts shall not include, and the Lender will not pay any fees or expenses incurred to impede such transactions or otherwise initiate or pursue actions in the Bankruptcy Court contrary to the interests of the Lender Parties. The Lender also will pay the applicable Fee/Expense Amount to each of LRC and German Counsel within forty five (45) days after the presentment of an invoice, with appropriate back-up detail, for such amount, provided that such presentment shall occur after the Effective Date and within thirty (30) days after the Dismissal Deadline. The Debtor previously provided to the Lender a detailed schedule showing unpaid third party invoices received by SLG with respect to services rendered to the Debtor by the Backup Servicer and AVS Underwriting, LLC for the period between November 15, 2010 and February 25, 2011. The Lender has agreed to pay directly to the Backup Servicer and AVS Underwriting, LLC a portion of such expenses as set forth in Exhibit F to the Settlement Agreement. The obligation of the Lender to pay such amounts, however, is effective only if the Settlement Agreement has become effective as set out in Section 4.1 thereof on or prior to the Effectiveness Deadline.

## RELIEF REQUESTED AND BASIS THEREFOR

16.     By this Motion, the Debtor seeks approval of the Settlement Agreement and the transactions contemplated therein.

### A.     Approval of Settlement Agreement

17.     Rule 9019(a) of the Federal Rules of Bankruptcy Procedure provides that, after notice and a hearing, a court may approve a proposed settlement of a claim. The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged and "generally favored in bankruptcy." *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006); *see also In re Penn Cent. Transp. Co.*, 596 F.2d 1102 (3d

Cir. 1979) ("[i]n administering reorganization proceedings in an economical and practical manner it will often be wise to arrange the settlement of claims ...") (*quoting In re Protective Comm. for Indep. Stockholders of TMT Ferry, Inc. v. Anderson*, 300 U.S. 414, 424 (1968)).

18. In deciding whether to approve a proposed settlement, the Court is required to exercise its sound discretion in assessing the reasonableness of a proposed settlement. *In re World Health Alternatives*, 344 B.R. at 296; *see also In re Honeywell*, 93 B.R. 291, 294 (Bankr. S.D. Fla. 1988); *In re Jackson Brewing Co.*, 624 F.2d 599 (5th Cir.1980); *In re Teltronics Services, Inc.*, 762 F.2d 185 (2d Cir.1985).

19. The standards for approval of settlements under Bankruptcy Rule 9019 are well settled. In passing on proposed settlements, the standard that courts applied under the former Bankruptcy Act is the same standard as courts should apply under the Bankruptcy Code. *In re Carla Leather, Inc.*, 44 B.R. 457, 466 (Bankr. S.D.N.Y. 1984), *aff'd* 50 B.R. 764 (S.D.N.Y. 1985). As stated by the Supreme Court in *Protective Committee v. Anderson*, *supra*, under the Act, in order to approve a proposed settlement, a court must have found that the settlement was "fair and equitable" based on an educated estimate of the complexity, expense and likely duration of the litigation, the possible difficulties of collecting on any judgment which might be obtained and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. *In re Protective Comm. for Indep. Stockholders of TMT Ferry, Inc. v. Anderson*, 300 U.S. at 424.

20. The Third Circuit Court of Appeals has enumerated four factors that should be considered in determining whether a settlement should be approved. The four enumerated factors are: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and

delay necessarily attending it; and (4) the paramount interest of the creditors." *Meyers v. Martin (In re Martin),* 91 F.3d 389, 393 (3d Cir. 1996); *see also World Health Alternatives,* 344 B.R. at 296.

21.     The decision to approve a settlement "is within the sound discretion of the bankruptcy court." *In re World Health Alternatives,* 344 B.R. at 296; *see also In re Neshaminy Office Bldg. Assocs.,* 62 B.R. 798, 803 (E.D. Pa. 1986).   The bankruptcy court should not, however, substitute its judgment for that of the parties. *See In re Neshaminy Office Bldg. Assocs,* 62 B.R. at 803.

22.     In that regard, the Court is not to decide the numerous questions of law or fact raised by litigation, but rather should canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness. *See In re World Health Alternatives,* 344 B.R. at 296 (stating that "the court does not have to be convinced that the settlement is the best possible compromise.   Rather, the Court must conclude that the settlement is within the reasonable range of litigation possibilities.") (internal citations and quotations omitted); *Meyers v. Martin (In re Martin),* 91 F.3d 389 (3d Cir. 1996).

23.     Additionally, authorizing the Debtor to effectuate the terms of the Settlement is well within the equitable powers of this Court. *See* 11 U.S.C. § 105(a) ("The court may issue any order, process or judgment that is necessary to carry out the provisions of [the Bankruptcy Code]."); *see also Spagnol Enters., Inc. v. Altantic Fin. Fed. Sav. Assoc.,* 33 B.R. 129, 130 (W.D. Pa. 1983) (explaining that "Section 105(a) of the Code empowers the Bankruptcy Court to issue such orders as are necessary to accomplish the purposes of the Bankruptcy Code."); *Chinichian v. Campolongo (In re Chinichian),* 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as

necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper Props. Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that a bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.")

24.     Applying the foregoing standards, the Debtor submits that the Settlement Agreement is in the best interest of the estate and should be approved. The Debtor believes that if the disputes with Wells Fargo are not resolved now, Wells Fargo will immediately commence foreclosure and exercise other remedies in the wake of the Court's Memorandum Order granting it stay relief and any value realized from an eventual foreclosure sale of the Policies would be for the sole and exclusive benefit of Wells Fargo. Further, in the event the Debtor were to engage in any litigation in connection with the exercise of remedies by Wells Fargo, such action would be prohibitively expensive to the Debtor (which has no cash) and subject the Debtor, its estate, and its other stakeholders to substantial uncertainties and risk. Importantly, pursuant to the Settlement, the Debtor maintains the right to obtain the Policies by exercising its option and paying the Required Payment Amount. Absent the Settlement Agreement, Wells Fargo would foreclose on the Policies.

25.     The Debtor has thus, in its business judgment, considered the benefit – and certainty – to the Debtor's estate and creditors that will be received as a result of the Settlement, particularly in light of the costs, uncertainties, delay and risks of further litigation, and has concluded that the Settlement is fair and equitable and in the best interest of the Debtor, its estate, stakeholders and other parties-in-interest. The Settlement provides not only for a prompt, effective resolution of all matters in controversy between it and Wells Fargo but also enables a

potential recovery for the Debtor's stakeholders if it exercises the Debtor Option in accordance with the terms of the Settlement Agreement. In addition, the Settlement, if authorized by the Court, enables an efficient resolution of this case with a definitive outcome.

26.     Accordingly, the Debtor, in the exercise of its business judgment, submits that the Settlement is: (a) fair, reasonable and equitable under the circumstances; (b) falls well within the range of reasonableness with respect to potential litigation outcomes; and (c) advances the paramount interests of the Debtor's estate by adding potential value, as a matter of certainty, while simultaneously providing a critical element of finality to the estate's largest creditor, Wells Fargo. Accordingly, the Settlement satisfies Bankruptcy Rule 9019 and the Debtor requests that the Court approves the Settlement embodied in the Settlement Agreement.

**B.      Sale of Assets to Pursuant to Section 363(b)**

27.     As noted above, the Settlement Agreement calls for the transfer of the Collateral to the Acquirer (which will be a subsidiary of Wells Fargo that is controlled by Wells Fargo), free and clear of all liens, claims and encumbrances with the exception of Wells Fargo's liens pursuant to Bankruptcy Code sections 363(b) and (f).

28.     Courts generally require debtors to establish "sound business judgment" prior to approving the sale of property of the estate, prior to confirmation of a plan, pursuant to Bankruptcy Code section 363(b). *In re Delaware & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Ionosphere Clubs, Inc.*, 184 B.R. 648, 653 (S.D.N.Y. 1995). The "sound business judgment" test requires a debtor to establish: (a) that a sound business reason justifies the sale outside the ordinary course of business, (b) that accurate and reasonable notice has been provided to interested parties, (c) that the debtor has obtained a fair and reasonable price, and (d) good faith.

*In re Phoenix Steel Corp.*, 82 B.R. 334, 335 (Bankr. D. Del. 1987); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2nd Cir. 1983).

29.     The Debtor submits that it has established sound business judgment that justifies the proposed Sale, outside of a plan of reorganization and without the need for any further marketing of the Collateral or additional sale procedures. As set forth above, the Sale contemplated by the Settlement Agreement resolves all of the Debtor's disputes with Wells Fargo, which is by far the largest stakeholder in this bankruptcy proceeding, and avoids litigation over the exercise of remedies by Wells Fargo in the wake of the Court's Memorandum Order that for the Debtor and its other stakeholders would be fraught with substantial risk, delay and expense. Further, the Debtor Option is fair and reasonable consideration under the circumstances for the Settlement Agreement and conveyance of the Sale Assets to the Acquirer.

30.     Further, good, sufficient and ample notice of the Settlement has been provided under the circumstances. As set forth in counsel's certificate of service, notice of the Settlement and the proposed Sale of the Sale Assets, including assignment of the Policies to the Acquirer, has been provided to: (i) the Office of the United States Trustee, (ii) issuers of the Policies, (iii) counsel for Wells Fargo, (iv) all persons who are known to possess or assert a Lien against any of the Sale Assets, (v) the Internal Revenue Service, (vi) all applicable state and local governmental entities with taxing authority, and (vii) all persons who have filed a notice of appearance in this Case.

31.     Lastly, the Settlement Agreement and the transactions contemplated therein were the product of good faith, arms' length negotiations between the Debtor and Wells Fargo. Wells Fargo is not an insider of the Debtor within the meaning of Bankruptcy Code section 101(31) and does not control or act on behalf of any insider of the Debtor. Therefore, the

Sale of the Sale Assets as set forth in the Settlement Agreement and the other transactions contemplated therein has been proposed in good faith. *See In re After Six, Inc.*, 154 B.R. 876, 883 (Bankr. E.D. Pa. 1993); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149 (3d Cir. 1986).

**C.**     **Sale of Assets Free and Clear of Liens Pursuant to Section 363(f)**

32.     Bankruptcy Code section 363(f) authorizes a debtor to sell property of the estate free and clear of any liens, claims or encumbrances if one of the following is met: (1) applicable non-bankruptcy law permits sale of such property free and clear of such interest; (2) such entity consents, (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, (4) such interest is in bona fide dispute or (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. The language of section 363(f) is in the disjunctive, so that a sale free and clear of interests can be approved if any of the aforementioned conditions is met. *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988); *In re Heine*, 141 B.R. 185, 189 (Bankr. D.S.D. 1992).

33.     The Sale of the Sale Assets to the Acquirer is to be free and clear of any liens, claims or encumbrances, with the exception of Wells Fargo's liens. Other than Wells Fargo, the Debtor is unaware of any party asserting any lien, claim or encumbrance in respect of the Collateral. Accordingly, at a minimum, the Sale can be approved pursuant to Bankruptcy Code section 363(f)(2).

**D.**     **Good Faith Under Bankruptcy Code Section 363(m); the Sale is Not In Violation of Bankruptcy Code Section 363(n)**

34.     Bankruptcy Code section 363(m) provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property

> does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m). Bankruptcy Code section 363(n), among other things, provides that a trustee may avoid a sale under such section if the sale price was controlled by an agreement among potential bidders at the sale. As discussed above, the Third Circuit in *In re Abbotts Dairies* noted the kind of misconduct that would destroy a buyer's good faith. 788 F.2d at 147.

35. Here, the Settlement Agreement represents an extensively negotiated, arms'-length transaction, in which Wells Fargo has acted in good faith, without collusion or fraud of any kind. Therefore, the Debtor respectfully requests that the Court find that the Acquirer has purchased the assets in good faith within the meaning of Bankruptcy Code section 363(m), and is entitled to the protections of Bankruptcy Code sections 363(m) and 363(n).

## E.     Assumption and Assignment of the Policies

36. Attached hereto as Exhibit 2 is a list identifying all contracts that the Debtor is a party to that it believes constitute executory contracts subject to assumption or rejection under Bankruptcy Code section 365 (the "Executory Contracts"). In addition, all of Policies are identified in Exhibit D to the Settlement Agreement. Pursuant to the Settlement Agreement, the Debtor is to assume and assign the Policies[4] and any other Executory Contract

---

[4] Because the Debtor has no duty under the Policies other than payment of money, *i.e.*, the premiums, the Debtor does not believe the Policies are executory contracts. *See, e.g., In re Wisconsin Barge Line, Inc.*, 76 B.R. 695 (Bankr. E.D. Mo. 1987) ("insurance contracts … are not executory in nature because Debtors have no duty under them to [insurer], other than the payment of money … [and], therefore, … they need not be either assumed or rejected by Debtors."); *In re Placid Oil Co.*, 72 B.R. 135, 137-40 (Bankr. N.D. Tex. 1987) (citing cases) (denying the insurer's motion to compel the debtor to either assume or reject the agreement after finding that the agreement in question providing for the payment of retrospective premiums was not an executory contract because the debtor therein had no duty of future performance under the contract, other than the payment of money). However, to avoid any argument after closing that the Acquirer has no rights in the Policies because the Debtor failed to properly assign such Policies to it, the Debtor has treated the Policies as executory contracts for purposes of this Motion. The Debtor reserves all rights, however, to challenge any position by any party, including any insurance company, that the Policies are indeed executory contracts.

designated by Wells Fargo as an Assigned Contract under the Settlement Agreement to the Acquirer.

37.     Prior to assigning the Executory Contracts, and assuming the Policies are executory contracts, the Debtor must assume the Executory Contracts pursuant to Bankruptcy Code section 365(a).   In determining whether to approve the assumption or rejection of a contract or lease, Courts employ the "business judgment" standard.   *In re Phila. Newspapers, LLC*, 424 B.R. 178, 182 (Bankr. E.D. Pa. 2010).   Under this standard, assumption or rejection is appropriate if the debtor can demonstrate that it will benefit the estate.   *Id.*

38.     Bankruptcy Code section 365(b) provides that if there is a default in an executory contract or unexpired lease, a debtor may not assume such agreement unless, at the time of assumption, the debtor: (a) cures, or provide adequate assurance that it will cure, such default; (b) compensates, or provide adequate assurance that it will promptly compensate, the other party to the contract or lease for any actual pecuniary loss to such party resulting from the default; and (c) provides adequate assurance of future performance under such contract or lease. *In re DBSI, Inc.*, 405 B.R. 698, 704 (Bankr. D. Del. 2009).

39.     The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).   Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.   *Accord In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future

performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

40. The Debtor has exercised sound business judgment in moving to assume the Executory Contracts, including the Policies, and such assumption will clearly benefit the estate as it is a material, essential part of the consideration that is being provided by the Settlement Agreement. Moreover, the Debtor is not aware of any default under any of the Policies or other Executory Contracts and, therefore, the Debtor does not believe there is no "cure" due with respect to any of the Policies or other Executory Contracts.[5] However, to the extent that there is determined by the Court in its final order approving this Motion (or express, written agreement between the non-debtor party to such Executory Contract and Wells Fargo) that any cure is due and owing, and Wells Fargo designates such Executory Contract as an Assigned Contract to be assumed and assigned to the Acquirer, Wells Fargo shall satisfy such outstanding cure amounts.

41. Following assumption, the Debtor seeks to assign the Policies to the Acquirer pursuant to Bankruptcy Code section 365(f), which allows a debtor to assign an executory contract or unexpired lease if (a) the debtor assumes such contract or lease in accordance with section 365 and (b) adequate assurance of future performance by the assignee is provided, whether or not there is a default in such contract or lease.

42. The Acquirer, which is a subsidiary of Wells Fargo that will be controlled by Wells Fargo, is expected to have the financial health and wherewithal to perform under the

---

[5] Nothing contained herein is intended or should be construed as an admission of the validity of any claim against the Debtor, a waiver of the Debtor's rights to dispute any claim, or an approval or assumption of any agreement, contract or lease under Bankruptcy Code section 365. The Debtor expressly reserves its rights to contest any claims or objections in accordance with applicable non-bankruptcy law.

existing agreements and, with the retention of an appropriate servicing agent (including but not limited to the Backup Servicer, which, as described above, has been servicing the Policies since entry of the Stipulated Servicing Order), will be quite capable of owning and managing the Portfolio, including performing any obligations that may exist with respect to any of the Policies or any of the Servicing Files. Accordingly, the Debtor submits that its request to assume and assign the Policies and Executory Contracts to the Acquirer should be approved.

**F.** **The Sale Will Not Require the Appointment of a Consumer Privacy Ombudsman**

43. The Sale will not necessitate the appointment of a consumer privacy ombudsman in accordance with Bankruptcy Code section 332. Bankruptcy Code section 363(b)(l) provides that:

> if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless … such sale or such lease is consistent with such policy.

11 .S.C. § 363(b)(l).

44. Section 101(41A) defines "personally identifiable information" to include an individual's name, residence address, email address, telephone number, social security number or credit card number, as well as an individual's birth date or other information that, if associated with the information described previously, would permit the identification or contacting of the individual. *See* 11 U.S.C. § 101(41A).

45. Because the information obtained by the Debtor that may be considered "personally identifiable information" was not provided to the Debtor "in connection with [any individual] obtaining a product or service from the debtor for personal, family, or household purposes" as required by 11 U.S.C. § 101(41A), the Debtor does not believe that section

363(b)(1) even applies. Nevertheless, in light of the sensitivity of the information associated with the transfer of the Policies (though much of it already is known to Wells Fargo), the Debtor and Wells Fargo have proceeded, out of an abundance of caution (but without waiving any rights or claims to contend that such section does not apply) as if Bankruptcy Code section 363(b)(1) may apply to the sale and other transactions contemplated by the Settlement.

46. With the understanding that the Existing Privacy Policies are not intended to limit the possible marketing of the Sale Assets after the Effective Date by the Acquirer to potential third-party purchasers, financing sources, or joint venture members pursuant to confidentiality agreements, Wells Fargo, after the Closing Date, has agreed in the Settlement Agreement to undertake to cause the Acquirer to implement and adhere to privacy policies with respect to the Sale Assets substantially similar to the Existing Privacy Policies.

47. Thus, to the extent that the information being transferred includes "personally identifiable information" within the meaning in section 101(41A), Wells Fargo will continue to utilize any such "personally identifiable information" in exactly the same fashion as the Debtor may under its Existing Privacy Policy. Accordingly, pursuant to section 363(b)(1)(B), this Court may authorize the proposed Sale without the appointment of a consumer privacy ombudsman.

## G.    Dismissal of this Case is Warranted Under Bankruptcy Code Section 1112(b)

48. The Settlement Agreement requires entry of an order voluntarily dismissing the Debtor's chapter 11 case upon the request of Wells Fargo not less than thirty (30) days after the Sale (and further enjoining the Debtor from re-filing for bankruptcy for at least another year thereafter). Pursuant to Bankruptcy Code section 1112(b)(1), absent unusual

circumstances, a court shall dismiss a bankruptcy case "for cause."[6]  The Bankruptcy Abuse

Prevention and Consumer Protection Act of 2005 ("BAPCPA") changed the statutory language

with respect to conversion and dismissal from permissive to mandatory.[7]  *See* H.R. Rep. 109-31

(I), 2005 U.S.C.C.A.N. 88, 94 (stating that BAPCPA "mandate[s] that the court convert or

dismiss a chapter 11 case, whichever is in the best interests of creditors and the estate, if the

movant establishes cause, absent unusual circumstances."); *see also In re Gateway Access

Solutions, Inc.*, 374 B.R. 556 (Bankr. M.D. Pa. 2007) (stating that the amendments to section

1112 limit the court's discretion to refuse to dismiss or convert a chapter 11 case upon a finding

of cause); *accord In re TCR of Denver, LLC*, 338 B.R. 494, 498 (Bankr. D. Colo. 2006)

("Congress has purposefully limited the role of this Court in deciding issues of conversion or

dismissal such that this Court has no choice, and no discretion in that it 'shall' dismiss or convert

a case under Chapter 11 if the elements for 'cause' are shown under 11 U.S.C. § 1112(b)(4)")

(emphasis added); *In re 3 Ram, Inc.*, 343 B.R. 113, 119 (Bankr. E.D. Pa. 2006) ("Under new §

1112 when cause is found, the court shall dismiss or convert unless special circumstances exist

---

[6] Section 1112(b)(1) states, in pertinent part:

> on request of a party in interest, and after notice and a hearing, absent unusual
> circumstances specifically identified by the court that establish that the
> requested conversion or dismissal is not in the best interests of creditors and the
> estate, the court **shall** convert a case under this chapter to a case under chapter 7
> or dismiss a case under this chapter, whichever is in the best interests of
> creditors and the estate, if the movant establishes cause.

(Emphasis added).

[7] Prior to BAPCPA, a bankruptcy court had wide discretion to use its equitable powers to dispose of a debtor's case
but was not mandated to dismiss a case if cause were shown. H.R.Rep. No. 595, 95th Cong., 1st Sess. 405 (1977);
S.Rep. No. 989, 95th Cong., 2d Sess. 117 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787; *see also Small Business
Admin. v. Preferred Door Co. (In re Preferred Door Co.)*, 990 F.2d 547, 549 (10th Cir. 1993) (a court has broad
discretion to dismiss a bankruptcy case); *In re Sullivan Cent. Plaza I, Ltd.*, 935 F.2d 723, 728 (5th Cir. 1991)
(determination of whether cause exists under § 1112(b) "rests in the sound discretion" of the bankruptcy court); *In
re Koerner*, 800 F.2d 1358, 1367 & n. 7 (5th Cir. 1986) (bankruptcy court is afforded "wide discretion" under §
1112(b)).

that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate.").

49.     Thus, as amended in 2005, Bankruptcy Code section 1112(b) mandates dismissal if cause is established unless "unusual circumstances" exist to suggest that dismissal would not be in the best interests of the estate and the creditors. *See* 11 U.S.C. § 1112(b)(1). Although "unusual circumstances" are not defined in the Bankruptcy Code, "they are not thought to be conditions that are common in most chapter 11 cases." *Kholyavka*, 2008 WL 3887653 at *6 (citing 7 *Collier on Bankruptcy* § 1112.04[3] at 1112-27 (15th ed. rev. 2005)).

50.     For reasons more fully explained below, this Court should dismiss the Debtor's chapter 11 case because cause exists and dismissal is in the best interests of the Debtor, the Debtor's estate and its creditors.

## H.     Cause Exists to Dismiss the Debtor's Bankruptcy Case

51.     Bankruptcy Code section 1112(b)(4) provides a nonexclusive list of 16 grounds for dismissal. 11 U.S.C. § 1112(b)(4)(A)-(P). *See Gateway Access Solutions*, 374 B.R. at 561 ("Generally, such lists are viewed as illustrative rather than exhaustive, and the Court should 'consider other factors as they arise.'") (quoting *In re Brown*, 951 F.2d 564, 572 (3d Cir. 1991)); *3 Ram, Inc.*, 343 B.R. at 117 ("While the enumerated examples of 'cause' to convert or dismiss a chapter 11 case now listed in § 1112(b)(4) have changed under BAPCPA, the fact that they are illustrative, not exhaustive has not."); accord *In re Frieouf*, 938 F.2d 1099, 1102 (10th Cir. 1991) (stating that Bankruptcy Code section 1112(b)'s list is non-exhaustive).[8]

---

[8] In *In re TCR of Denver*, the court recognized the apparent typographical error in Bankruptcy Code section 1112(b)(4). The sixteen illustrative examples of "cause" set forth in that section are linked by the word "and" after subsection (O). Accordingly, strict construction of the statute would require that a debtor establish all of the items constituting "cause" before a case can be dismissed by the court. The *TCR* court held that Congress could not have intended to require a "perfect storm" of all sixteen circumstances listed before a case be converted or dismissed. *See In re TCR of Denver*, 338 B.R. at 498.

52.     In determining whether 'cause' exists for dismissal, "a court may consider other factors as they arise . . . [using] its equitable powers to reach an appropriate result . . . ." *In re Nardi*, 1991 U.S. Dist. LEXIS 17179, at \*5 (E.D. Pa. 1991) (quoting S. Rep. No. 989, 95th Cong., 2d Sess. 117, reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 5903 and citing *In re Gonic Realty Trust*, 909 F.2d 624, 626 (1st Cir. 1990)).

53.     The Debtor submits that "cause" exists to dismiss the chapter 11 case consistent with the Settlement Agreement (*i.e.*, upon the request of Wells Fargo not less than thirty (30) days after the transfer of the Sale Assets to the Acquirer pursuant to the Sale as more particularly set forth in the Settlement Agreement).

54.     As set forth above, upon consummation of the Sale, the Debtor will have transferred all of the Sale Assets, including the Policies to the Acquirer.  Following such Closing, there will be no significant assets left to administer in the chapter 11 case and dismissal, as contemplated by the Settlement Agreement and requested herein, will be in the best interest of all parties.

55.     Indeed, failure to dismiss may impair Debtor's ability to consummate the transactions contemplated by the Settlement, which Settlement the Debtor submits, as set forth above, is in the best interests of its estate and stakeholders.

56.     Courts have granted debtors relief similar to that requested herein in similar circumstances. *See, e.g., In re QOC I LLC*, Case No. 10-40153-BKC-PGH (Bankr. S.D. Fla. December 7, 2010) [Fla. Docket No. 83] (order upon motion of debtor dismissing chapter 11 case); *see also In re Calpine Corp.*, Case No. 05-60200 (BRL) (Bankr. S.D.N.Y. Sept. 6, 2007) [N.Y. Docket No. 5786] (order upon motion of debtors dismissing chapter 11 case of related debtor entity Towantic Energy L.L.C.).

57. In sum, the Debtor has met its burden of proof that the Debtor's case should be dismissed under § 1112(b).

## I. Dismissal is in the Best Interests of the Creditors and of this Estate

58. Once a court determines that cause exists to dismiss a debtor's chapter 11 case, the court evaluates whether dismissal is in the best interests of the creditors and of the estate. *See, e.g., In re Nugelt, Inc.*, 142 B.R. 661, 669 (Bankr. D. Del. 1992) (explaining that "[a]fter the court has made the threshold determination that cause exists, the court must decide whether conversion or dismissal is in the best interest of creditors and the estate.") (internal quotations omitted); *see also Rollex Corp. v. Associated Materials (In re Superior Siding & Window)*, 14 F.3d 240, 242 (4th Cir. 1994) (stating that "[o]nce 'cause' is established, a court is required to consider this second question of whether to dismiss or convert"). A variety of factors demonstrate that, after the Closing on the Sale, it will be in the best interest of the Debtor's estate and its creditors to dismiss the Debtor's chapter 11 case.

59. Dismissal of the Debtor's chapter 11 bankruptcy case meets the best interests of the creditors test. The test is met where a debtor has nothing to reorganize, and the debtor's assets have already become fully fixed and liquidated. *See Camden Ordnance Mfg. Co. of Ark., Inc. v. U.S. Trustee (In re Camden Ordnance Mfg. Co. of Ark., Inc.)*, 245 B.R. 794, 799 (E.D. Pa. 2000) (reorganization to salvage business which ceased operating was unfeasible); *In re Brogdon Inv. Co.*, 22 B.R. 546, 549 (Bankr. N.D. Ga. 1982) (court dismissed chapter 11 proceeding in part where there was "simply nothing to reorganize" and no reason to continue the reorganization). Upon the Closing of the Sale, the assets of the Debtor's estate will be fixed and effectively liquidated. As explained above, upon the consummation of the Sale, the Debtor will have nothing left with which to pursue reorganization. Thus, it is in the best interests of the Debtor's estate to dismiss the Debtor's chapter 11 proceeding because, upon the consummation

of the Settlement, the Debtor's operations will cease and there will be no funds available to finance a plan.

60.  The best interests of the creditors test is also met where an interested party, other than the debtor, feels that dismissal is a proper disposition of the case. *See Camden Ordnance Arkansas*, 245 B.R. at 798; *In re Mazzocone*, 183 B.R. 402, 414 (Bankr. ED. Pa. 1995) (noting that where debtor and United States Trustee both favored dismissal, such factors weighed more heavily in favor of dismissal of chapter 11 case rather than conversion to chapter 7). Significantly, Wells Fargo, by far the estate's largest non-insider creditor, supports the dismissal of this case – indeed, it is a requirement of the Settlement.

61.  Moreover, in light of the Settlement, the Debtor no longer needs to utilize the bankruptcy process for any of its intended purposes.  Thus, the Debtor's bankruptcy proceeding should be dismissed because the major players in the Debtor's bankruptcy proceeding concur that dismissal is warranted and there is simply no benefit to continuing the case.

62.  Here, through the Sale and other transactions contemplated by the Settlement Agreement, the Debtor will have maximized the value of the Debtor's assets.  The Debtor is confident that the most significant assets have been liquidated, and that there is nothing further to pursue in its chapter 11 proceeding.

63.  The best interest of the estate test focuses upon whether the economic value of the estate is greater inside or outside of bankruptcy. *See In re Clark*, 1995 WL 495951, at *5 (N.D. Ill. 1995); *In re Staff Inv. Co.*, 146 B.R. 256, 261 (Bankr. E.D. Cal. 1993).  The prime criterion for assessing the interests of the estate is the maximization of its value as an economic

enterprise. *See id.* Following the Closing as contemplated by the Settlement Agreement, there will be nothing left to administer because the Debtor will have completed the Sale of substantially all of its assets. In other words, the liquidation of the Debtor's estate is a present reality. The Settlement serves to maximize the value of the Debtor's estate by providing the Debtor with the Debtor Option on the terms set forth in the Settlement Agreement. In contrast, a conversion to chapter 7 would only impose substantial and unnecessary additional administrative costs and delay, while failing to provide any meaningful prospect (let alone guarantee) to the estate and creditors that they would receive any other recovery.

64.    It is black letter law that the bankruptcy court maintains the power to monitor the tenor of reorganization proceedings. *See In re SPM Mfg. Corp.*, 984 F.2d 1305, 1315 (1st Cir. 1993). The Court, by granting the Motion will acknowledge and affirm the parties' cooperative efforts at reaching a solution that benefits all creditors within the confines of the Bankruptcy Code. Allowing dismissal of the Debtor's bankruptcy case now simply furthers the Bankruptcy Code's goal of the efficient administration of the Debtor's estate that maximizes the return to the estate's stakeholders.

65.    In a balance of the equities, the Debtor submits that it has demonstrated that the Debtor's creditors and estate will be better served if the Debtor's case is dismissed. Further, there are no unusual circumstances present that necessitate maintaining the chapter 11 case. In order to maximize the potential return to stakeholders, this Court should dismiss the Debtor's chapter 11 case.

**J.    Dismissal is Also Warranted Under Bankruptcy Code Section 305(a)(1)**

66.    Alternatively, cause exists to dismiss this chapter 11 case pursuant to Bankruptcy Code section 305(a), which provides, in pertinent part:

(a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if -

(1) the interests of creditors and the debtor would be better served by such dismissal or suspension;

11 U.S.C. § 305(a).

67.     In applying section 305(a), courts have considered a wide range of factors, including, but not limited to:

i.      economy and efficiency of administration;

ii.     whether federal proceedings are necessary to reach a just and equitable solution;

iii.    whether there is an alternative means of achieving an equitable distribution of assets; and

iv.     whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves the interests in the case.

*See In re Crown Village Farm, LLC*, 415 B.R. 86, 96 (Bankr. D. Del. 2009) (enumerating 305(a) factors and denying motion only because dismissal or abstention would have a deleterious effect on the administration of the debtor's chapter 11 case "which would languish while core issues were tried elsewhere"); *In re Mazzocone*, 200 B.R. 568, 575 (E.D. Pa. 1996). However, "the exact factors to be considered and the weight to be given to each of them is [*sic*] highly sensitive to the facts of each individual case." *Id.*

68.     Dismissal of this case is warranted under Bankruptcy Code section 305(a)(1) for the same reasons that "cause" exists to dismiss this case pursuant to Bankruptcy Code section 1112(b) – approval of the Settlement and dismissal of the case will effectuate an efficient administration of this estate and represent the least expensive and most equitable alternative for distribution of the Debtor's assets.

69.     The Settlement and dismissal of this case represents the parties' negotiated resolution of this chapter 11 case. Authorizing the terms of the Settlement as set forth in the Settlement Agreement and allowing the dismissal of this chapter 11 case as contemplated therein, furthers the efficient administration of the Debtor's estate and the maximization of value for stakeholders. Once the transactions contemplated by the Settlement are consummated and the Sale of the Sale Assets to the Acquirer has closed, there simply will be no reason for these proceedings to continue further.

70.     In sum, the Debtor submits that it has demonstrated that the Debtor's creditors and estate will be better served if the Debtor's case is dismissed upon the request of Wells Fargo on not less than thirty (30) days after the Closing.

**K.     Relief Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate**

71.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property … is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease … is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."

72.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the stay period, the leading Bankruptcy treatise indicates that the stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 *Collier on Bankruptcy* ¶ 6004.10 at 6004-18 (L. King, 15th rev. ed. 2008). The treatise further provides that if an

objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

73.     As described above, a prompt Closing of the Sale is required under the Settlement Agreement and the Debtor requests that any Order approving the Settlement Agreement, the Sale or the assumption and assignment of the Policies and Servicing Files be effective immediately by providing that the 14-day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

## NOTICE

74.     No examiner or creditors' committee has been appointed in this chapter 11 case. Notice of this Motion has been given to: (i) the Office of the United States Trustee, (ii) issuers of the Life Policies, (iii) counsel for Wells Fargo, (iv) all persons who are known to possess or assert a Lien against any of the Sale Assets, (v) the Internal Revenue Service, (vi) all applicable state and local governmental entities with taxing authority, and (vii) all persons who have filed a notice of appearance in this Case. The Debtor submits that no other or further notice is necessary. No prior request for the relief sought in this Motion has been made to this or any other court.

**WHEREFORE**, based on the foregoing, the Debtor respectfully requests entry of the order in the form appended hereto as <u>Exhibit 3</u>, including authorizing the Sale and assumption and assignment of the Policies and Executory Contracts to the Acquirer in accordance with the applicable provisions of the Settlement Agreement, authorizing the dismissal of this case as contemplated by the Settlement Agreement, and providing such other relief as may be just and necessary under the circumstances.

Dated: March 16, 2011  
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Adam G. Landis (No. 3407)  
Kerri K. Mumford (No. 4186)  
James S. Green, Jr. (No. 4406)  
Kimberly A. Brown (No. 5138)  
919 Market Street, Suite 1800  
Wilmington, DE 19801  
Telephone: (302) 467-4400  
Facsimile: (302) 467-4450  
Email: landis@lrclaw.com  
      mumford@lrclaw.com  
      green@lrclaw.com  
      brown@lrclaw.com  
*Counsel to Debtor and Debtor in Possession*